

# AFTAB PUREVAL
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

ELECTRONICALLY FILED
June 10, 2019 11:26 AM
AFTAB PUREVAL
Clerk of Courts
Hamilton County, Ohio
CONFIRMATION 852707

**AMERITAS LIFE INSURANCE CORP IN ITS OWN CAPACITY**
vs.
**FEDERAL INSURANCE COMPANY**

A 1902831

**FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND**

**PAGES FILED: 160**

EFR200

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., IN ITS OWN CAPACITY AND AS SUCCESSOR-IN-INTEREST TO THE UNION CENTRAL LIFE INSURANCE COMPANY, 1876 Waycross Road Cincinnati, OH, 45240, | ) ) ) ) ) ) ) ) |

CASE NO.

JUDGE

**COMPLAINT**

**(JURY DEMAND ENDORSED HEREON)**

-and-

AMERITAS HOLDING COMPANY,
5900 O Street
Lincoln, NE 68510,

               Plaintiffs,

     v.

FEDERAL INSURANCE COMPANY,
c/o CT Corporation System, Registered Agent
150 West Market Street, Suite 800
Indianapolis, IN 46204,

-and-

TWIN CITY FIRE INSURANCE CO.,
c/o CT Corporation System, Registered Agent
150 West Market Street, Suite 800
Indianapolis, IN 46204,

-and-

ARCH INSURANCE COMPANY,
c/o General Counsel,
Arch Insurance Group, Inc.
One Liberty Plaza, 53rd Floor,
New York, NY 10006,

             Defendants.

Plaintiffs Ameritas Life Insurance Corp., in its own capacity and as successor-in-interest

to The Union Central Life Insurance Company ("Ameritas Life") and Ameritas Holding

Company ("Ameritas Holding" and collectively with Ameritas Life, "Plaintiffs") state as follows for their Complaint against Defendants Federal Insurance Company ("Federal Insurance"), Twin City Fire Insurance Company ("Twin City"), and Arch Insurance Company ("Arch" and collectively with Federal Insurance and Twin City, "Defendants"):

## NATURE OF THE CASE

1.     This is an insurance coverage dispute arising from Defendants' wrongful refusal to cover more than $24 million in insurable loss and defense costs incurred by Plaintiffs in connection with a Ponzi scheme perpetrated by a former general insurance agent and its sub-agents.

2.     Each of Twin City, Federal Insurance, and Arch sold and issued to Plaintiffs certain insurance policies that cover these expenses.

3.     But notwithstanding, each of Twin City, Federal Insurance, and Arch failed to provide any insurance coverage whatsoever for these multi-million dollar expenses (including, where applicable, a defense or reimbursement of defense costs).

4.     Defendants' wrongful denial of coverage ultimately left their mutual insureds, Plaintiffs, 100% financially responsible for these expenses.

5.     By these actions, Twin City, Federal Insurance, and Arch materially breached the terms of their insurance policies with Plaintiffs.

6.     Consequently, Plaintiffs bring this action to enforce their rights under the relevant insurance policies.

2

## PARTIES, JURISDICTION, AND VENUE

7.     At all relevant times until July 2014, The Union Central Life Insurance Company ("Union Central") was an Ohio corporation engaged in the business of selling, among other things, life insurance products with its principal place of business in Cincinnati, Ohio.

8.     Ameritas Life is a Nebraska corporation engaged in the business of selling, among other things, life insurance products.

9.     In July 2014, Union Central was merged into Ameritas Life.   For all relevant purposes, Ameritas Life is the successor-in-interest to Union Central.   Since Union Central merged into Ameritas Life, Ameritas Life has continued operating Union Central's business out of the same Ohio offices.

10.     Ameritas Holding is a Nebraska corporation.   Ameritas Holding is the holding company parent of Ameritas Life.

11.     Twin City is an insurance company providing, among other things, directors & officers liability insurance and errors & omissions liability insurance.

12.     Federal Insurance is an insurance company providing, among other things, general liability insurance and fidelity bonds.   Federal Insurance is an affiliate or subsidiary of Chubb, one of the world's largest providers of various property, casualty, and liability insurance products.

13.     Arch is an insurance company providing, among other things, errors & omissions liability insurance.

14.     This Court has subject matter jurisdiction over this case under R.C. 2305.01.

15.     Venue is proper in this Court under Civ.R. 3(B).

3

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

## FACTUAL ALLEGATIONS

**The underlying lawsuits and settlements leading to this insurance coverage dispute.**

16.     From about February 2000 to October 2011, Union Central contracted with an entity known as Horizon Financial and Insurance Agency, Inc. ("Horizon Financial") whereby Horizon Financial served as Union Central's general agent in Utah. Horizon Financial was owned and controlled by an individual named Dee Allen Randall ("Randall").

17.     Pursuant to a written general agent contract, Horizon Financial, through its owner Randall and various sub-agents, was responsible for representing Union Central in the sale of its insurance and annuity products in Utah.

18.     Horizon Financial, through Randall and various sub-agents, represented Union Central in that capacity from 2000 to late 2011, selling Union Central's insurance and annuity products to Utah customers.

19.     In December 2010, Randall filed for Chapter 11 personal bankruptcy in Utah bankruptcy court.

20.     In October 2011, the court-appointed trustee for Randall's bankruptcy estate (the "Randall Trustee") caused Horizon Financial and certain other entities owned or controlled by Randall to file bankruptcy petitions in Utah bankruptcy court.

21.     In November 2011, Union Central terminated Horizon Financial's general agent contract.

22.     In September 2012, the Randall Trustee filed an adversary proceeding in the Utah bankruptcy court against Union Central and Ameritas Life (the "First Adversary Proceeding"). In the First Adversary Proceeding, the Randall Trustee alleged that certain monies purportedly transferred to Union Central and/or Ameritas Life to purchase life insurance policies for Randall

4

4830-6817-1927, v.4

and his family members should be clawed back to Randall's or Horizon Financial's bankruptcy estates under various fraudulent transfer and unjust enrichment theories.

23. In January 2013, the Randall Trustee filed another adversary proceeding in the Utah bankruptcy court against Union Central, Ameritas Life, and two of their affiliates (the "Second Adversary Proceeding" and collectively with the First Adversary Proceeding, the "Adversary Proceedings"). In the Second Adversary Proceeding, the Randall Trustee sought the recovery of monies paid to or withheld from Randall or his entities under the terms of certain alleged post-bankruptcy petition agreements on the grounds that such alleged post-petition agreements violated the automatic bankruptcy stay.

24. Around June 18, 2014, Randall was charged by the Utah Attorney General's Office with several counts of Utah state law felony securities fraud arising from Randall's and his sub-agents' perpetration of a Ponzi scheme.

25. On August 5, 2014, the Randall Trustee, acting in his capacity as trustee for victims of Randall's and his sub-agents' Ponzi scheme, filed in Utah federal court a complaint against Union Central, Ameritas Life, and two others Ameritas Holding subsidiaries, Ameritas Life Insurance Corp. of New York and Acacia Life Insurance Company (the "Randall Investors' Lawsuit" and collectively with the Adversary Proceedings, the "Underlying Lawsuits").

26. The Randall Trustee alleged that Randall and his sub-agents perpetrated a multi-step Ponzi scheme against their clients. First, Randall and his sub-agents convinced clients to purchase high-interest promissory notes issued by affiliated entities set up by Randall. These promissory notes were supposedly collateralized by auto titles or specific real estate projects. Then, Randall and his sub-agents convinced their clients to use the interest payments on the promissory notes to purchase Union Central life insurance products, thus resulting in

5

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

commissions being paid to Horizon Financial, Randall, and his sub-agents. As alleged in the Randall Investors' Lawsuit, in classic Ponzi scheme fashion, the interest payments on existing promissory notes could only be paid with cash inflows from purchasers of new notes. Eventually, however, the cash ran out and investors stopped receiving interest payments on the notes. When that happened, the Randall Trustee alleged, many of Randall's and his sub-agents' customers also were left unable to continue paying premiums on the Union Central insurance products that Randall and his sub-agents sold to them, thus causing the cancellation of these policies.

27.     The Randall Trustee alleged in the Randall Investors' Lawsuit that Union Central and its co-defendants were liable to Randall's victims based on various legal theories, including negligent hiring, negligent supervision, negligent retention, control person liability under Utah state securities law, and unjust enrichment.

28.     The Randall Trustee sought in the Randall Investors' Lawsuit, among other things, damages from Union Central of at least $29.6 million, disgorgement of profits and insurance premiums, and treble damages under Utah state securities law.

29.     Union Central, Ameritas Life, and their co-defendants filed a Rule 12(b)(6) motion to dismiss the Complaint in the Randall Investors' Lawsuit.

30.     The court granted the motion in part, (a) dismissing the unjust enrichment claim without prejudice; (b) entirely dismissing from the case Union Central's co-defendants, Ameritas Life, Ameritas Life Insurance Corp. of New York, and Acacia Life Insurance Company, with leave to "amend to assert more specific claims against them"; and (c) dismissing all state law securities fraud claims accruing before October 30, 2008 under the applicable statute of repose.

31. After the court's decision on the motion to dismiss, the Randall Trustee did not seek to amend the complaint.

32. Thus, after the motion to dismiss ruling, Union Central was left as the sole defendant in the Randall Investors' Lawsuit, facing claims of negligent hiring, negligent supervision, negligent retention, and control person liability under Utah state securities law for claims accruing after October 30, 2008.

33. The Underlying Lawsuits were litigated until 2018, when each was settled.

34. In April 2018, the parties to the Adversary Proceedings agreed to settle both cases for a combined $3,450,000 (the "Adversary Proceeding Settlement"). The Adversary Proceeding Settlement was approved by the bankruptcy court in early May 2018.

35. In late October 2018, Union Central and Ameritas Life agreed to settle the Randall Investors' Lawsuit for $11,250,000 (the "Randall Investors' Settlement" and collectively with the Adversary Proceeding Settlement, the "Underlying Settlements"). The Randall Investors' Settlement was approved by the bankruptcy court in late November 2018.

36. Unfortunately, as further detailed below, during the four-plus years that these claims were pending and being litigated at great expense to Plaintiffs, Plaintiffs were forced to defend these claims and negotiate these settlements without any insurance coverage or assistance from Defendants — the three insurers from whom Plaintiffs reasonably expected coverage. Indeed, each Defendant wrongfully and completely denied all coverage for the Underlying Lawsuits, including defense, reimbursement of defense costs, and indemnity. This despite the fact that Plaintiffs faithfully and timely paid all premiums in return for the promised insurance protections upon which Defendants have reneged.

7

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

**The Federal Insurance Fidelity Bond policy**

37.     Chubb, Federal Insurance's parent company, purports to be the "#1 writer of fidelity bonds in Canada and North America, based on premium."

38.     As Chubb's website notes, "even if you have the best working environment, fraud and embezzlement are on the rise."

39.     Chubb's website then touts that its fidelity bond product "is designed to protect your organization from the potentially devastating impact of employee and non-employee perpetrated crimes."

40.     As a Chubb marketing brochure for these fidelity bond products rhetorically asks, "When one of your customers suffers a Financial Institution Bond loss, aren't you relieved to know they have coverage from a leader in fidelity bond insurance?"

41.     In December 2013, Ameritas Holding, on behalf of itself, Union Central, Ameritas Life, and other subsidiaries, purchased from Federal Insurance Fidelity Bond No. 81952300, spanning bond period 1/1/2014 to 1/1/2015 (the "Fidelity Bond"). A true and accurate copy of the Fidelity Bond is attached as **Exhibit A**.

42.     The Fidelity Bond contains a $500,000 deductible and $10 million single loss limit of liability for each of its seven discrete insuring clauses, plus a $20 million aggregate limit of liability.

43.     In relevant part, Insuring Clauses 1(C), 2, 4, and 7 in the Fidelity Bond provide as follows:

> 1.     General Agent
>
>> C.  Loss resulting directly from dishonest acts of any **General Agent**, committed alone on in collusion with others except with a director or trustee of the

8

ASSURED who is not an **Employee**, provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **General Agent**, which result in improper personal financial gain to such **General Agent** and in which acts were committed with the intent to cause the ASSURED to sustain such loss.

2. Loss of **Property** resulting directly from:

   a. robbery, burglary, misplacement, mysterious unexplainable disappearance, damage or destruction, or

   b. false pretenses, or common law or statutory larceny, committed by a natural person while on the premises of the ASSURED,

   while the **Property** is lodged or deposited at premises located anywhere, including with any authority of a political subdivision in the United States or Canada.

4. Loss resulting directly from **Forgery** on, or fraudulent material alteration of any:

   a. request for change of beneficiary in any insurance policy issued by the ASSURED,

   b. insurance policy loan agreement made with the ASSURED,

   c. assignment to the ASSURED of any of its insurance policies, or

   d. Negotiable Instrument:

      (1) issued by, made or drawn by, or drawn on the ASSURED, or

      (2) made or drawn by one acting as agent of the ASSURED, or purporting to have been so made or drawn.

9

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

7. Loss resulting directly from fraudulent:

   a. entries of data into, or

   b. changes of data elements or programs within, a **Computer System**, provided the fraudulent entry or change causes:

      (1) funds or other property to be transferred, paid or delivered,

      (2) an account of the ASSURED or of its customer to be added, deleted, debited or credited, or

      (3) an unauthorized account or a fictitious account to be debited or credited.

44. Each of these insuring clauses thus covers "loss" falling within the terms of the specified insuring clauses.

45. The Fidelity Bond does not define "loss."

46. Plaintiffs' "loss" as that term is used in the Fidelity Bond consists of the approximately $14.7 million in settlement payments paid to resolve the Underlying Lawsuits.

**The Twin City Errors & Omissions Policy**

47. In late 2012, Ameritas Holding, on behalf of itself, Union Central, Ameritas Life, and other subsidiaries, purchased from Twin City a Directors & Officers Liability and Errors & Omissions Liability Policy, Policy No. 00 IC 0141426-12, spanning policy period 10/1/2012 to 10/1/2013 (the "Twin City Policy"). A true and accurate copy of the Twin City Policy is attached as **Exhibit B**.

10

48.     As relevant to the claims asserted here, the Twin City Policy contains a $10 million retention and $15 million per-claim and aggregate limit of liability, inclusive of Claims Expenses as defined in the Twin City Policy.

49.     Insuring Clause C of the Twin City Policy provides as follows:

> C.     Errors and Omissions Liability Policy
>
> The Insurer will pay on behalf of the Insureds Loss which the Insureds shall become legally obligated to pay as a result of a Claim first made against the Insureds during the Policy Period or the Discovery Period, if applicable, for a Wrongful Act in the performance of Professional Services which takes place during or prior to the Policy Period.
>
> Provided, however, as a condition precedent to any such coverage under Insuring Agreements A., B., and C., the Insureds shall report such Claim to the Insurer as soon as practicable but in no event later than sixty (60) days after the termination of the Policy Period or Discovery Period, if applicable.

50.     Furthermore, Section IV of the Twin City Policy obligates Twin City to reimburse Plaintiffs for Claims Expenses incurred in defending any covered Claims. "Claims Expenses" includes, among other things, "reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense or appeal of a Claim."

51.     Plaintiffs are therefore entitled to reimbursement of the costs of settling the Underlying Lawsuits, plus their Claims Expenses as that term is defined in the Twin City Policy, which exceed $24 million (subject to any applicable limits and retention).

**The Arch Errors & Omissions Policy**

52.     In 2013, Ameritas Life, on behalf of itself and all of its subsidiaries, purchased from Arch a Company-Sponsored Life Insurance Agents Errors and Omissions Policy, Policy No. CAP 0050281 01, spanning policy period 7/1/2013 to 7/1/2014 (the "Arch Policy" and

11

collectively with the Fidelity Bond and Twin City Policy, the "Policies"). A true and accurate copy of the Arch Policy is attached as **Exhibit C**.

53. As relevant to the claims asserted here, the Arch Policy contains a $1 million per claim/$2 million aggregate each Agent or $2 million per claim/$3 million aggregate each Agent limit of liability (depending on enrollment), subject to a $1,000 deductible for the insured's sponsored insurance products and a $2,500 deductible for all other covered insurance products. The Arch Policy also contains a separate $1 million supplemental limit for defense costs, which are in addition to the foregoing limits of liability.

54. Insuring Clause C of the Arch Policy provides as follows:

C. Vicarious Liability

The Insurer shall pay on behalf of the **Sponsoring Company** all **Loss** which the **Sponsoring Company** shall become legally obligated to pay because of a **Claim** first made during the **Policy Period** or an **Extended Reporting Period,** if applicable, solely arising out of a **Wrongful Act** of an **Agent** committed on or after the **Retroactive Date** solely in the rendering or failing to render **Professional Services.** The **Wrongful Act** must be attributable solely to an **Agent** in the rendering or failing to render **Professional Services** and not due to any actual or alleged independent wrongdoing or bad faith of the **Sponsoring Company.** If a **Claim** made against the **Sponsoring Company** includes both covered and uncovered allegations, the **Sponsoring Company** and the **Insurer** agree to use their best efforts to agree upon a fair and proper allocation of the payment of **Loss** and **Defense Costs** for such **Claim.**

55. Furthermore, Section II of the Arch Policy gives Arch the right and duty to defend any Claim against the Insured seeking sums payable under the Arch Policy, even if the allegations of the Claim are groundless or false.

12

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

56.     Plaintiffs are therefore entitled under the Arch Policy to reimbursement of the costs of settling the Underlying Lawsuits, plus their defense costs, which exceed $24 million (subject to any applicable limits and retention).

**Federal Insurance, Twin City, and Arch each wrongfully refuse to cover the Underlying Lawsuits and/or Underlying Settlements.**

57.     Plaintiffs submitted the Underlying Lawsuits to Federal Insurance, Twin City, and Arch for coverage in accordance with the Policies.

58.     From the outset, however, Federal Insurance, Twin City, and Arch consistently, repeatedly, and wrongfully refused to provide any defense, reimbursement, or indemnity for the Underlying Lawsuits or the Underlying Settlements.

59.     Federal Insurance, Twin City, and Arch's denials of coverage were based on misinterpretations and misapplications of the relevant insuring clauses, policy definitions, and inapplicable policy exclusions.

60.     Given Defendants' wrongful denials of coverage under their respective Policies, Plaintiffs were forced to bear the costs of defending and ultimately settling the Underlying Lawsuits.  In the end, Plaintiffs' out-of-pocket losses in defending and settling the Underlying Lawsuits exceeded $24 million.

### COUNT I
### Declaratory Judgment
### (against Federal Insurance)

61.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 60 of this Complaint as if fully rewritten here.

62.     There exists a real and justiciable controversy over Plaintiffs' and Federal Insurance's legal rights, status, and relationships.

13

63. Declaratory relief from this Court will terminate this controversy and is necessary to preserve the parties' rights.

64. This Court has jurisdiction to declare the rights, status, and other legal relations of the parties.

65. As detailed above, Plaintiffs are entitled to indemnity for the Underlying Settlements pursuant to Insuring Clauses 1(C), 2, 4, and/or 7 of the Fidelity Bond.

66. Accordingly, Plaintiffs are entitled to an order declaring that Federal Insurance is obligated to reimburse Plaintiffs for the Underlying Settlements.

**COUNT II**
**Breach of Contract**
**(against Federal Insurance)**

67. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 66 of this Complaint as if fully rewritten here.

68. The Fidelity Bond is an enforceable contract.

69. Federal Insurance agreed to pay loss covered under Insuring Clauses 1(C), 2, 4, and/or 7 of the Fidelity Bond.

70. The Underlying Settlements are covered loss within Insuring Clauses 1(C), 2, 4, and/or 7 of the Fidelity Bond.

71. By completely denying coverage and reimbursement for the Underlying Settlements, Federal Insurance materially breached the Fidelity Bond.

72. Plaintiffs were damaged by Federal Insurance's breach in an amount exceeding $25,000.

14

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

## COUNT III
### Declaratory Judgment
### (against Twin City)

73.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 72 of this Complaint as if fully rewritten here.

74.     There exists a real and justiciable controversy over Plaintiffs' and Twin City's legal rights, status, and relationships.

75.     Declaratory relief from this Court will terminate this controversy and is necessary to preserve the parties' rights.

76.     This Court has jurisdiction to declare the rights, status, and other legal relations of the parties.

77.     As detailed above, Plaintiffs are entitled to reimbursement of their defense costs incurred in connection with the Underlying Lawsuits and entitled to indemnity for the Underlying Settlements under Insuring Clause C and Section IV of the Twin City Policy.

78.·     Accordingly, Plaintiffs are entitled to an order declaring that Twin City is obligated to (a) reimburse Plaintiffs' defense costs; and (b) indemnify Plaintiffs for the amounts paid in connection with the Underlying Settlements.

## COUNT IV
### Breach of Contract
### (against Twin City)

79.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 78 of this Complaint as if fully rewritten here.

80.     The Twin City Policy is an enforceable contract.

15

81.     Twin City agreed to pay and/or reimburse Plaintiffs for all Loss covered under Insuring Clause C and Section IV of the Twin City Policy, including Claims Expenses and settlements.

82.     Plaintiffs' Claims Expenses and settlement payments in connection with the Underlying Lawsuits and Underlying Settlements are covered Loss under Insuring Clause C of the Twin City Policy.

83.     By completely denying coverage and reimbursement of Claims Expenses and the Underlying Settlements, Twin City materially breached the Twin City Policy.

84.     Plaintiffs were damaged by Twin City's breach in an amount exceeding $25,000.

## COUNT V
### Declaratory Judgment
(against Arch)

85.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 84 of this Complaint as if fully rewritten here.

86.     There exists a real and justiciable controversy over Plaintiffs' and Arch's legal rights, status, and relationships.

87.     Declaratory relief from this Court will terminate this controversy and is necessary to preserve the parties' rights.

88.     This Court has jurisdiction to declare the rights, status, and other legal relations of the parties.

89.     As detailed above, Plaintiffs were entitled to a defense and indemnity from Arch for the Underlying Lawsuits and Underlying Settlements pursuant to Insuring Clause C and Section II of the Arch Policy.

16

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

90.     Accordingly, Plaintiffs are entitled to an order declaring that Arch is obligated to (a) reimburse Plaintiffs' defense costs; and (b) indemnify Plaintiffs for the amounts paid in connection with the Underlying Settlements.

## COUNT VI
### Breach of Contract
### (against Arch)

91.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 90 of this Complaint as if fully rewritten here.

92.     The Arch Policy is an enforceable contract.

93.     Under Insuring Clause C and Section II of the Arch Policy, Arch agreed to indemnify Plaintiffs for all Loss covered under Insuring Clause C and to defend Plaintiffs against all covered Claims.

94.     The Underlying Lawsuits were covered Claims under the Arch Policy and the Underlying Settlements constitute covered Loss under the Arch Policy.

95.     By completely denying Plaintiffs a defense or indemnity for the Underlying Lawsuits or Underlying Settlements, Arch materially breached the Arch Policy.

96.     Plaintiffs were damaged by Arch's breach in an amount exceeding $25,000.

## PLAINTIFFS' PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays this Court for the following relief:

   a) On Count I, an order declaring that Federal Insurance is obligated to reimburse Plaintiffs for the Underlying Settlements pursuant to Insuring Clauses 1(C), 2, 4, and/or 7 of the Fidelity Bond;

17

4830-6817-1927, v.4

b) On Count III, an order declaring that Twin City is obligated to (a) reimburse Plaintiffs' defense costs; and (b) indemnify Plaintiffs for the amounts paid in connection with the Underlying Settlements;

c) On Count V, an order declaring that Arch is obligated to (a) reimburse Plaintiffs' defense costs; and (b) indemnify Plaintiffs for the amounts paid in connection with the Underlying Settlements;

d) On Counts II, IV, and VI, monetary damages in an amount to be proven at trial but which in any event exceed $25,000;

e) The reasonable costs and attorneys' fees that Plaintiffs incur here;

f) Prejudgment and postjudgment interest at the maximum rates permitted by law; and

g) Such other or further relief that this Court deems just and proper.

4830-6817-1927, v.4

Respectfully submitted,

/s/ *Matthew A. Chiricosta*
K. JAMES SULLIVAN (0074211)
  TRIAL ATTORNEY
MATTHEW A. CHIRICOSTA (0089044)
  OF COUNSEL
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114-1607
(216) 622-8200 (Phone)
(216) 241-0816 (Fax)
KJSullivan@Calfee.com
MChiricosta@Calfee.com

JENNIFER W. COLVIN (0078296)
  OF COUNSEL
CALFEE, HALTER & GRISWOLD LLP
2800 First Financial Center
255 East Fifth Street
Cincinnati, OH 45202-4728
(513) 693-4880 (Phone)
(513) 842-7028 (Fax)
JColvin@Calfee.com

*Attorneys for Plaintiffs Ameritas Life Insurance Corp., in its own capacity and as successor-in-interest to The Union Central Life Insurance Company* and *Ameritas Holding Company*

4830-6817-1927, v.4

## JURY DEMAND

Under Civ.R. 38, Plaintiffs demands a trial by jury of all issues triable of right by jury.

/s/ Matthew A. Chiricosta
MATTHEW A. CHIRICOSTA (0089044)

*Attorney for Plaintiffs Ameritas Life Insurance Corp., in its own capacity and as successor-in-interest to The Union Central Life Insurance Company and Ameritas Holding Company*

4830-6817-1927, v.4

**Exhibit A**

**PREMIUM BILL**


Insured:    AMERITAS HOLDING COMPANY                    Date: December 19, 2013


Producer:   UNICO GROUP, INC.

Company:    FEDERAL INSURANCE COMPANY

THIS BILLING IS TO BE ATTACHED TO AND FORM PART OF THE BOND REFERENCED BELOW.

NOTE:  PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES.  BILL
       WILL BE RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

PLEASE REMIT TO PRODUCER INDICATED ABOVE.  PLEASE REFER TO:

| EFFECTIVE DATE | BOND NUMBER | COVERAGE | | PREMIUM |
|---|---|---|---|---|
| January 1, 2014 | 81952300 | Financial Institution Bond Form C-L | | $ 102,500 |
| To | | | | |
| January 1, 2015 | | | | |
| | | This premium is to be claimed on the January 2014 Agency Account Current with payment received to Chubb on or before March 15, 2014 | | |
| 0.0%  Commission | | | | |
| | | | TOTAL | $ 102,500 |

**Chubb Group of Insurance Companies**

15 Mountain View Road, Warren, New Jersey 07059

**DECLARATIONS**
**FINANCIAL INSTITUTION**
**BOND FORM C-LIFE**

NAME OF ASSURED (including its **Subsidiaries**):

AMERITAS HOLDING COMPANY

5900 O STREET
LINCOLN, NE 68510

Bond Number: 81952300

**FEDERAL INSURANCE COMPANY**
Incorporated under the laws of Indiana
a stock insurance company herein called the COMPANY

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

*CERTIFIED COPY*

**ITEM 1.** BOND PERIOD: from 12:01 a.m. on January 1, 2014
to 12:01 a.m. on January 1, 2015

**ITEM 2.** (A) AGGREGATE LIMIT OF LIABILITY: $20,000,000

(B) AGGREGATE LIMIT OF LIABILITY only as respects
INSURING CLAUSE 1.C., 1.D., 1.E. AND 1.F.: $20,000,000

The amount set forth in ITEM 2(B) shall be part of and not in addition to the AGGREGATE LIMIT OF
LIABILITY as stated in ITEM 2(A) above.

**ITEM 3.** SINGLE LOSS LIMITS OF LIABILITY - DEDUCTIBLE AMOUNTS:

The amounts set forth below shall be part of and not in addition to the AGGREGATE LIMIT OF LIABILITY. If
"Not Covered" is inserted opposite any specified INSURING CLAUSE, such INSURING CLAUSE and any
other reference to such INSURING CLAUSE in this Bond shall be deemed to be deleted.

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| 1. Dishonesty | | |
| A. Employee | $ 10,000,000 | $ 500,000 |
| B. Trade or Loan | $ 10,000,000 | $ 500,000 |
| C. General Agent | $ 10,000,000 | $ 500,000 |
| D. Soliciting Agent | $ 10,000,000 | $ 500,000 |
| E. Third Party Administrator | $ 10,000,000 | $ 500,000 |
| F. Servicing Contractor | $ 10,000,000 | $ 500,000 |
| 2. On Premises | $ 10,000,000 | $ 500,000 |
| 3. In Transit | $ 10,000,000 | $ 500,000 |
| 4. Forgery or Alteration | $ 10,000,000 | $ 500,000 |
| 5. Extended Forgery | $ 10,000,000 | $ 500,000 |
| 6. Counterfeit Money | $ 10,000,000 | $ 500,000 |
| 7. Computer System | $ 10,000,000 | $ 500,000 |

**ITEM 4.** THE LIABILITY OF THE COMPANY IS ALSO SUBJECT TO THE TERMS OF THE FOLLOWING
ENDORSEMENTS EXECUTED SIMULTANEOUSLY HEREWITH:
1-15

**IN WITNESS WHEREOF, THE COMPANY** has caused this Bond to be signed by its authorized officers, but it shall not
be valid unless also signed by an authorized representative of the Company

_Maureen A. Brundage_
Secretary

_Paul J. Krump_
President

Countersigned by _____ December 19, 2013 _____

_____
Authorized Representative

The COMPANY, in consideration of payment of the required premium, and in reliance on the APPLICATION and all other statements made and information furnished to the COMPANY by the ASSURED, and subject to the DECLARATIONS made a part of this Bond and to all other terms and conditions of this Bond, agrees to pay the ASSURED for:

## *Insuring Clauses*

*Dishonesty*  1.  A.  Employee

Loss resulting directly from dishonest acts, other than stated in 1.B. below, of any **Employee**, committed alone or in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, which result in improper personal financial gain to either such **Employee** or other natural person acting in collusion with such **Employee**, or which acts were committed with the intent to cause the ASSURED to sustain such loss.

B.  Trade or Loan

Loss resulting directly from dishonest acts of any **Employee**, committed alone or in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, which arises totally or partially from:

(1)  any **Trade**, or

(2)  any **Loan**,

provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **Employee** which result in improper personal financial gain to such **Employee** and which acts were committed with the intent to cause the ASSURED to sustain such loss.

Notwithstanding the foregoing, when a loss is covered under this INSURING CLAUSE and the **Employee** was acting in collusion with others and intended to receive improper personal financial gain, but said **Employee** failed to derive such improper personal financial gain, such loss will nevertheless be covered under this INSURING CLAUSE as if the **Employee** had obtained such improper personal financial gain provided that the ASSURED establishes that the **Employee** intended to receive such improper personal financial gain.

C.  General Agent

Loss resulting directly from dishonest acts of any **General Agent**, committed alone on in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **General Agent**, which result in improper personal financial gain to such **General Agent** and which acts were committed with the intent to cause the ASSURED to sustain such loss.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

*Dishonesty*
*(continued)*

D.   Soliciting Agent

Loss resulting directly from dishonest acts of any **Soliciting Agent**, committed alone on in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **Soliciting Agent**, which result in improper personal financial gain to such **Soliciting Agent** and which acts were committed with the intent to cause the ASSURED to sustain such loss.

E.   Third Party Administrator

Loss resulting directly from dishonest acts of any **Third Party Administrator**, committed alone or in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **Third Party Administrator**, which result in improper personal financial gain to such **Third Party Administrator** and which acts were committed with the intent to cause the ASSURED to sustain such loss.

F.   Servicing Contractor

Loss resulting directly from dishonest acts of any **Servicing Contractor** committed alone or in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **Servicing Contractor**, which result in improper personal financial gain to such **Servicing Contractor** and which acts were committed with the intent to cause the ASSURED to sustain such loss.

Notwithstanding the foregoing, when a loss is covered under INSURING CLAUSE 1.C., 1.D., 1.E., or 1.F., and the **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** was acting in collusion with others and intended to receive improper personal financial gain, but said **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** failed to derive such improper personal financial gain, such loss will nevertheless be covered under this INSURING CLAUSE as if the **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** had obtained such improper personal financial gain provided that the ASSURED establishes that the **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** intended to receive such improper personal financial gain.

For the purposes of INSURING CLAUSE 1.C., 1.D., 1.E., and 1.F., the term **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** shall be deemed to include the partners, officers and employees of such **General Agent, Soliciting Agent, Third Party Administrator** or Servicing Contractor. Each **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** and its partners, officers, and employees shall collectively be deemed to be one person for the purposes of Section 1, Definitions, u., Single Loss.

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

## Insuring Clauses

**Dishonesty**
*(continued)*

.

For the purpose of this INSURING CLAUSE, improper personal financial gain shall not include salary, salary increases, commissions, fees, bonuses, promotions, awards, profit sharing, incentive plans, pensions or other emoluments received by an **Employee**, **General Agent**, **Soliciting Agent**, **Third Party Administrator** or **Servicing Contractor**.

*On Premises*

2. Loss of **Property** resulting directly from:

   a. robbery, burglary, misplacement, mysterious unexplainable disappearance, damage or destruction, or

   b. false pretenses, or common law or statutory larceny, committed by a natural person while on the premises of the ASSURED,

   while the **Property** is lodged or deposited at premises located anywhere, including with any authority of a political subdivision in the United States or Canada.

*In Transit*

3. Loss of **Property** resulting directly from common law or statutory larceny, misplacement, mysterious unexplainable disappearance, damage or destruction, while the **Property** is in transit anywhere:

   a. in an armored motor vehicle, including loading and unloading thereof,

   b. in the custody of a natural person acting as a messenger of the ASSURED, or

   c. in the custody of a **Transportation Company** and being transported in a conveyance other than an armored motor vehicle provided, however, that covered **Property** transported in such manner is limited to the following:

      (1) written records,

      (2) **Certificated Securities** issued in registered form, which are not endorsed or are restrictively endorsed, or

      (3) **Negotiable Instruments** not payable to bearer, which are not endorsed or are restrictively endorsed.

   Coverage under this INSURING CLAUSE begins immediately on the receipt of such **Property** by the natural person or **Transportation Company** and ends immediately on delivery to the premises of the addressee or to any representative of the addressee located anywhere.

*Forgery Or Alteration*

4. Loss resulting directly from **Forgery** on, or fraudulent material alteration of any:

   a. request for change of beneficiary in any insurance policy issued by the ASSURED,

   b. insurance policy loan agreement made with the ASSURED,

   c. assignment to the ASSURED of any of its insurance policies, or

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

## *Insuring Clauses*

*Forgery Or Alteration*
*(continued)*

d.   Negotiable Instrument:

(1)   issued by, made or drawn by, or drawn on the ASSURED, or

(2)   made or drawn by one acting as agent of the ASSURED,

or purporting to have been so made or drawn.

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

*Extended Forgery*

5.   Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:

a.   acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original

(1)   **Certificated Security,**

(2)   deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,

(3)   **Evidence of Debt,**

(4)   corporate, partnership or personal **Guarantee,**

(5)   **Security Agreement,**

(6)   **Letter of Credit,** or

(7)   **Instruction** which

i.   bears a Forgery, or

ii.   is fraudulently materially altered, or

iii.   is lost or stolen, or

b.   guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, **Guarantee,** or endorsement upon or in connection with any item listed in a.(1) through a.(7) above, or

c.   acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any item listed in a.(1) or a.(2) above which is a **Counterfeit Original.**

Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in a.(1) through a.(7) above by the ASSURED or a Federal or State chartered deposit institution of the ASSURED is a condition precedent to the ASSURED having relied on such items. Release or return of such collateral is an acknowledgment by the ASSURED that it no longer relies on such collateral.

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

## Insuring Clauses
*(continued)*

| | | |
|---|---|---|
| *Counterfeit Money* | 6. | Loss resulting directly from the receipt by the ASSURED in good faith of any counterfeit **Money**. |

*Computer System*  7.  Loss resulting directly from fraudulent:

  a.  entries of data into, or

  b.  changes of data elements or programs within,

  a **Computer System**, provided the fraudulent entry or change causes:

  (1)  funds or other property to be transferred, paid or delivered,

  (2)  an account of the ASSURED or of its customer to be added, deleted, debited or credited, or

  (3)  an unauthorized account or a fictitious account to be debited or credited.

## General Agreements

*Joint Assured*  A.  Only the first named ASSURED shall be deemed to be the sole agent of the others for all purposes under this Bond, including but not limited to the giving or receiving of any notice or proof required to be given and for the purpose of effecting or accepting any amendments to or termination of this Bond. Each and every other ASSURED shall be conclusively deemed to have consented and agreed that none of them shall have any direct beneficiary interest in or any right of action under this Bond and neither this Bond nor any right of action shall be assignable.

Knowledge possessed or discovery made by any ASSURED shall constitute knowledge possessed or discovery made by all of the ASSUREDS for the purposes of this Bond.

All losses and other payments, if any, payable by the COMPANY shall be payable to the first named ASSURED without regard to such ASSURED'S obligations to others, and the COMPANY shall not be responsible for the application by the first named ASSURED of any payment made by the COMPANY. If the COMPANY agrees to and makes payment to any ASSURED other than the one first named, such payment shall be treated as though made to the first named ASSURED. The COMPANY shall not be liable for loss sustained by one ASSURED to the advantage of any other ASSURED.

*Representations Made By Assured*  B.  The ASSURED represents that all information it has furnished in the APPLICATION for this Bond or otherwise is complete, true and correct. Such APPLICATION and other information constitute part of this Bond.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

## *General Agreements*

*Representations Made
By Assured
(continued)*

The ASSURED must promptly notify the COMPANY of any change in any fact or circumstance which materially affects the risk assumed by the COMPANY under this Bond.

Any intentional misrepresentation, omission, concealment or incorrect statement of a material fact, in the APPLICATION or otherwise, shall be grounds for recision of this Bond.

*Additional Offices Or
Employees – Consolidation,
Merger Or Purchase Or
Acquisition Of Assets Or
Liabilities - Notice To
Company*

C.  If the ASSURED, while this Bond is in force, merges or consolidates with, or purchases or acquires assets or liabilities of another institution, the ASSURED shall not have the coverage afforded under this Bond for loss which has:

(1)  occurred or will occur on premises,

(2)  been caused or will be caused by any employee, or

(3)  arisen or will arise out of the assets or liabilities,

of such institution, unless the ASSURED:

a.  gives the COMPANY written notice of the proposed consolidation, merger or purchase or acquisition of assets or liabilities prior to the proposed effective date of such action, and

b.  obtains the written consent of the COMPANY to extend some or all of the coverage provided by this Bond to such additional exposure, and

c.  on obtaining such consent, pays to the COMPANY an additional premium.

Notwithstanding anything stated above to the contrary, the COMPANY hereby agrees to provide coverage which shall be effective on the date of acquisition under this Bond for those acquired institutions in which the ASSURED owns greater than fifty percent (50%) of the voting stock or voting rights either directly or through one or more of its subsidiaries for the remainder of the BOND PERIOD, with no additional premium, provided the acquired institutions meets all of the following conditions:

i.  the assets shall not exceed ten percent (10%) of the ASSURED'S assets,

ii.  there shall be neither any paid nor pending Bond claim for the three (3) year period prior to the date of acquisition, and

iii.  the ASSURED is not aware of any disciplinary action or proceeding by State or Federal officials involving the acquired institution as of the date of acquisition.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

## General Agreements

**Additional Offices Or Employees – Consolidation, Merger Or Purchase Or Acquisition Of Assets Or Liabilities – Notice To Company**
*(continued)*

The COMPANY further agrees that as respects any acquisition that involves a State or Federal regulatory assisted acquisition or assumption of assets and/or liabilities, coverage shall be provided under this Bond for the remainder of the BOND PERIOD as long as conditions i. and ii. above are met. As respects As respects such acquisition or assumption of assets and/or liabilities, coverage applies only to a **Single Loss** fully sustained by the ASSURED on or after the date of such acquisition or assumption. All of the circumstances, conditions or acts causing or contributing to a **Single Loss** must occur on or after the date of such acquisition or assumption for coverage to apply regardless of the time such loss is discovered by the ASSURED.

**Change Of Control - Notice To Company**

D. The ASSURED shall notify the COMPANY at the earliest practical moment, not to exceed sixty (60) days, after the ASSURED learns of a change of control.

There shall be no coverage under this Bond for any loss involving a stockholder or affiliated group of stockholders that acquires control if such loss occurs after the date such party acquired control and if notice of such change in control is not received by the COMPANY within the sixty (60) day time period.

As used in this General Agreement, control means the power to determine the management or policy of a controlling holding company or of the ASSURED by virtue of voting stock ownership. A change in control, for the purpose of the required notice, means a change in ownership of voting stock or voting rights which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten (10%) percent or more of such stock or voting rights.

**Notice To Company Of Legal Proceedings Against Assured – Election To Defend**

E. The ASSURED shall notify the COMPANY at the earliest practical moment, not to exceed sixty (60) days after the ASSURED receives notice, of any legal proceeding brought to determine the ASSURED'S liability for any loss, claim or damage which, if established, would constitute a collectible loss under this Bond. Concurrent with such notice, and as requested thereafter, the ASSURED shall furnish copies of all pleadings and pertinent papers to the COMPANY.

The COMPANY may, at it sole option, elect to conduct the defense of all or part of such legal proceeding. The defense by the COMPANY shall be in the name of the ASSURED through attorneys selected by the COMPANY. The ASSURED shall provide all reasonable information and assistance as required by the COMPANY for such defense.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

## General Agreements

*Notice To Company Of Legal Proceedings Against Assured - Election To Defend (continued)*

If the COMPANY elects to defend all or part of any legal proceeding, the court costs and attorneys' fees incurred by the COMPANY and any settlement or judgment on that part defended by the COMPANY shall be a loss under the applicable INSURING CLAUSE of this Bond. In addition, if the amount demanded in the legal proceeding is greater than the amount recoverable under this Bond, or if a DEDUCTIBLE AMOUNT is applicable, or both, the COMPANY'S liability for court costs and attorney's fees incurred in defending all or part of such legal proceeding is limited to the proportion of such court costs and attorneys' fees incurred that the amount recoverable under this Bond bears to the total of the amount demanded in such legal proceeding.

If the COMPANY declines to defend the ASSURED, no settlement without the prior written consent of the COMPANY or judgment against the ASSURED shall determine the existence, extent or amount of coverage under this Bond, and the COMPANY shall not be liable for any costs, fees and expenses incurred by the ASSURED.

## Conditions And Limitations

*Definitions*

1.   As used in this Bond:

a.   **Acceptance** means a draft which the drawee has, by signature written on it, engaged to honor as presented.

b.   **Certificate of Deposit** means an acknowledgment in writing by a financial institution of receipt of **Money** with an engagement to repay it.

c.   **Certificated Security** means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, which is:

(1)   represented by an instrument issued in bearer or registered form, and

(2)   of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment, and

(3)   either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

d.   **Computer System** means a computer and all input, output, processing, storage, off-line media libraries, and communication facilities which are connected to the computer and which are under the control and supervision of the operating system(s) or application(s) software used by the ASSURED.

e.   **Counterfeit Original** means an imitation of an actual valid original which is intended to deceive and be taken as the original.

f.   **Employee** means:

(1)   an officer of the ASSURED,

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

*Definitions
(continued)*

(2) a natural person while in the regular service of the ASSURED at any of the ASSURED'S premises and compensated directly by the ASSURED through its payroll system and subject to the United States Internal Revenue Service Form W-2 or equivalent income reporting plans of other countries, and whom the ASSURED has the right to control and direct both as to the result to be accomplished and details and means by which such result is accomplished in the performance of such service,

(3) a guest student pursuing studies or performing duties in any of the ASSURED'S premises,

(4) an attorney retained by the ASSURED and an employee of such attorney while either is performing legal services for the ASSURED, other than those attorneys and their employees retained by the ASSURED to:

    i.   manage or litigate claims on contracts of insurance or suretyship, or

    ii.   search or close titles on real estate or perform escrow services or other related services on real estate,

(5) a natural person provided by an employment contractor to perform employee duties for the ASSURED under the ASSURED'S supervision at any of the ASSURED'S premises,

(6) an employee of an institution merged or consolidated with the ASSURED prior to the effective date of this Bond, or

(7) a director or trustee of the ASSURED, but only while performing acts within the scope of the customary and usual duties of any officer or other employee of the ASSURED or while acting as a member of any committee duly elected or appointed to examine or audit or have custody of or access to **Property** of the ASSURED.

Each employer of persons as set forth in f.(4) and f.(5) preceding and the partners, officers and other employees of such employers shall collectively be deemed to be one person for the purpose of Section 1.u. below, and in the event of payment under this Bond, the COMPANY shall be subrogated to the ASSURED'S rights of recovery, as stated in Section 11., against any such employer.

**Employee** does not mean any agent, broker, factor, commission merchant, independent contractor not specified in f.(4) or f.(5) preceding, intermediary, finder or other representative of the same general character who is not on the ASSURED'S payroll system or who is not subject to the ASSURED'S reporting to the United States Internal Revenue Service on a Form W-2 or equivalent income reporting plans of other countries.

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

*Definitions
(continued)*

g. **Evidence of Debt** means an instrument, including a **Negotiable Instrument**, executed by a customer of the ASSURED and held by the ASSURED, which in the regular course of business is treated as evidencing the customer's debt to the ASSURED.

h. **Forgery** means the signing of the name of another natural person with the intent to deceive but does not mean a signature which consists in whole or in part of one's own name, with or without authority, in any capacity for any purpose.

i. **General Agent** means any natural person, partnership, or corporation duly authorized by the ASSURED to solicit insurance only for the account of the ASSURED. **General Agent** does not mean **Soliciting Agent, Servicing Contractor, or Third Party Administrator**.

j. **Guarantee** means a written undertaking obligating the signer to pay the debt of another to the ASSURED or its assignee or to a financial institution from which the ASSURED has purchased participation in the debt, if the debt is not paid in accordance with its terms.

k. **Initial Transaction Statement** means the first written statement signed by or on behalf of the issuer of an **Uncertificated Security** sent to the registered owner or registered pledgee containing:

   (1) a description of the issue of which the **Uncertificated Security** is a part, and

   (2) the number of shares or units transferred to the registered owner, pledged by the registered owner to the registered pledgee, or released from pledge by the registered pledgee, and

   (3) the name, address and taxpayer identification number, if any, of the registered owner and registered pledgee, and

   (4) the date the transfer or release was registered.

l. **Instruction** means a written order to the issuer of an **Uncertificated Security** requesting that the transfer, pledge or release from pledge of the specified **Uncertificated Security** be registered.

m. **Letter of Credit** means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment in compliance with the conditions specified in the engagement.

n. **Loan** means all extensions of credit by the ASSURED and all transactions creating a creditor or lessor relationship in favor of the ASSURED, including all purchase and repurchase agreements, and all transactions by which the ASSURED assumes an existing creditor or lessor relationship.

o. **Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as part of its currency.

p. **Negotiable Instrument** means any writing:

   (1) signed by the maker or drawer, and

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**Conditions And Limitations**

*Definitions (continued)*

(2) containing an unconditional promise or order to pay a sum certain in **Money** and no other promise, order, obligation or power given by the maker or drawer, and

(3) is payable on demand or at a definite time, and

(4) is payable to order or bearer.

q. **Property** means **Money; Certificated Security; Initial Transaction Statement; Negotiable Instrument; Certificate of Deposit; Acceptance; Evidence of Debt; Security Agreement; Letter of Credit**; insurance policy issued to the ASSURED; abstract of title, deed and mortgage on real estate; revenue and other stamps; and books of account and other records recorded in writing, but not data processing records or media.

r. **Securities** means either **Certificated Securities** or **Uncertificated Securities**.

s. **Security Agreement** means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

t. **Servicing Contractor** means any natural person, partnership or corporation duly authorized by the ASSURED to perform any of the following services:

(1) collect and record payments on real estate mortgage or home improvement loans made, held or assigned by the ASSURED,

(2) establish tax or insurance escrow accounts on real estate mortgage or home improvement loans made, held or assigned by the ASSURED,

(3) manage real property owned by or under the supervision or control of the ASSURED, or

(4) perform other acts related to (1), (2) or (3) above,

but only while such person, partnership or corporation is actually performing such services on behalf of the ASSURED. **Servicing Contractor** does not mean **General Agent, Soliciting Agent,** or **Third Party Administrator**.

u. **Single Loss** means all covered loss, including court costs and attorneys' fees incurred by the COMPANY under General Agreement E., resulting from:

(1) any one act of burglary, robbery or attempt at either, in which no **Employee** is implicated, or

(2) any one act or series of related acts on the part of any natural person resulting in damage, destruction, or misplacement of **Property**, or

(3) all acts other than those specified in u.(1) and u.(2), caused by any natural person or in which such person is implicated, or

(4) any one event not specified in u.(1), u.(2) or u.(3).

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

*Definitions*
*(continued)*

v. **Soliciting Agent** means any natural person, partnership or corporation engaged or authorized by the ASSURED or by any **General Agent** of the ASSURED to solicit insurance for the account of the ASSURED or of such **General Agent**, and shall be deemed to include any insurance broker under contract with the ASSURED or with such **General Agent**. **Soliciting Agent** does not mean **General Agent, Third Party Administrator**, or **Servicing Contractor**.

w. **Subsidiary** means any organization that, at the inception date of this Bond, is named in the Application or is created during the BOND PERIOD and of which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled by the ASSURED either directly or through one or more of its subsidiaries.

x. **Third Party Administrator** means any natural person, partnership, or corporation duly authorized by contractual agreement with the ASSURED to perform any or all of the following services, but only while performing acts within the scope of those services and specifically authorized by contract with the ASSURED:

(1) payment of claims arising under the terms of the policies being serviced,

(2) accounting or other record keeping services for such policies, or other administrative services, or

(3) collection of policy premiums.

**Third Party Administrator** does not mean **General Agent, Soliciting Agent** or **Servicing Contractor**.

y. **Trade** means any purchase, exchange or sale transaction, with or without the knowledge of the ASSURED, whether or not represented by an indebtedness or balance shown to be due the ASSURED on any customer account, actual or fictitious.

z. **Transportation Company** means any organization which provides its own or leased vehicles for transportation or which provides freight forwarding or air express services.

aa. **Uncertificated Security** means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is:

(1) not represented by an instrument and the transfer of which is registered on books maintained for that purpose by or on behalf of the issuer, and

(2) of a type commonly dealt in on securities exchanges or markets, and

(3) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

## Conditions And Limitations

**Definitions**
*(continued)*

bb. **Warehousing** means the carrying of mortgages in inventory by the use of interim financing, consisting of funds provided by the ASSURED, pending sale and delivery to a subsequent purchaser.

For the purposes of these definitions, the singular includes the plural and the plural includes the singular, unless otherwise indicated.

**General Exclusions - Applicable To All Insuring Clauses**

2.  **This bond does not directly or indirectly cover:**

a.  loss not reported to the COMPANY in writing within sixty (60) days after termination of this Bond as an entirety;

b.  loss due to riot or civil commotion outside the United States of America and Canada, or any loss due to military, naval or usurped power, war or insurrection. This Section 2.b., however, shall not apply to loss which occurs in transit in the circumstances recited in INSURING CLAUSE 3., provided that when such transit was initiated there was no knowledge on the part of any person acting for the ASSURED of such riot, civil commotion, military, naval or usurped power, war or insurrection;

c.  loss resulting from the effects of nuclear fission or fusion or radioactivity;

d.  loss of potential income including, but not limited to, interest and dividends not realized by the ASSURED or by any customer of the ASSURED;

e.  damages of any type for which the ASSURED is legally liable, except compensatory damages, but not multiples thereof, arising from a loss covered under this Bond;

f.  any costs, fees and expenses incurred by the ASSURED:

    (1)  in establishing the existence of or amount of loss covered under this Bond, or

    (2)  as a party to any legal proceeding, even if such legal proceeding results in a loss covered by this Bond;

g.  loss resulting from indirect or consequential loss of any nature;

h.  loss resulting from dishonest acts of any member of the Board of Directors or Board of Trustees of the ASSURED who is not an **Employee**, acting alone or in collusion with others;

i.  loss, or that part of any loss, resulting solely from any violation by the ASSURED or by any **Employee** or by any **General Agent, Soliciting Agent, Third Party Administrator,** or **Servicing Contractor:**

    (1)  of any law regulating:

        i.  the issuance, purchase or sale of securities,

        ii.  securities transactions on security or commodity exchanges or the over the counter market,

        iii.  investment companies,

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

    iv.    investment advisors,

    v.    insurance companies, or

    (2)    of any rule or regulation made pursuant to any such law;

j.    loss of confidential information, material or data;

k.    loss resulting from any actual or alleged:

    (1)    representation or advice, or

    (2)    warranty or guarantee as to the performance of any contract or investment;

l.    loss due to liability resulting from disclosure of or acting on material nonpublic information;

m.    loss, including extra-contractual liability sustained by the ASSURED from the issuance by or on behalf of the ASSURED of any contracts or purported contracts of insurance, indemnity or suretyship, except:

    (1)    for the ASSURED'S loss of premiums thereon, or

    (2)    which results directly from the dishonest acts of any **Employee, General Agent, Soliciting Agent, Third Party Administrator**, or **Servicing Contractor** in adjusting or paying fictitious or fraudulent claims asserted under valid contracts of insurance, indemnity or suretyship,

    when such loss is covered under INSURING CLAUSE 1;

n.    loss from an inspection, title search, survey or report by or for the ASSURED, whether improperly or dishonestly made, or not made at all;

o.    loss caused by any agent, broker, factor, commission merchant, independent contractor, intermediary, finder or other representative of the same general character, of the ASSURED provided, however, this SECTION 2.o. shall not apply to any **General Agent, Soliciting Agent, Third Party Administrator**, or **Servicing Contractor**;

p.    loss caused by any employee, agent, broker, factor commission merchant, independent contractor, intermediary, finder or other representative of the same general character, of any third party, while conducting business with the ASSURED on behalf of such third party; or

q.    loss resulting from the insolvency, bankruptcy or taking over by a trustee, receiver, liquidator, or by State or Federal officials of any depository institution, unless such depository institution is a **Third Party Administrator** or **Servicing Contractor** covered under this Bond and such insolvency, bankruptcy or taking over results from dishonest acts of officers or employees of such depository institution.

r.    loss through the failure to collect or receive funds for the account of the ASSURED; or

s.    loss resulting from **Warehousing**.

*Specific Exclusions - Applicable To All Insuring Clauses Except Insuring Clause 1.*

3. **This bond does not directly or indirectly cover:**

   a. loss caused by an **Employee**, **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** provided, however, this Section 3.a. shall not apply to loss covered under INSURING CLAUSE 2. Or 3. which results directly from misplacement, mysterious unexplainable disappearance, or damage or destruction of **Property**;

   b. loss through the surrender of property away from premises of the ASSURED as a result of a threat:

      (1) to do bodily harm to any person, except loss of **Property** in transit in the custody of any natural person acting as messenger of the ASSURED, provided that when such transit was initiated there was no knowledge by the ASSURED of any such threat, or

      (2) to do damage to the premises or **Property** of the ASSURED;

   c. loss resulting from payments made or withdrawals from any account involving erroneous credits to such account;

   d. loss involving any **Uncertificated Security** provided, however, this Section 3.d. shall not apply to INSURING CLAUSE 7;

   e. loss of property while in the mail;

   f. damages resulting from any civil, criminal or other legal proceeding in which the ASSURED is adjudicated to have engaged in racketeering activity. For the purposes of this Section 3.f., "racketeering activity" is defined in 18 United State Code 1961 et seq., as amended;

   g. loss resulting from the failure for any reason of a financial or depository institution, its receiver or other liquidator to pay or deliver funds or **Property** to the ASSURED provided, however, this Section 3.g. shall not apply to **Securities** covered under INSURING CLAUSE 2.a.;

   h. loss of **Property** while in the custody of a **Transportation Company** provided, however, this Section 3.h. shall not apply to INSURING CLAUSE 3.;

   i. loss resulting from entries or changes made by a natural person with authorized access to a **Computer System** who acts in good faith on instructions, unless such instructions are given to that person by a software contractor or its partner, officer, or employee authorized by the ASSURED to design, develop, prepare, supply, service, write or implement programs for the ASSURED'S **Computer System**;

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

*Specific Exclusions -
Applicable To All Insuring
Clauses Except Insuring
Clause 1.*
*(continued)*

j.    loss resulting directly or indirectly from the input of data into a **Computer System** terminal device, either on the premises of a customer of the ASSURED or under the control of such a customer, by a customer or other person who had authorized access to the customer's authentication mechanism;

*Specific Exclusions -
Applicable To All Insuring
Clauses Except Insuring
Clauses 1., 4., And 5.*

4.    **This bond does not directly or indirectly cover:**

a.    loss resulting from the complete or partial non-payment of or default on any **Loan** whether such **Loan** was procured in good faith or through trick, artifice, fraud or false pretenses provided, however, this Section 4.a. shall not apply to INSURING CLAUSE 7;

b.    loss resulting from forgery or any alteration;

c.    loss involving a counterfeit provided, however, this Section 4.c. shall not apply to INSURING CLAUSE 6; or

d.    loss resulting from any **Trade** provided, however, this Section 4.d. shall not apply to INSURING CLAUSE 7.

*Limit Of Liability*

*Aggregate Limit Of
Liability*

5.    The COMPANY'S total cumulative liability for all **Single Loss** of all ASSUREDS discovered during the BOND PERIOD shall not exceed the applicable AGGREGATE LIMIT OF LIABILITY as stated in the DECLARATIONS. Each payment made under the terms of this Bond shall reduce the unpaid portion of the applicable AGGREGATE LIMIT OF LIABILITY until it is exhausted.

On exhausting the applicable AGGREGATE LIMIT OF LIABILITY by such payments:

a.    the COMPANY shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the COMPANY, and

b.    the COMPANY shall have no obligation under General Agreement E. to continue the defense of the ASSURED, and on notice by the COMPANY to the ASSURED that the applicable AGGREGATE LIMIT OF LIABILITY has been exhausted, the ASSURED shall assume all responsibility for its defense at its own cost.

The unpaid portion of the applicable AGGREGATE LIMIT OF LIABILITY shall not be increased or reinstated by any recovery made and applied in accordance with Section 11. In the event that a loss of **Property** is settled by indemnity in lieu of payment, then such loss shall not reduce the unpaid portion of the applicable AGGREGATE LIMIT OF LIABILITY.

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

*Conditions And*
*Limitations*
*(continued)*

*Single Loss Limit Of*
*Liability*

The COMPANY'S liability for each **Single Loss** shall not exceed the applicable SINGLE LOSS LIMIT OF LIABILITY as stated in ITEM 3. of the DECLARATIONS or the unpaid portion of the applicable AGGREGATE LIMIT OF LIABILITY, whichever is less. If a **Single Loss** is covered under more than one INSURING CLAUSE, the maximum payable shall not exceed the largest applicable SINGLE LOSS LIMIT OF LIABILITY.

*Discovery*

6. This Bond applies only to loss first discovered by an officer of the ASSURED during the BOND PERIOD. Discovery occurs at the earlier of an officer of the ASSURED being aware of:

   a. facts which may subsequently result in a loss of a type covered by this Bond, or

   b. an actual or potential claim in which it is alleged that the ASSURED is liable to a third party,

   regardless of when the act or acts causing or contributing to such loss occurred, even though the amount of loss does not exceed the applicable DEDUCTIBLE AMOUNT, or the exact amount or details of loss may not then be known.

*Notice To Company -*
*Proof - Legal Proceedings*
*Against Company*

7. a. The ASSURED shall give the COMPANY notice at the earliest practicable moment, not to exceed sixty (60) days after discovery of loss, in an amount that is in excess of 50% of the applicable DEDUCTIBLE AMOUNT, as stated in ITEM 3. of the DECLARATIONS.

   b. The ASSURED shall furnish to the COMPANY proof of loss, duly sworn to, with full particulars, within six (6) months after such discovery.

   c. **Certificated Securities** listed in a proof of loss shall be identified by certificate or bond numbers, if issued with them.

   d. Legal proceedings for the recovery of any loss under this Bond shall not be brought prior to the expiration of sixty (60) days after the proof of loss is filed with the COMPANY or after the expiration of twenty-four (24) months from the discovery of such loss.

   e. This Bond affords coverage only in favor of the ASSURED. No claim, suit, action or legal proceeding shall be brought under this Bond by anyone other than the ASSURED.

*Deductible Amount*

8. The COMPANY shall be liable under this Bond only for the amount by which any **Single Loss** is greater than the applicable DEDUCTIBLE AMOUNT as stated in ITEM 3. of the DECLARATIONS, and is equal to or less than the applicable SINGLE LOSS LIMIT OF LIABILITY.

| | | |
|---|---|---|
| *Valuation* | 9. | The value of any loss of **Property** consisting of books of account or other records used by the ASSURED in the conduct of its business shall be the amount paid by the ASSURED for blank books, blank pages, or other materials which replace the lost books of account or other records, plus the cost of labor paid by the ASSURED for the actual transcription or copying of data to reproduce such books of account or other records. |
| *Books Of Account Or Other Records* | | |

*Loan*

The value of any loss or that portion of any loss resulting from a **Loan** shall be the amount actually disbursed by the ASSURED to a borrower under such **Loan** reduced by all amounts including, but not limited to, interest and fees received by the ASSURED under all **Loans** to such borrower, whether or not part of any claim under this Bond.

*Money*

Any loss of **Money**, or loss payable in **Money**, shall be paid in the **Money** of the United States of America or the dollar equivalent of it, determined by the free market rate of exchange in effect at the time of discovery of such loss.

*Other Property*

The value of any loss of **Property,** other than as stated above, shall be the actual cash value or the cost of repairing or replacing such **Property** with property of like quality and value, whichever is less.

*Securities*

The value of any loss of **Securities** shall be the average market value of such **Securities** on the business day immediately preceding discovery of such loss provided, however, that the value of any **Securities** replaced by the ASSURED, with the consent of the COMPANY and prior to the settlement of any claim for them, shall be the actual market value at the time of replacement. In the case of a loss of interim certificates, warrants, rights or other **Securities**, the production of which is necessary to the exercise of subscription, conversion, redemption or deposit privileges, the value of them shall be the market value of such privileges immediately preceding their expiration if said loss is not discovered until after their expiration. If no market price is quoted for such **Securities** or for such privileges, the value shall be fixed by agreement of the parties.

*Set-Off*

Any loss covered under INSURING CLAUSE 1. shall be reduced by a set-off consisting of the amount owed to the **Employee** causing the loss, whether or not assigned to another.

Any loss covered under INSURING CLAUSE 1. shall be reduced by a set-off consisting of the amount owed to any **General Agent, Soliciting Agent, Third Party Administrator,** or **Servicing Contractor,** causing the loss, whether or not assigned to another.

*Trade*

The value of any loss or that portion of any loss resulting from a **Trade** shall be reduced by the amount of commissions and other amounts received by the ASSURED as a result of such **Trade.**

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

| | | |
|---|---|---|
| *Securities Settlement* | 10. | In the event of a loss of **Securities** covered under this Bond, the COMPANY may, at its sole discretion, purchase replacement **Securities**, tender the value of the **Securities** in **Money**, or issue its indemnity to effect replacement **Securities**. |

The indemnity required from the ASSURED under the terms of this Section against all loss, cost or expense arising from the replacement of securities by the COMPANY'S indemnity shall be:

a.     for **Securities** having a value less than or equal to the applicable DEDUCTIBLE AMOUNT - one hundred (100%) percent;

b.     for **Securities** having a value in excess of the applicable DEDUCTIBLE AMOUNT but within the SINGLE LOSS LIMIT OF LIABILITY - the percentage that the DEDUCTIBLE AMOUNT bears to the value of the **Securities**;

c.     for **Securities** having a value greater than the applicable SINGLE LOSS LIMIT OF LIABILITY - the percentage that the DEDUCTIBLE AMOUNT and portion in excess of the SINGLE LOSS LIMIT OF LIABILITY bears to the value of the **Securities**.

The value referred to in Section 10.a., b., and c. is the value in accordance with Section 9., Valuation, regardless of the value of such **Securities** at the time the loss under the COMPANY'S indemnity is sustained.

The COMPANY is not required to issue its indemnity for any portion of a loss of **Securities** which is not covered by this Bond, however, the COMPANY may do so as a courtesy to the ASSURED and at its sole discretion.

The ASSURED shall pay the proportion of the COMPANY'S premium charge for the COMPANY'S indemnity as set forth in Section 10.a., b., and c. No portion of the SINGLE LOSS LIMIT OF LIABILITY shall be used as payment of premium for any indemnity purchased by the ASSURED to obtain replacement **Securities**.

| | | |
|---|---|---|
| *Subrogation -* <br> *Assignment - Recovery* | 11. | In the event of a payment under this Bond, the COMPANY shall be subrogated to all of the ASSURED'S rights of recovery against any person or entity to the extent of such payment. On request, the ASSURED shall deliver to the COMPANY an assignment of the ASSURED'S rights, title and interest and causes of action against any person or entity to the extent of such payment. |

Recoveries, whether effected by the COMPANY or by the ASSURED, shall be applied net of the expense of such recovery in the following order:

a.     first, to the satisfaction of the ASSURED'S covered loss which would otherwise have been paid but for the fact that it is in excess of either the SINGLE LOSS LIMIT OF LIABILITY or AGGREGATE LIMIT OF LIABILITY,

b.     second, to the COMPANY in satisfaction of amounts paid in settlement of the ASSURED'S claim,

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

*Subrogation -
Assignment - Recovery
(continued)*

    c.    third, to the ASSURED in satisfaction of the applicable DEDUCTIBLE AMOUNT, and

    d.    fourth, to the ASSURED in satisfaction of any loss suffered by the ASSURED which was not covered under this Bond.

Recovery from reinsurance or indemnity of the COMPANY shall not be deemed a recovery under this Section.

This Bond does not afford coverage in favor of any **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** and in the event of a payment of a loss caused by any **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** under this Bond, the COMPANY shall be subrogated to the ASSURED'S rights of recovery, as described in this SECTION against any **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor**.

*Cooperation Of Assured*

12.    At the COMPANY'S request, and at reasonable times and places designated by the COMPANY, the ASSURED shall:

    a.    submit to examination by the COMPANY and subscribe to the same under oath, and

    b.    produce for the COMPANY'S examination all pertinent records, and

    c.    cooperate with the COMPANY in all matters pertaining to the loss.

The ASSURED shall execute all papers and render assistance to secure to the COMPANY the rights and causes of action provided for under this Bond. The ASSURED shall do nothing after loss to prejudice such rights or causes of action.

*Termination*

13.    This Bond terminates as an entirety on the earliest occurrence of any of the following:

    a.    immediately on the receipt by the COMPANY of a written notice from the ASSURED of its decision to terminate this Bond, or

    b.    immediately on the appointment of a trustee, receiver or liquidator to act on behalf of the ASSURED, or the taking over of the ASSURED by State or Federal officials, or

    c.    immediately on the dissolution of the ASSURED, or

    d.    immediately on the taking over of the ASSURED by another entity, or

    e.    immediately on exhausting the AGGREGATE LIMIT OF LIABILITY, or

    f.    immediately on expiration of the BOND PERIOD.

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

**Conditions And
Limitations**

*Termination
(continued)*

This Bond terminates as to any **Employee**:

(1)   immediately on the ASSURED, or any of its directors, trustees or officers not acting in collusion with such **Employee**, learning of any dishonest act committed by such **Employee** at any time, whether in the employment of the ASSURED or otherwise, whether or not such act is of the type covered under this Bond, and whether against the ASSURED or any other person or entity, or

(2)   fifteen (15) days after the receipt by the ASSURED of a written notice from the COMPANY of its decision to terminate this Bond as to any **Employee**.

Termination as to any **Employee** shall not apply if the dishonest act occurred prior to the employment with the ASSURED and involved less than $10,000.

Such termination, however, is without prejudice to the loss of any **Property** then in transit in the custody of such **Employee**.

This Bond terminates as to any **General Agent, Soliciting Agent, Third Party Administrator or Servicing Contractor**:

(1)   immediately on the ASSURED, or any or its directors, trustees or officers not acting in collusion with such **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor**, learning of any dishonest act committed by such **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** at any time, whether under contract to the ASSURED or otherwise, whether or not such act is of the type covered under this Bond, and whether against the ASSURED or any other person or entity, or

(2)   fifteen (15) days after the receipt by the ASSURED of a written notice from the COMPANY of its decision to terminate this Bond as to any **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor**.

*Other Insurance*

14.   Coverage under this Bond shall apply only as excess over any other valid and collectible insurance, indemnity or suretyship obtained by or on behalf of:

a.   the ASSURED, or

b.   a **Transportation Company**, or

c.   another entity on whose premises the loss occurred or which employed the person causing the loss or engaged the messenger conveying the **Property** involved.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**Conditions And Limitations**
*(continued)*

*Employee Benefit Plans*   15.   All of the ASSURED'S employee benefit plans that qualify under Section 412 of the Employee Retirement Income Security Act of 1974 (ERISA), are provided bonding protection under INSURING CLAUSE 1., DISHONESTY, as required under ERISA.

*Conformity*   16.   If any limitation within this Bond is prohibited by any law controlling this Bond's construction, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

*Change Or Modification*   17.   This Bond or any instrument amending or affecting this Bond may not be changed or modified orally. No change in or modification of this Bond shall be effective except when made by written endorsement to this Bond signed by an authorized representative of the COMPANY.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

## POLICYHOLDER
## DISCLOSURE NOTICE OF
## TERRORISM INSURANCE COVERAGE
**(for policies with no terrorism exclusion or sublimit)**

You are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), effective December 26, 2007, this policy makes available to you insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage.

However, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

10-02-1281 (Ed. 1/2003)

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of your policy's annual premium that is attributable to insurance for such acts of terrorism is: $ **-0-.**

If you have any questions about this notice, please contact your agent or broker.

10-02-1281 (Ed. 1/2003)

# IMPORTANT NOTICE TO POLICYHOLDERS

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers"). Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478. Additional information may be available from your producer.

Thank you for choosing Chubb.

10-02-1295 (ed. 6/2007)

Effective date of
this endorsement/rider: January 1, 2014

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 81952300

Issued to:  AMERITAS HOLDING COMPANY

### COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS

It is agreed that this insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the coverage provided by this insurance.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

NAME OF ASSURED: AMERITAS HOLDING COMPANY

---

### AMENDED EXTENDED FORGERY ENDORSEMENT

It is agreed that this Bond is amended by deleting INSURING CLAUSE 5., Extended Forgery, in its entirety and substituting the following:

5.   Extended Forgery

Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:

a.   acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original

   (1)   **Certificated Security,**

   (2)   deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,

   (3)   **Evidence of Debt,**

   (4)   corporate, partnership or personal **Guarantee,**

   (5)   **Security Agreement,**

   (6)   **Letter of Credit,**

   (7)   **Instruction,**

   which

   i.     bears a **Forgery,** or

   ii.    is fraudulently materially altered, or

   iii.   is lost or stolen, or

b.   guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, **Guarantee,** or endorsement upon or in connection with any item listed in a.(1) through a.(7) above, or

c.   acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any item listed in a.(1) or a.(2) above which is a **Counterfeit Original.**

Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in a.(1) through a.(7) above by the ASSURED or a Federal or State chartered deposit institution of the ASSURED is a condition precedent to the ASSURED having relied on such items. Release or return of such collateral is an acknowledgment by the ASSURED that it no longer relies on such collateral.

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: December 19, 2013

By _____
Authorized Representative

C-L Bond
Form 17-02-5495 (Ed. 7-03)

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**FEDERAL INSURANCE COMPANY**

Endorsement No:    3

Bond Number:    81952300

NAME OF ASSURED:    AMERITAS HOLDING COMPANY

---

## NAME OF ASSURED ENDORSEMENT

It is agreed that the NAME OF ASSURED in the DECLARATIONS is amended to read as follows:

Ameritas Holding Company
Ameritas Life Insurance Corp.
Acacia Life Insurance Company
Union Central Life Insurance Company
Ameritas Life Insurance Corp of NY
Ameritas Investment Partners, Inc.
Ameritas Investment Corp
PRB Administrators and PRBA Inc.
Griffin Realty LLC
UNIFI Mutual Holding Company
Brokers National Life Assurance Company

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013

By _____
Authorized Representative

C-L Bond
Form 17-02-0949 (Rev. 1-97)

Page 1

**FEDERAL INSURANCE COMPANY**

Endorsement No.: 4

Bond Number:     81952300

NAME OF ASSURED: AMERITAS HOLDING COMPANY

---

## NON-CUMULATIVE ENDORSEMENT

It is agreed that in the event of a loss covered under this Bond and also covered under FEDERAL INSURANCE COMPANY'S Bond No. 81900063 & 81458676 issued to AMERUS GROUP CO. & CALVERT DISTRIBUTORS, INC., the SINGLE LOSS LIMIT OF LIABILITY under this Bond shall be reduced by any payment under Bond No. 81900063 & 81458676 and only the remainder, if any, shall be applicable to such loss hereunder.

Name and Address of Assured:

AMERITAS HOLDING COMPANY

5900 O STREET
LINCOLN, NE 68510

_____
Signature of Assured's Representative

_____
Position/Title

_____
Date

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013

By  _____
                      Authorized Representative

C-L Bond
Form 17-02-0955 (Ed. 1-97)

NAME OF ASSURED: AMERITAS HOLDING COMPANY

---

### JOINT LOSS PAYEE AND NOTIFICATION ENDORSEMENT

It is agreed that this Bond is amended by adding at the end of General Agreement A., Joint Assured, the following:

Notwithstanding the foregoing, at the written request of the first named ASSURED, any payment in satisfaction of loss covered by this Bond involving **Money** or other **Property** in which

Wells Fargo Bank National Association and Berkadia Commercial Mortgage

has an interest shall be paid by an instrument issued to the named ASSURED and

Wells Fargo Bank National Association and Berkadia Commercial Mortgage

as joint loss payees subject to the following conditions and limitations:

(1)   The Bond is for the sole use and benefit of the named ASSURED as expressed herein.  The organization named above shall not be considered as an ASSURED under the Bond, nor shall it otherwise have any rights or benefits under said Bond.

(2)   Notwithstanding any payment made at the written request of the first named ASSURED, the amount paid for any **Single Loss** shall not exceed the applicable SINGLE LOSS LIMIT OF LIABILITY or the unused portion of the AGGREGATE LIMIT OF LIABILITY under this Bond, whichever is less.

(3)   If the COMPANY makes any such payment, such payment shall be treated as though made to the first named ASSURED.

Should this Bond be cancelled, non-renewed or restrictively modified by the COMPANY, the COMPANY will endeavor to give advance notice to the organization named above, but failure to provide such notice shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

Should this Bond be cancelled, non-renewed or restrictively modified at the request of the ASSURED, the COMPANY shall endeavor to notify the organization named above within ten (10) business days after receipt of such request, but failure to do so shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013                    By _____
                                                              Authorized Representative

C-L Bond
Form 17-02-1041 (Rev. 3-03)

FEDERAL INSURANCE COMPANY

Endorsement No.: 6

Bond Number: 81952300

NAME OF ASSURED: AMERITAS HOLDING COMPANY

---

### REVISE ITEM 3 ENDORSEMENT

It is agreed that this Bond is amended by deleting ITEM 3. in its entirety on the DECLARATIONS and substituting the following:

"**ITEM 3.** SINGLE LOSS LIMITS OF LIABILITY--DEDUCTIBLE AMOUNTS:

The amounts set forth below shall be part of and not in addition to the AGGREGATE LIMIT OF LIABILITY. If **"Not Covered"** is inserted opposite any specified INSURING CLAUSE, such INSURING CLAUSE and any other reference to such INSURING CLAUSE in this Bond shall be deemed to be deleted.

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| 1. Dishonesty | | |
| A. Employee | $ 10,000,000 | $ 500,000 |
| B. Trade or Loan | $ 10,000,000 | $ 500,000 |
| C. General Agent | $ 10,000,000 | $ 500,000 |
| D. Soliciting Agent | $ 10,000,000 | $ 500,000 |
| E. Third Party Administrator | $ 10,000,000 | $ 500,000 |
| F. Servicing Contractor | $ 10,000,000 | $ 500,000 |
| 2. On Premises | $ 10,000,000 | $ 500,000 |
| 3. In Transit | $ 10,000,000 | $ 500,000 |
| 4. Forgery or Alteration | $ 10,000,000 | $ 500,000 |
| 5. Extended Forgery | $ 10,000,000 | $ 500,000 |
| 6. Counterfeit Money | $ 10,000,000 | $ 500,000 |
| 7. Computer System | $ 10,000,000 | $ 500,000 |
| 8. Extended Computer Systems | $ 10,00,0000 | $ 500,000 |
| 9. Facsimile Signature | $ 10,000,000 | $ 500,000 |

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: December 19, 2013      By _____
                                                   Authorized Representative

NAME OF ASSURED: AMERITAS HOLDING COMPANY

## EXTENDED COMPUTER SYSTEMS ENDORSEMENT

It is agreed that this Bond is amended as follows:

1.   By adding the following Insuring Clause:

"8.   Extended Computer Systems

A.   Electronic Data, Electronic Media, Electronic Instruction

Loss resulting directly from:

(1)   the fraudulent modification of **Electronic Data, Electronic Media** or **Electronic Instruction** being stored within or being run within any system covered under this INSURING CLAUSE,

(2)   robbery, burglary, larceny or theft of **Electronic Data, Electronic Media** or **Electronic Instructions,**

(3)   the acts of a hacker causing damage or destruction of **Electronic Data, Electronic Media** or **Electronic Instruction** owned by the ASSURED or for which the ASSURED is legally liable, while stored within a **Computer System** covered under this INSURING CLAUSE, or

4.   the damage or destruction of **Electronic Data, Electronic Media** or **Electronic Instruction** owned by the ASSURED or for which the ASSURED is legally liable while stored within a **Computer System** covered under INSURING CLAUSE 8., provided such damage or destruction was caused by a computer program or similar instruction which was written or altered to intentionally incorporate a hidden instruction designed to damage or destroy **Electronic Data, Electronic Media,** or **Electronic Instruction** in the **Computer System** in which the computer program or instruction so written or so altered is used.

B. Electronic Communication

Loss resulting directly from the ASSURED having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communications directed to the ASSURED, which were transmitted or appear to have been transmitted through:

(1) an **Electronic Communication System**,

(2) an automated clearing house or custodian, or

(3) a Telex, TWX, or similar means of communication,

directly into the ASSURED'S **Computer System** or **Communication Terminal**, and fraudulently purport to have been sent by a customer, automated clearing house, custodian, or financial institution, but which communications were either not sent by said customer, automated clearing house, custodian, or financial institution, or were fraudulently modified during physical transit of **Electronic Media** to the ASSURED or during electronic transmission to the ASSURED'S **Computer System** or **Communication Terminal**.

C. Electronic Transmission

Loss resulting directly from a customer of the ASSURED, any automated clearing house, custodian, or financial institution having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communications, purporting to have been directed by the ASSURED to such customer, automated clearing house, custodian, or financial institution initiating, authorizing, or acknowledging, the transfer, payment, delivery or receipt of funds or property, which communications were transmitted through:

(1) an **Electronic Communication System**,

(2) an automated clearing house or custodian, or

(3) a Telex, TWX, or similar means of communication,

directly into a **Computer System** or **Communication Terminal** of said customer, automated clearing house, custodian, or financial institution, and fraudulently purport to have been directed by the ASSURED, but which communications were either not sent by the ASSURED, or were fraudulently modified during physical transit of **Electronic Media** from the ASSURED or during electronic transmission from the ASSURED'S **Computer System** or **Communication Terminal**, and for which loss the ASSURED is held to be legally liable."

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

2. By adding to Section 1., Definitions, the following:

"cc. **Communication Terminal** means a teletype, teleprinter or video display terminal, or similar device capable of sending or receiving information electronically. **Communication Terminal** does not mean a telephone.

dd. **Electronic Communication System** means electronic communication operations by Fedwire, Clearing House Interbank Payment System (CHIPS), Society of Worldwide International Financial Telecommunication (SWIFT), similar automated interbank communication systems, and Internet access facilities.

ee. **Electronic Data** means facts or information converted to a form usable in **Computer Systems** and which is stored on **Electronic Media** for use by computer programs.

ff. **Electronic Instruction** means computer programs converted to a form usable in a **Computer System** to act upon **Electronic Data**.

gg. **Electronic Media** means the magnetic tape, magnetic disk, optical disk, or any other bulk media on which data is recorded."

3. By adding the following Section after Section 4., Specific Exclusions-Applicable to All Insuring Clauses Except Insuring Clauses 1., 4., and 5.:

"Section 4.A. Specific Exclusions-Applicable to Insuring Clause 8.

**This Bond does not directly or indirectly cover:**

a. loss resulting directly or indirectly from **Forged**, altered or fraudulent negotiable instruments, securities, documents or written instruments used as source documentation in the preparation of **Electronic Data**;

b. loss of negotiable instruments, securities, documents or written instruments except as converted to **Electronic Data** and then only in that converted form;

c. loss resulting from mechanical failure, faulty construction, error in design, latent defect, wear or tear, gradual deterioration, electrical disturbance, **Electronic Media** failure or breakdown or any malfunction or error in programming or error or omission in processing;

d. loss resulting directly or indirectly from the input of **Electronic Data** at an authorized electronic terminal of an **Electronic Funds Transfer System** or a **Customer Communication System** by a person who had authorized access from a customer to that customer's authentication mechanism; or

e. liability assumed by the ASSURED by agreement under any contract, unless such liability would have attached to the ASSURED even in the absence of such agreement; or

f. loss resulting directly or indirectly from:

(1) written instruction unless covered under this INSURING CLAUSE; or

(2) instruction by voice over the telephone, unless covered under this INSURING CLAUSE."

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

4. By adding to section 9., Valuation, the following:

"Electronic Data, Electronic Media, Or Electronic Instruction

In case of loss of, or damage to, **Electronic Data, Electronic Media** or **Electronic Instruction** used by the ASSURED in its business, the COMPANY shall be liable under this Bond only if such items are actually reproduced form other **Electronic Data, Electronic Media** or **Electronic Instruction** of the same kind or quality and then for not more than the cost of the blank media and/or the cost of labor for the actual transcription or copying of data which shall have been furnished by the ASSURED in order to reproduce such **Electronic Data, Electronic Media** or **Electronic Instruction** subject to the applicable SINGLE LOSS LIMIT OF LIABILITY.

However, if such **Electronic Data** can not be reproduced and said **Electronic Data** represents **Securities** or financial instruments having a value, then the loss will be valued as indicated in the Securities and Other Property paragraphs of this Section."

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: December 19, 2013                   By _____
                                             Authorized Representative

C-L Bond
Form 17-02-2356 (Ed. 1-02)

Page 4

**FEDERAL INSURANCE COMPANY**

Endorsement No.: 8

Bond Number:     81952300

NAME OF ASSURED:  AMERITAS HOLDING COMPANY

---

## FACSIMILE SIGNATURE ENDORSEMENT

It is agreed that this Bond is amended as follows:

1.    By adding the following INSURING CLAUSE:

"9.    Facsimile Signature

Loss resulting directly from any issuer of securities, transfer agent, bank, banker or trust company having received from the ASSURED or the New York Stock Exchange, specimen copies of the ASSURED'S mechanically reproduced facsimile signature and having acted in reliance upon any false, fraudulent or unauthorized reproduction of such facsimile signature, whether such facsimile signature is the facsimile signature duly adopted by the ASSURED or is one resembling or purporting to be such facsimile signature, regardless of by whom or by what means the same may have been imprinted, and whether or not such loss is sustained by reason of the ASSURED having entered into an agreement to be legally liable when such facsimile signature or one resembling or purporting to be such facsimile signature is used, provided, however, that

a.    such facsimile signature is used

(1)    as the signature to an assignment or other instrument authorizing or effecting the transfer of shares of stock, or other registered securities, which may now or at any time hereafter be registered in the name of the ASSURED on the books of the association, company or corporation issuing the same, or

(2)    as the signature to a power of substitution, designating a substitute or substitutes to make the actual transfer on the books of the issuer of shares of stock, or other registered securities, in respect of which the ASSURED may now or at any time hereafter be named as an attorney to effect said transfer, whether said power of substitution is embodied in an endorsement on the certificate for said shares of stock or other registered security or in a separate instrument, and

C-L Bond
Form 17-02-2357 (Ed.10-00)

Page 1

     b.    the New York Stock Exchange has not interposed any objections to the use by the ASSURED of such facsimile signature and such agreement, if any, was required by the said Exchange as a condition to its failing to interpose any such objections, and

     c.    this INSURING CLAUSE shall not apply to any **Certificated Security** which is a **Counterfeit Original**."

2.    Section 4.a. and 4.b., Specific Exclusions, does not apply to loss covered under INSURING CLAUSE 9.

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013                By _____
                                                  Authorized Representative

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**FEDERAL INSURANCE COMPANY**

Endorsement No.: 9

Bond Number: 81952300

NAME OF ASSURED: AMERITAS HOLDING COMPANY

---

### PREAMBLE – REPRESENTATIONS MADE BY ASSURED ENDORSEMENT

It is agreed that this Bond is amended as follows:

1. By deleting in its entirety the Preamble on Page 1 of the Bond and substituting the following:

   "The COMPANY, in consideration of payment of the required premium and subject to the DECLARATIONS made a part of this Bond and to all other terms and conditions of this Bond, agrees to pay the ASSURED for:"

2. By deleting in its entirety General Agreement B., Representations Made By Assured, and substituting the following:

   "B.   Representations Made By Assured

   No statement made by or on behalf of the ASSURED, whether contained in the APPLICATION or otherwise, shall be deemed to be a warranty of anything except that the statement is true to the best of the knowledge and behalf of the person making the statement.

   Any intentional misrepresentation, omission, concealment or incorrect statement of a material fact, in the APPLICATION or otherwise, shall be grounds for recision of this Bond."

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013          By _____
                                        Authorized Representative

C-L Bond
Form 17-02-2360 (Ed. 10-00)

NAME OF ASSURED: AMERITAS HOLDING COMPANY

---

## AMENDED DEDUCTIBLE FOR SPECIFIED SUBSIDIARY(IES) ENDORSEMENT

It is agreed that this Bond is amended as follows:

1.   The DEDUCTIBLE AMOUNT stated in ITEM 3. of the DECLARATIONS is amended as scheduled below only as respects the following **Subsidiary(ies)**:

SCHEDULE

| **Subsidiary(ies)** | DEDUCTIBLE AMOUNT |
|---|---|
| Ameritas Investment Corp. | $80,000 |

2.   In the event of a loss sustained solely by one or more **Subsidiary(ies)** listed above, the applicable DEDUCTIBLE AMOUNT shown above shall apply; otherwise, if the loss is sustained in whole or in part by any other **Subsidiary(ies)**, not listed above, the DEDUCTIBLE AMOUNT is $ 500,000.

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: December 19, 2013                    By _____
                                                            Authorized Representative

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**FEDERAL INSURANCE COMPANY**

Endorsement No: 11

Bond Number:    81952300

NAME OF ASSURED: AMERITAS HOLDING COMPANY

_____

### AMENDING TERMINATION - NOTICE OF NON-RENEWAL ENDORSEMENT

It is agreed that this Bond is amended by adding at the end of the first paragraph in Section 13., Termination, the following:

g.    120 (120) days after receipt by the ASSURED of a written notice of non-renewal from the COMPANY.

This Endorsement applies to loss discovered after 12:01 a.m. on  January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013                     By _____
                                                            Authorized Representative

C-L Bond
Form 17-02-4777 (Ed. 7-02)

Effective date of
this endorsement/rider: January 1, 2014

**FEDERAL INSURANCE COMPANY**

Endorsement/Rider No. 12

To be attached to and
form a part of Bond No. 81952300

Issued to: AMERITAS HOLDING COMPANY

---

FINRA TERMINATION NOTICE ENDORSEMENT

In consideration of the premium charged, it is agreed that Conditions and Limitations, Section 13, Termination, is amended by adding the following:

The COMPANY will mark its records to indicate that The Financial Industry Regulatory Authority National Association of Securities Dealers, Inc., is to be notified promptly concerning the cancellation or substantial modification of the Bond, whether at the request of the ASSURED or the COMPANY, and will use its best efforts to so notify said Authority but failure to so notify said Authority shall not impair or delay the effectiveness of any such cancellation or modification.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Bond shall remain unchanged.

_Authorized Representative_

17-02-5477 (12/2007) rev.          Page 1

**FEDERAL INSURANCE COMPANY**

Endorsement No: 13

Bond Number:     81952300

NAME OF ASSURED: AMERITAS HOLDING COMPANY

---

**PREMIUM ENDORSEMENT**

It is agreed that:

1.     The premium for this Bond for the period  January 1, 2014 to January 1, 2015  is:

       Premium:   One hundred and two thousand, five hundred dollars ($102,500.00)

2.     It is further agreed that this premium is subject to change during this period if amendments are made to this Bond at the request of the ASSURED.

This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2014.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013                              By _____
                                                                              Authorized Representative

C-L Bond
Form 17-02-0735 (Rev. 1-97)

Effective date of
this endorsement/rider: January 1, 2014

**FEDERAL INSURANCE COMPANY**

Endorsement/Rider No.  14

To be attached to and
form a part of Bond No.  81952300

Issued to:  AMERITAS HOLDING COMPANY

---

FINANCIAL INDUSTRY REGULATORY AUTHORITY ENDORSEMENT

In consideration of the premium charged, it is agreed that this Bond is amended by adding to the definition of Employee in Section 1., Definitions, the following:

(7)    a person who is a registered representative or a registered principal associated with an ASSURED except a:

    a.    sole proprietor

    b.    sole stockholder,

    c.    director or a trustee of an ASSURED who is not performing acts coming within the scope of the usual duties of an officer or an employee, or

    d.    partner.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Bond shall remain unchanged.

_____
Authorized Representative

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

NAME OF ASSURED: AMERITAS HOLDING COMPANY

FINRA RULE 4360 FOR SPECIFIC ENTITY ENDORSEMENT
(For use with Bond Forms A, B & C)

In consideration of the premium charged, it is agreed that each payment made under the terms of this endorsement shall reduce the unpaid portion of this Bond's Aggregate Limit of Liability until it is exhausted. It is further agreed that solely with respect to loss sustained by Ameritas Investment Corp., this Bond is amended as follows:

(1)    Item 2, AGGREGATE LIMIT OF LIABILITY, of the DECLARATIONS shall not apply to the Single Loss Limits of Liability shown below:

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| 1. Dishonesty | $800,000 | $80,000 |
| 2. On Premises | $800,000 | $80,000 |
| 3. In Transit | $800,000 | $80,000 |
| 4. Forgery or Alteration | $800,000 | $80,000 |
| 5. Extended Forgery | $800,000 | $80,000 |
| 6. Counterfeit Money | $800,000 | $80,000 |

The Single Loss Limit of Liability set forth in the schedule above shall be part of and not in addition to the Single Loss Limit of Liability set forth in Item 3 of the DECLARATIONS.

(2)    The third full paragraph of General Agreement E., Notice To Company of Legal Proceedings Against Assured – Election to Defend, is deleted and replaced with the following:

If the COMPANY elects to defend all or part of any legal proceeding, the court costs and attorneys' fees incurred by the COMPANY and any settlement or judgment on that part defended by the COMPANY shall be a loss under the applicable INSURING CLAUSE of this Bond. In addition, if the amount demanded in the legal proceeding is greater than the amount recoverable under this Bond, or if a DEDUCTIBLE AMOUNT is applicable, or both, the COMPANY'S liability for court costs and attorney's fees incurred in defending all or part of such legal proceeding is limited to the proportion of such court costs and attorneys' fees incurred that the amount recoverable under this Bond bears to the total of the amount demanded in such legal proceeding. Notwithstanding the above, court costs and attorney's fees incurred and paid by the COMPANY

14-02-18365 (10/2011)

in defense of a legal proceeding shall reduce, and shall be a part of, only that portion of the SINGLE LOSS LIMIT OF LIABILITY that exceeds the minimum coverage required by Rule 4360 of the Financial Industry Regulatory Authority as applied to Ameritas Investment Corp..

(3)    The first full paragraph of Section 13., Termination, is deleted and replaced with the following:

This Bond terminates as an entirety on the earliest occurrence of any of the following:

a.    60 days after the receipt by the ASSURED of a written notice from the COMPANY of its decision to cancel this Bond, or

b.    immediately on the receipt by the COMPANY of a written notice from the ASSURED of its decision to terminate this Bond, or

c.    immediately on the appointment of a trustee, receiver or liquidator to act on behalf of the ASSURED, or the taking over of the ASSURED by State or Federal officials, or

d.    immediately on the dissolution of the ASSURED, or

e.    immediately on the taking over of the ASSURED by another entity, or

f.    immediately on expiration of the BOND PERIOD.

(4)    This Endorsement applies to loss discovered after 12:01 a.m. on January 1, 2013.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  December 19, 2013                    By _____
                                                          Authorized Representative

14-02-18365 (10/2011)

# Exhibit B



**The Hartford**

## INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY
## AND ERRORS & OMISSIONS LIABILITY POLICY
## DECLARATIONS

Policy Number: 00 IC 0141426-12

<u>TWIN CITY FIRE INSURANCE CO.</u>
A stock insurance company, herein called the Insurer

NOTICE: THIS IS A CLAIMS-MADE AND REPORTED POLICY. EXCEPT AS OTHERWISE PROVIDED IN THIS POLICY, COVERAGE UNDER THIS POLICY IS LIMITED TO LIABILITY FOR LOSS ARISING FROM WRONGFUL ACTS FOR WHICH CLAIMS ARE FIRST MADE WHILE THE POLICY IS IN FORCE AND WHICH ARE REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT NO LATER THAN SIXTY (60) DAYS AFTER THE TERMINATION OF THE POLICY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS, INCLUDING JUDGMENT OR SETTLEMENT AMOUNTS, SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE AND OTHER CLAIMS EXPENSES. ALL LOSS INCURRED UNDER THIS POLICY, INCLUDING AMOUNTS FOR JUDGMENTS, SETTLEMENTS AND LEGAL DEFENSE AND OTHER CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE APPLICABLE RETENTION AMOUNT.

THIS POLICY DOES NOT PROVIDE FOR ANY DUTY OR OBLIGATION ON THE PART OF THE INSURER TO DEFEND ANY OF THE INSUREDS.

**ITEM 1. Parent Company:** AMERITAS HOLDING COMPANY      **Agency Code:** 81507
        **Address:** 5900 O STREET      **Name And Address:**
        LINCOLN, NE 68501      WESTROPE & ASSOCIATES
        1100 WALNUT STREET, SUITE 3200
        KANSAS CITY, MO 64106

**ITEM 2. POLICY PERIOD:** From: <u>10/01/12</u> (Inception Date) to: <u>10/01/13</u> (Expiration Date) at 12:01 A.M.
Standard Time at the address of the Parent Company stated above.

**ITEM 3. LIMIT OF LIABILITY:** $15,000,000 for each Claim and in the aggregate for all Claims during the Policy Period (inclusive of Claims Expenses).

**ITEM 4. RETENTIONS:** (a) $0 each of the Directors and Officers for each Claim, but in no event exceeding
        $0 all of the Directors and Officers for each Claim for which coverage is provided under Insuring Agreement A. (inclusive of Claims Expenses);

**NO FLAT CANCELLATIONS**

        (b) $1,000,000 for each Claim for which coverage is provided under Insuring Agreement B. (inclusive of Claims Expenses);

        (c) $10,000,000 for each Claim for which coverage is provided under Insuring Agreement C. (inclusive of Claims Expenses).

**ITEM 5. PRIOR LITIGATION DATE:** <u>10/01/1997</u> (a) applicable to INSURING AGREEMENTS A. and B.
                           <u>10/01/1997</u> (b) applicable to INSURING AGREEMENT C.
**ITEM 6. POLICY PERIOD PREMIUM:** $660,000

**ITEM 7. DISCOVERY PERIOD:** (a) **PREMIUM:** $990,000
                         (b) **PERIOD:** 12 MONTHS

**ITEM 8. NON-PROFIT OUTSIDE POSITION COVERAGE GRANTED** X **YES** ___ **NO**

**ITEM 9. ENDORSEMENTS ATTACHED AT POLICY ISSUANCE:**

This Declarations Page together with the completed and signed Proposal, including all attachments and exhibits, and the attached Insurance Company Directors & Officers Liability and Errors & Omissions Liability Policy form and all endorsements thereto shall constitute the Policy between (1) the Directors and Officers and the Company and (2) the Insurer.

DO 00 S027 00 0911         © 2011, The Hartford         Page 1 of 2

11/09/12
_____
DATE

AUTHORIZED INSURER REPRESENTATIVE

# ENDORSEMENT

This endorsement, effective on     10/01/12                              at 12:01 A.M. standard time, forms a part of

Policy No.   00 IC 0141426-12          of the          TWIN CITY FIRE INSURANCE CO.

Issued to   AMERITAS HOLDING COMPANY

André A. Napoli, President

| | | | SCHEDULE |
|---|---|---|---|
| | RN00N02600 | 5/93 | IN WITNESS PAGE |
| 1 | EO00M19300 | 11/07 | ADD SUBSIDIARY WITH PENDING OR PRIOR LITIGATION AND PRIOR ACTS EXCLUSIONS |
| 2 | EO00M19400 | 11/07 | AMENDED CONSENT TO SETTLEMENT CLAUSE (50% COINSURANCE) |
| 3 | EO00M19500 | 11/07 | AMEND REPORTING PROVISION |
| 4 | EO00M19600 | 11/07 | AMEND SECTION III. EXCLUSIONS A. 5. & 6. |
| 5 | EO00M19700 | 11/07 | AMENDMENT INSURED AS POLICYHOLDER |
| 6 | EO00M19800 | 11/07 | AMENDMENT OF DEFINITIONS |
| 7 | EO00M19900 | 11/07 | AMENDMENT OF EXCLUSION OF CLAIMS FROM AMERUS |
| 8 | EO00M20000 | 11/07 | AMENDMENT OF EXCLUSIONS |
| 9 | EO00M20100 | 11/07 | AMENDMENT OF EXCLUSIONS |
| 10 | EO00M20200 | 11/07 | AMENDMENT OF PROFESSIONAL SERVICES |
| 11 | EO00M20300 | 11/07 | CONVERSION NOTIFICATION ENDORSEMENT |
| 12 | EO00M20400 | 11/07 | COST OF CORRECTIONS |
| 13 | EO00M20500 | 11/07 | FAILURE TO MAINTAIN INSURANCE EXCLUSION |
| 14 | EO00M20700 | 11/07 | INSURANCE COMPANY WRONGFUL PRACTICES EXCLUSION |
| 15 | EO00M20800 | 11/07 | MEDICAL MALPRACTICE EXCLUSION |
| 16 | EO00M20900 | 11/07 | MUTUAL FUND WRONGFUL PRACTICES EXCLUSION |

Rev. Ed. Date (04/02)
GU 207 (6-78)

# ENDORSEMENT

This endorsement, effective on  10/01/12                          at 12:01 A.M. standard time, forms a part of

Policy No.  00 IC 0141426-12        of the        TWIN CITY FIRE INSURANCE CO.

Issued to   AMERITAS HOLDING COMPANY

*André A. Napoli, President*

<table>
<tr><td colspan="4">SCHEDULE</td></tr>
<tr><td>17</td><td>E000M21100</td><td>11/07</td><td>NUCLEAR LIABILITY EXCLUSION</td></tr>
<tr><td>18</td><td>E000M21200</td><td>11/07</td><td>POLLUTION EXCLUSION - DERIVATIVE WAIVER</td></tr>
<tr><td>19</td><td>E000M21300</td><td>11/07</td><td>PUNITIVE DAMAGES EXCLUSION</td></tr>
<tr><td>20</td><td>E000M21400</td><td>11/07</td><td>SECURITIES OFFERING ENDORSEMENT</td></tr>
<tr><td>21</td><td>E000M21500</td><td>11/07</td><td>SPECIFIC ORGANIZATION EXCLUSION</td></tr>
<tr><td>22</td><td>E000M21600</td><td>11/07</td><td>UNAUTHORIZED ACCESS EXCLUSION</td></tr>
<tr><td>23</td><td>E000S05101</td><td>12/03</td><td>NUCLEAR LIABILITY EXCLUSION</td></tr>
<tr><td>24</td><td>E000M19300</td><td>11/07</td><td>ADD SUBSIDIARY WITH PENDING OR PRIOR LITIGATION AND PRIOR ACTS EXCLUSION</td></tr>
<tr><td>25</td><td>E000M19300</td><td>11/07</td><td>ADD SUBSIDIARY WITH PENDING OR PRIOR LITIGATION AND PRIOR ACTS EXCLUSION</td></tr>
<tr><td>26</td><td>E000M24800</td><td>1/12</td><td>FIDUCIARY LIABILITY COVERAGE</td></tr>
<tr><td>27</td><td>HG00H06800</td><td>2/08</td><td>CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM</td></tr>
<tr><td>28</td><td>HR26H00300</td><td>6/05</td><td>NEBRASKA CANCELLATION AND NON-RENEWAL ENDORSEMENT</td></tr>
<tr><td>29</td><td>HG00H00901</td><td>7/08</td><td>AMEND MAILING ADDRESS FOR NOTICE ENDORSEMENT</td></tr>
<tr><td></td><td>HG00H00103</td><td>2/08</td><td>CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM</td></tr>
<tr><td></td><td>HG00H05300</td><td>12/03</td><td>IMPORTANT NOTICE - COMMERCIAL LINES DEREGULATION</td></tr>
<tr><td></td><td>HR00H09300</td><td>2/07</td><td>PRODUCER COMPENSATION NOTICE</td></tr>
</table>

Rev. Ed. Date (04/02)
GU 207 (6-78)



**THE HARTFORD**

## INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY

## AND ERRORS & OMISSIONS LIABILITY POLICY

In consideration of, and subject to, the payment of the premium, and in reliance upon the particulars, statements, attachments and exhibits contained in and submitted with the Proposal and which shall be the basis of this Policy and shall be deemed to be incorporated herein, and subject to all the terms and conditions of this Policy, the Insurer and the Insureds agree as follows:

**I. INSURING AGREEMENTS**

    A.   Directors' and Officers' Liability

    Except for Loss which the Insurer pays pursuant to Insuring Agreement B. of this Policy, the Insurer will pay on behalf of the Directors and Officers Loss which the Directors and Officers shall become legally obligated to pay as a result of a Claim first made during the Policy Period or Discovery Period, if applicable, against the Directors and Officers for a Wrongful Act which takes place during or prior to the Policy Period.

    If the Company is permitted or required by law to ultimately indemnify the Directors and Officers, or to advance Claims Expenses on their behalf, and does not in fact do so other than for reasons of Financial Insolvency, then the Insurer shall pay Loss on behalf of the Directors and Officers, subject to the retention amount set forth in Item 4(b) of the Declarations of this Policy. For purposes of this paragraph, the shareholder and board of directors resolutions of the Company shall be deemed to provide indemnification for such Loss to the fullest extent permitted or required by law.

    B.   Company Reimbursement

    The Insurer will pay on behalf of the Company Loss for which the Company has, to the extent permitted or required by law, indemnified the Directors and Officers, and which the Directors and Officers have become legally obligated to pay as a result of a Claim first made during the Policy Period or Discovery Period, if applicable, against the Directors and Officers for a Wrongful Act which takes place during or prior to the Policy Period.

    C.   Errors and Omissions Liability Policy

    The Insurer will pay on behalf of the Insureds Loss which the Insureds shall become legally obligated to pay as a result of a Claim first made against the Insureds during the Policy Period or the Discovery Period, if applicable, for a Wrongful Act in the performance of Professional Services which takes place during or prior to the Policy Period.

    Provided, however, as a condition precedent to any such coverage under Insuring Agreements A., B., and C., the Insureds shall report such Claim to the Insurer as soon as practicable but in no event later than sixty (60) days after the termination of the Policy Period or Discovery Period, if applicable.

**II. DEFINITIONS**

    The following terms, whenever used in this Policy, shall have the meanings indicated:

    A.   "Claim" means:

        (a)  a written demand for civil damages or other civil relief that appears reasonably likely to involve payment under this Policy commenced by the Insured's receipt of such demand,

DO 00 S016 00 1000                                             **Page 1 of 10**
        00 IC 0141426-12   10/01/12

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

(b)  a civil proceeding commenced by the service of a complaint or similar pleading, or

(c)  a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document.

B.  "Claims Expenses" means that portion of Loss consisting of reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense or appeal of a Claim, but shall not include the wages, salaries, benefits or expenses of the Insureds.

C.  "Company" means the Parent Company and any Subsidiary.

D.  "Directors and Officers" means: (1) one or more natural persons who were, now are or shall in the future be duly elected or appointed directors or officers of the Company, or, with respect to a Subsidiary incorporated outside the United States, their functional equivalent; and (2) with respect to Insuring Agreement C. only, any other natural persons who were, now are or shall hereafter be employees of the Company.

E.  "Discovery Period" means the period set forth in Item 7(b) of the Declarations.

F.  "Executive Officer" means the president, chief executive officer, chief operating officer, chief financial officer, in-house general counsel, managing director, any executive vice president and any equivalent executive officer of the Company.

G.  "Financial Insolvency" means the status of the Company as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the Company, or the Company becoming a debtor in possession.

H.  "Insureds" means:

(1)  one or more Directors and Officers; and

(2)  solely with respect to Insuring Agreements B. and C., the Company.

I.  "Interrelated Wrongful Acts" means Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

J.  "Loss" means sums which the Directors and Officers or, with respect to Insuring Agreement C., the Company, are legally liable to pay solely as a result of any Claim insured by this Policy, including Claims Expenses, compensatory damages, settlement amounts, legal fees and costs awarded pursuant to judgments and punitive and exemplary damages and the multiplied portion of multiple damages, but excluding fines, penalties, taxes, any amount allocated to uncovered loss pursuant to Section VI. of this Policy, or any amount or Loss which is uninsurable pursuant to applicable law.

K.  "Parent Company" means the entity designated in Item 1 of the Declarations.

L.  "Policy Period" means the period set forth in Item 2 of the Declarations, subject to prior termination pursuant to Section IX.B.

M.  "Professional Services" means services performed solely by any of the Insureds in underwriting, claim handling and adjusting, safety inspections, loss control, safety engineering, premium financing, insurance consulting, actuarial consulting, risk management, personal injury rehabilitation operations, subrogation and salvage operations, or investment advice incidental to the purchase or servicing of the Company's insurance products.

N.  "Subsidiary" means any corporation in which more than fifty-percent (50%) of the outstanding securities or voting rights representing the present right to vote for election of directors or equivalent position is owned, in any combination, by one or more Companies.

O.  "Wrongful Act" means:

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

(1) any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, committed or attempted by the Directors and Officers, individually or collectively, in their capacity as such, or in an Outside Position, or, with respect to Insuring Agreement C., by the Company, or

(2) any matter claimed against the Directors and Officers solely by reason of their serving in such capacity or in an Outside Position.

## III. EXCLUSIONS

A. Exclusions Applicable to all Insuring Agreements

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against the Insureds:

1. for bodily injury, sickness, disease, emotional distress, mental anguish, outrage, humiliation, death, false arrest or imprisonment, abuse of process, malicious prosecution, defamation, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction, or for damage to or destruction of any tangible property including loss of use thereof;

2. for any actual or alleged Wrongful Act by Directors and Officers of any Subsidiary in their capacities as such or, with respect to Insuring Agreement C., by any Subsidiary if such Wrongful Act actually or allegedly occurred when such corporation was not a Subsidiary;

3. for, based upon, arising from, or in any way related to any claim, Wrongful Act, or circumstance if notice thereof is given under any directors and officers liability policy or insurance company errors and omissions liability policy the term of which incepted prior to the Inception Date of this Policy;

4. for, based upon, arising from, or in any way related to any Insured serving in the capacity of trustee, fiduciary or administrator of an employee pension benefit plan or employee welfare benefit plan established for the benefit of the Directors and Officers and/or employees of the Company and based upon or arising from an actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or regulations promulgated thereunder, or similar federal, state, local or common law;

5. for, based upon, arising from, or in any way related to their gaining in fact any profit or advantage or receiving any remuneration to which such Insured was not legally entitled;

6. for, based upon, arising from, or in any way related to any deliberately dishonest, malicious, fraudulent act or omission or any willful violation of law by such Insured if a judgment or other final adjudication adverse to such Insured establishes such act, omission or willful violation; provided, however, this exclusion shall not apply to Insuring Agreement C. for Loss in connection with any Claim which includes allegations of both fraud and bad faith in rendering or in failing to render Professional Services;

7. for liability assumed under any contract or agreement, except for liability which would have attached to the Insured even in the absence of such contract or agreement; or

8. for, based upon, arising from, directly or indirectly resulting from, or in any way related to:

   (i) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

   (ii) any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste;

including without limitation any Claim by or on behalf of the Company or its shareholders in their capacity as such; provided, however, this exclusion shall not apply to any Loss in connection with any Claim otherwise covered under Insuring Agreement C. and which is brought by a policyholder of the Company seeking coverage under an insurance policy issued by the Company.

Pollutants include, but are not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or

        00 IC 0141426-12    10/01/12

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

oil products, radiation, asbestos or asbestos-containing products, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes, but is not limited to, material to be recycled, reconditioned or reclaimed.

**B.    Exclusions Applicable to Insuring Agreements A. and B.**

The Insurer shall not be liable to make any payment for Loss under Insuring Agreements A. or B. in connection with any Claim made against the Directors and Officers:

1.    for, based on, arising from, directly or indirectly resulting from, or in any manner relating to the rendering or failure to render Professional Services by any Insured except for any Claim brought by or on behalf of the Company directly or derivatively or by or on behalf of the policyholders or securityholders of the Company individually or as a class, so long as such policyholders and/or securityholders are acting totally independent of, without the solicitation of, or assistance of, or participation of, or intervention of, any of the Directors and Officers, or the Company;

2.    for, based upon, arising from, or in any way related to such Director and Officer serving as a director, officer, general partner, trustee, regent, governor or employee of any entity other than the Company, even if such service is at the direction or request of the Company; provided that this exclusion does not apply with respect to a Claim for a Wrongful Act by a Director and Officer while serving in an Outside Position if such Claim is brought and maintained without the solicitation, assistance or participation of the entity in which such Director and Officer serves in such Outside Position or any director, officer, trustee, regent, governor or employee of such entity;

3.    for, based upon, arising from, or in any way related to an accounting of profits made from the purchase or sale by such Directors and Officers of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any federal, state, local or common law;

4.    brought or maintained by or on behalf of an Insured in any capacity, except:

    (i)    a Claim that is a shareholders' derivative action brought or maintained on behalf of the Company by one or more securityholders who are not Directors and Officers and who bring or maintain the Claim without the solicitation, assistance or participation of the Company or any of the Directors and Officers;

    (ii)    a Claim by any of the Directors and Officers for the actual or alleged wrongful termination, discrimination or sexual harassment of such Director and Officer;

    (iii)    a Claim for contribution or indemnity, if the Claim directly results from another Claim that is otherwise covered under this Policy; or

    (iv)    a Claim brought by an Insured who is a natural person in the capacity of a policyholder of any policy issued by the Company;

5.    for, based upon, arising from, or in any way related to any demand, suit or other proceeding against any Insured which was pending on or existed prior to the applicable Prior Litigation Date specified in Item 5(a) of the Declarations, or the same or substantially the same facts, circumstances or allegations which are the subject of or the basis for such demand, suit or other proceeding.

The Wrongful Act of any Directors and Officers shall not be imputed to any other Directors and Officers for purposes of applying the exclusions set forth in Sections III.A. and III.B.

**C.    Exclusions Applicable to Insuring Agreement C.**

The Insurer shall not be liable to make any payment for Loss under Insuring Agreement C. in connection with any Claim made against the Insureds:

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

1. brought against the Company by any Insured; provided, however, this exclusion does not apply to any Claim brought by an Insured who is a natural person in the capacity of a policyholder of any policy issued by the Company;

2. for, based upon, arising from, directly or indirectly resulting from, or in any way related to Financial Insolvency;

3. by any pool or association (including any director, officer or employee thereof) in which any Insureds are participants or by any participant (including any director, officer or employee thereof) in any such pool or association involving the business or operations of such pool or association;

4. for, based upon, arising from, directly or indirectly resulting from, or in any way related to the adequacy, accuracy or redundancy of claim reserves;

5. for, based upon, arising from, or in any way related to express warranties or guarantees made in connection with Professional Services;

6. for any actual or alleged obligation assumed by the Company as an insurer or reinsurer under any policy or contract or treaty of insurance, reinsurance, suretyship, annuity, or endowment;

7. for, based upon, arising from, or in any way related to the failure to purchase or maintain adequate reinsurance and/or retrocession arrangements;

8. for any actual or alleged discrimination in the underwriting or sale of any insurance product;

9. for premiums, return premiums, brokerage fees or commissions, tax monies, or the commingling of funds;

10. for, based upon, arising from, or in any way related to underwriting results;

11. for, based upon, arising from, or in any way related to, the termination or administration of any agency or brokerage contract or agreement;

12. for, based upon, arising from, or in any way related to any demand, suit or other proceeding against any Insured which was pending or existed prior to the applicable Prior Litigation Date specified in Item 5(b) of the Declarations, or the same or substantially similar facts, circumstances or allegations which are the subject of or the basis for such demand, suit or other proceeding; or

13. which is brought by or on behalf of any reinsurer of the Company.

## IV. CLAIMS EXPENSES, SETTLEMENTS AND COOPERATION

A. No Claims Expenses shall be incurred or settlements made, contractual obligations assumed or liability admitted with respect to any Claim without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any Claims Expenses, settlement, assumed obligation or admission to which it has not consented.

B. The Insurer shall have the right to associate itself in the defense and settlement of any Claim that appears reasonably likely to involve this Policy. The Insurer may make any investigation it deems appropriate. However, it shall be the duty of the Insureds, not the Insurer, to defend any Claim.

C. Subject to Section VI. of this Policy, the Insurer shall advance on behalf of the Insureds Claims Expenses which Directors and Officers or, solely with respect to Insuring Agreement C., the Company, have incurred in connection with Claims made against them, prior to disposition of such Claims, provided always that to the extent it is finally established that any such Claims Expenses are not covered under this Policy, the Insureds, as appropriate, agree to repay the Insurer such non-covered Claims Expenses.

D. The Insurer may, with the written consent of the Insured, settle a Claim covered under Insuring Agreement C. for solely a monetary amount which the Insurer deems reasonable. If the Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

the Insurer could have settled such Claim plus Claims Expenses accrued as of the date such settlement was proposed in writing by the Insurer to the Insured.

E.   The Insureds shall, as a condition precedent to their rights under this Policy, give to the Insurer all information and cooperation as the Insurer may reasonably require and shall do nothing that may prejudice the Insurer's position or actual rights of recovery.

## V.   LIMITS OF LIABILITY AND RETENTION

A.   The Insurer's aggregate Limit of Liability for all Loss otherwise covered under this Policy shall be the amount identified in Item 3 of the Declarations, whether such Loss is covered under one or more Insuring Agreements. The Limit of Liability in the Discovery Period shall be a part of, and not in addition to, the Limit of Liability identified in Item 3 of the Declarations.

B.   The Insurer's liability in respect of Loss arising from each Claim made against any Insured shall apply only to that part of Loss which is excess of the applicable Retention identified in Item 4 of the Declarations.

C.   All Claims arising out of the same Wrongful Act or Interrelated Wrongful Acts of one or more of the Insureds shall be considered a single Claim. Such Claims shall be deemed to be first made when the first such Claim is made or deemed to be made pursuant to Section VII. of this Policy, regardless of whether such date is before or during the Policy Period.

D.   If Loss arising from a single Claim is covered in whole or in part under more than one Insuring Agreement, the applicable Retention shall be applied separately to that part of the Loss covered by each Insuring Agreement and the sum of the Retentions so applied shall constitute the Retention applicable to such Claim; provided, however, the largest Retention amount identified in Item 4(c) of the Declarations shall be the maximum Retention applicable to such Claim.

E.   The Limit of Liability available to pay judgments or settlements shall be reduced by Claims Expenses.

## VI.   ALLOCATION

If both Loss covered by this Policy and loss not covered by this Policy are incurred, either because a Claim against an Insured includes both covered and uncovered matters or because a Claim not covered under Insuring Agreement C. is made against both a Director and Officer and others, including the Company, the Insureds and the Insurer shall fairly and reasonably allocate such amount between covered Loss and uncovered Loss.

If there can be an agreement on an allocation of Claims Expenses, the Insurer shall advance on a current basis Claims Expenses allocated to covered Loss. If there can be no agreement on allocation of Loss:

A.   no presumption as to allocation shall exist in any arbitration, suit or other proceeding; and

B.   the Insurer shall advance on a current basis Claims Expenses which the Insurer believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined; and

C.   the Insurer, if requested by the Insureds, shall submit the dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the Insureds, one arbitrator selected by the Insurer and a third independent arbitrator selected by the first two arbitrators.

Any negotiated, arbitrated or judicially determined allocation of Claims Expenses shall be applied retroactively to all Claims Expenses on account of such Claim, notwithstanding any prior advancement to the contrary. Any allocation or advancement of Claims Expenses on account of a Claim shall not apply to or create any presumption with respect to the allocation of other Loss on account of such Claim.

## VII. NOTICE

A.   If during the Policy Period, the Insureds become aware of a specific Wrongful Act that may reasonably be expected to give rise to a Claim against any Insured, and if such Wrongful Act is reported to the Insurer during

DO 00 S016 00 1000                                                                                 Page 6 of 10

        00 IC 0141426-12   10/01/12

the Policy Period in writing with particulars as to the reasons for anticipating such a Claim, the nature and date of the alleged Wrongful Act, the alleged damages sustained, the names of potential claimants, any Director and Officer involved in the alleged Wrongful Act and the manner in which the Insureds first became aware of the specific Wrongful Act, then any Claim subsequently arising from such duly reported Wrongful Act shall be deemed under this Policy to be a Claim made during the Policy Period in which the Wrongful Act is first duly reported to the Insurer.

B.   Notice of any Claim or specific Wrongful Act shall be given in writing to The Hartford, Hartford Plaza, Hartford, Connecticut 06115 Attention: D&O Claims. All other notices under this Policy shall be given to the same addressee but to the attention of Financial Products Underwriters.

C.   All notices under this Policy shall refer to the Policy Number, shall be in writing, shall be given by mail or prepaid express courier properly addressed and shall be effective upon receipt.

## VIII. EXTENSIONS

A.   Death, Incapacity or Bankruptcy

In the event of the death, incapacity or bankruptcy of a Director and Officer, any Claim made against the estate, legal representatives, heirs or the assigns of such Director and Officer for a Wrongful Act of such Director and Officer shall be deemed to be a Claim against such Director or Officer.

B.   Discovery Period

If the Insurer or the Parent Company fails or refuses to renew this Policy or if the Parent Company cancels this Policy, any Insured shall have the right, upon payment of the Discovery Period Premium set forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal but only with respect to any Wrongful Act taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium shall be deemed to be fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

C.   Spousal Extension

If a Claim against a Director and Officer includes a Claim against the lawful spouse of such Director and Officer solely by reason of (a) such spousal status, or (b) such spouse's ownership interest in property or assets that are sought as recovery for Wrongful Acts, any loss for which such spouse becomes legally obligated to pay on account of such Claim shall be deemed Loss which such Director and Officer of the spouse becomes legally obligated to pay as a result of such Claim.

All terms and conditions of this Policy, including the Retention, applicable to Loss sustained by such Director and Officer in the Claim shall also apply to such spousal loss.

The extension of coverage afforded by this Section VIII.C. shall not apply to the extent the Claim alleges any Wrongful Act or omission by such spouse.

D.   Outside Position Liability Extension

Subject to all of its terms and conditions, this Policy covers any Director and Officer serving in an Outside Position, but such coverage shall be specifically excess of any indemnity or insurance available from or provided by the entity in which the Director and Officer serves in such Outside Position.

Payment by the Insurer or any member company of the Reliance Group of Insurance Companies under another policy as a result of a Claim against a Director or Officer in an Outside Position shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy with respect to such Claim.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

"Outside Position" means the position of director, officer, trustee, or other equivalent executive position held by a Director and Officer in:

(i) any Non-Profit Entity, provided Non-Profit Outside Position coverage is granted pursuant to Item 8 of the Declarations, or

(ii) any other entity, provided such coverage is specifically granted by endorsement to this Policy, if service in such position is with the knowledge and consent or at the request of the Company.

"Non-Profit Entity" means any non-profit corporation, community chest, fund or foundation that (i) is not included in the definition of the Company, and (ii) is exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

## IX. GENERAL CONDITIONS

### A. Territory

This Policy extends to Wrongful Acts taking place or Claims made anywhere in the world.

### B. Cancellation

The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the Parent Company at its last known address. The Insurer may not otherwise cancel this Policy. The Parent Company may cancel this Policy by sending contemporaneous notice to the Insurer, provided the Parent Company may not cancel this Policy after the effective date of the acquisition of the Parent Company as described in Section IX.H.(2) of this Policy. In the event the Parent Company cancels this Policy, the Insurer shall retain the customary short rate premium. Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

### C. Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof, and the Insureds shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Insureds. The obligations of the Insureds pursuant to this Section IX.C. survive the termination of the Policy Period.

### D. Company Authorization

By acceptance of this Policy, the Insureds agree that the Parent Company may act on behalf of all Insureds with respect to the giving and receiving of notice of Claim or cancellation, the payment of premiums and the receiving of any return premium, the negotiation, agreement to and acceptance of any endorsements to this Policy, and the exercising of the Discovery Period option.

### E. Other Insurance

If any Loss arising from any Claim is insured by another valid policy or policies, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

### F. Alteration and Assignment

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by written endorsement signed by an authorized representative of the Insurer.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

G.  Action Against Insurer

No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial, or by written agreement of the Insureds, the claimant and the Insurer.

No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the Insureds to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or their legal representative. Bankruptcy or insolvency of an Insured or of an Insured's estate shall not relieve the Insurer of any of its obligations hereunder.

H.  Changes in Exposure

(1)  Acquisition or Creation of Corporation; Assets Acquisition; Assumption of Liability

If before or during the Policy Period the Company:

(a)  acquires securities or voting rights in another corporation or creates another corporation, which as a result of such acquisition or creation becomes a Subsidiary, or

(b)  acquires any corporation by merger into or consolidation with the Company,

such corporation and its Directors and Officers shall be Insureds under this Policy but only with respect to Wrongful Acts taking place after such acquisition or creation.

However, if during the Policy Period the fair value of (i) all cash, securities, assumed liabilities and other consideration paid by the Company for any such acquisition, or (ii) all assets acquired or liabilities assumed by the Company in any single transaction or series of related transactions, exceeds 20% of the total consolidated assets or liabilities, respectively, of all Companies as reflected in the Parent Company's last audited consolidated financial statements prior to such acquisition, the Parent Company as a condition precedent to coverage with respect to such new Insureds or to coverage for Wrongful Acts relating to such acquired assets or assumed liabilities occurring subsequent to such acquisition or assumption, shall give written notice of such acquisition or assumption to the Insurer as soon as practicable but in no event more than ninety (90) days after the effective date of such acquisition or assumption, together with such information as the Insurer may require, and shall pay all additional premium so required by the Insurer. If the Parent Company fails to comply with such condition precedent, coverage otherwise afforded by this Section H.(1) shall terminate as of ninety (90) days after the effective date of such acquisition or assumption.

(2)  Acquisition of Parent Company

If during the Policy Period (i) the Parent Company merges into or consolidates with another entity such that the Parent Company is not the surviving entity, or (ii) another entity, or person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Parent Company, then coverage under this Policy shall continue until the later of:

(a)  termination of the Policy Period, or

(b)  any subsequent date to which the Insurer may agree by endorsement,

but only with respect to Claims for Wrongful Acts, taking place prior to such merger, consolidation or acquisition. Any coverage extension pursuant to (b) above shall be conditioned upon any premium paid or to be paid under this Policy being deemed fully earned upon inception of such coverage extension. Any Claim made during such coverage extension shall be deemed to have been made during the Policy Period in which such merger, consolidation or acquisition occurred.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

The Parent Company shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable together with such information as the Insurer may reasonably require.

(3) Cessation of Subsidiaries

If before or during the Policy Period a corporation ceases to be a Subsidiary, coverage with respect to such Subsidiary and its Directors and Officers shall continue until termination of this Policy but only with respect to Claims for Wrongful Acts taking place prior to the date such corporation ceased to be a Subsidiary.

I.  Representations and Severability

The Insureds represent that the particulars and statements contained in the Proposal are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

The Insureds agree that in the event that the particulars and statements contained in the Proposal are untrue, this Policy shall not afford any coverage with respect to any of the following Insureds:

(1) any Director and Officer who knew as of the Inception Date of this Policy the facts that were not truthfully disclosed in the Proposal,

(2) the Company, under Insuring Agreement B., to the extent it indemnifies any Director and Officer referenced in (a) above, and

(3) the Company, under Insuring Agreement C., if a Director or any Executive Officer knew as of the Inception Date of this Policy the facts that were not truthfully disclosed in the Proposal,

whether or not such Director, Officer or Executive Officer knew of such untruthful disclosure in the Proposal.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

## TWIN CITY FIRE INSURANCE COMPANY
### HOME OFFICE - INDIANAPOLIS, INDIANA
### ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
### (A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

Terence Shields, Secretary

André A. Napoli, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN
    00 IC 0141426-12    10/01/12

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

**issued to:**    AMERITAS HOLDING COMPANY

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADD SUBSIDIARY WITH PENDING OR PRIOR LITIGATION AND PRIOR ACTS EXCLUSIONS

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that the definition of "Subsidiary" in **Section II. DEFINITIONS N.** is amended to include the following:

It is further agreed that Section **III. EXCLUSIONS A.** is amended by adding the following:

ACACIA LIFE INSURANCE COMPANY

9.    for, based upon, arising from, or in any way related to any act(s) or omission(s) actually or allegedly committed or attempted by the above referenced **Subsidiary** and/or its **Directors** and **Officers** prior to ___1/01/99___.

It is further agreed that, solely with respect to the extension of coverage afforded by this Endorsement, the Prior Litigation Date set forth in Item 5. of the Declarations is amended to read in its entirety as follows:

Insuring Agreements A and B:    1/01/99

Insuring Agreement C:    1/01/99

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

issued to:    AMERITAS HOLDING COMPANY

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED CONSENT TO SETTLEMENT CLAUSE (50% COINSURANCE)

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section **IV. CLAIMS EXPENSES, SETTLEMENTS AND COOPERATION D.** is deleted in its entirety and replaced with the following:

The Insurer may, with the written consent of the Insured, settle a Claim covered under Insuring Agreement C., for solely a monetary amount which the Insurer deems reasonable. If the Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed, subject to the terms and conditions of the Policy:

(i)    the amount for which the Insurer could have settled such Claim plus Claims Expenses accrued as of the date such settleent was proposed in writing by the Insurer to the Insured, plus,

(ii)    50% of that portion of any settlement or judgment that exceeds the amount for which the Insurer could have settled such Claim, plus 50% of the Claims Expenses accrued after the date such settlement was proposed in writing by the Insurer to the Insured.

All other terms and conditions remain unchanged.

*Neal S. Wolin*

Neal S. Wolin, President & COO

This endorsement, effective 12:01 am,     10/01/12
of policy number     00 IC 0141426-12

issued to:         AMERITAS HOLDING COMPANY

by:         TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND REPORTING PROVISION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that:

1. Section I. **INSURING AGREEMENTS** is amended by deleting the last paragraph.

2. Section VII. **NOTICE** is deleted in its entirety and replaced by the following:

A.   The Insured has the right under this Policy to settle claims or losses not exceeding $ 500,000
      without the consent of the Insurer.

B.   The Insured will report Claims which are reasonably valued between $500,001 and $2,000,000
      and that may have coverage implications under this policy on a quarterly bordereau report as per the following
      schedule:

| Quarter Close | Report Due |
|---|---|
| 1/1 | 2/1 |
| 4/1 | 5/1 |
| 7/1 | 8/1 |
| 10/1 | 11/1 |

C.   Any Claim which, in the opinion of the Insureds and its counsel, has the probability to exceed
      $ 2,000,000            is to be reported to the Insurer as soon as practicable, but in no     event   later   than
      thirty days after the expiration of the policy period. In addition to the separate reporting requirement, such Claim
      shall also be maintained and updated on the bordereau set froth in paragraph (B) above.

D.   In the event that a Claim does not exceed $500,000            at the time the Insured initially makes such
      determination, and such loss or Claim subsequently exceeds $500,000           , the Insureds' rights
      under this policy shall not be prejudiced provided the loss or claim is reported to the Insurer as soon as practicable,
      but in no event later than thirty (30) days after the expiration of the policy period in which the Claim is first made.

E.   If during the Policy Period the Insureds first become aware of a specific Wrongful Act, and if the Insureds during
      the Policy Period give written notice tot the Insurer as soon as practicable during the policy period of:

(1)   the specific Wrongful Act, and

(2)   the consequences which have resulted or may reasonably be expected to result therefrom, and

(3)   the circumstances by which the Insureds first became aware thereof,

then any Claim made subsequently arising out of such Wrongful Act shall be deemed for the   purposes   of   this
Policy to have been made at the time such notice was first given.

F.   Any notice to the Insurer provided for in this Section VII. **NOTICE** shall be given to:
      Hartford Financial Products
      James P. Palermini, Esq.
      Assistant Vice-President & Claims Counsel
      2 N. LaSalle Street
      Suite 420
      Chicago, IL 60602

EO 00 M195 00 1107                         © 2007, The Hartford                         Page 1 of 2

If any limitation embodied in this provision or elsewhere in this Policy is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

**issued to:**    AMERITAS HOLDING COMPANY

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## AMEND SECTION III. EXCLUSIONS A. 5. & 6.

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. **EXCLUSIONS** A. 5. and 6. shall be deleted in their entirety and replaced by the following:

5.   for, based upon, arising from, or in any manner related to their gaining in fact any personal profit or advantage or receiving any remuneration to which such Insured was not legally entitled;

6.   for, based upon, arising from, or in any way related to any deliberately dishonest, malicious, fraudulent act or omission or any willful violation of law if a judgment or other final adjudication establishes such act, omission or willful violation; provided, however, this exclusion shall not apply to Insuring Agreement C. for Loss in connection with any Claim which includes allegations of both fraud and bad faith in rendering or in failing to render Professional Services;

All other terms and conditions remain unchanged.

*Neal S. Wolin, President & COO*

EO 00 M196 00 1107                    © 2007, The Hartford                    Page 1 of 1

This endorsement, effective 12:01 am,     10/01/12
of policy number      00 IC 0141426-12

issued to:       AMERITAS HOLDING COMPANY

                 TWIN CITY FIRE INSURANCE CO.
by:

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT INSURED AS POLICYHOLDER

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. EXCLUSIONS B. 4. (iv) shall be deleted in its entirety and replaced by the following:

   (iv)  a Claim brought by an Insured who is a natural person in the capacity of a customer of the company or a policyholder of any policy issued by the Company;

All other terms and conditions remain unchanged.

Neal S. Wolin, President & COO

EO 00 M197 00 1107                    © 2007, The Hartford                    Page 1 of 1

**This endorsement, effective 12:01 am,**     10/01/12
**of policy number**     00 IC 0141426-12

**issued to:**     AMERITAS HOLDING COMPANY

**by:**     TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDMENT OF DEFINITIONS

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section **II. DEFINITIONS N.** shall be deleted in its entirety and replaced by the following:

N.   "Subsidiary" means any entity in which the Company holds more than a fifty percent (50%) ownership interest.

All other terms and conditions remain unchanged.

*Neal S. Wolin, President & COO*

EO 00 M198 00 1107                    © 2007, The Hartford                    Page 1 of 1

**This endorsement, effective 12:01 am,**  10/01/12
**of policy number**    00 IC 0141426-12

**issued to:**      AMERITAS HOLDING COMPANY

**by:**         TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF EXCLUSION OF CLAIMS FROM AMERUS

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. **EXCLUSIONS** A. shall be amended by adding the following:

12.   brought or maintained in any capacity by or on behalf of:

    (1)   AmerUs and/or its subsidiaries; or

    (2)   any director, officer, employee, present or former security holder or class of security holders of the entity or entities included in item (1) above.

All other terms and conditions remain unchanged.

*Neal S. Wolin*

Neal S. Wolin, President & COO

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

This endorsement, effective 12:01 am,     10/01/12
of policy number     00 IC 0141426-12

issued to:     AMERITAS HOLDING COMPANY

by:     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. EXCLUSIONS C. is amended by adding the following:

14. for, based upon, arising from, attributable to, in connection with, or in any way related to the inability by any bank or banking firm or broker and/or dealer in securities or commodities to make any payment or settle or effect any transaction of any kind;

15. for, based upon, arising from, attributable to, in connection with, or in any way related to the purchase or sale of securities for which the Insured and/or Director and/or Officer received commission or other remuneration or where the Insured and/or Director and/or Officer had an equity interest in the issuer of such securities;

16. for, based upon, or arising out of, the INSURED'S business operations as an investment banker, including without limitation:

    Investment banking activities, including financing activities, the rendering of fairness and valuation opinions, the underwriting, syndicating and promotion of securities sales, the rendering of advice and recommendations regarding securities, and professional activities and services rendered in connection with mergers, acquisitions, divestitures, tender offers, proxy contests, leveraged buy-outs, going private transactions, reorganizations, capital restructurings, recapitalizations, spin-offs, primary and secondary offerings of securities, asset sales and stock sales.

17. for, based upon, or arising out of the INSURED'S activities as a managed health care organization which shall include, but not be limited to, health care cost review, peer review, claims handling, marketing, administration and management of services provided by or on behalf of the insured including directly providing or the failure to provide medical services;

All other terms and conditions of this policy remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

EO 00 M200 00 1107          © 2007, The Hartford          Page 1 of 1

**This endorsement, effective 12:01 am,**    10/01/12
**of policy number**    00 IC 0141426-12

**issued to:**    AMERITAS HOLDING COMPANY

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. EXCLUSIONS A. shall be amended by adding the following to the end of Exclusion 1:

however, this exclusion shall not apply to any Loss arising from:

(1) emotional distress or mental anguish incurred in connection with any Claim for the wrongful denial of insurance benefits;

All other terms and conditions remain unchanged.

*Neal S. Wolin*

Neal S. Wolin, President & COO

This endorsement, effective 12:01 am,    10/01/12        forms part
of policy number    00 IC 0141426-12

**issued to:**      AMERITAS HOLDING COMPANY

**by:**      TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section II. DEFINITIONS M. shall be amended by adding the following:

"Professional Services" shall also mean:

1)    services performed solely by any of the Insureds as:

    a)    a securities broker and/or dealer or registered representative of the Insured with respect to the rendering of financial or investment advice or investment services or providing securities trading services for others or in the services set forth in the definitions of the terms broker and/or dealer in the Securities Act of 1933, the Securities Exchange Act of 1934, and/or the Investment Company Act of 1940;

    b)    an investment advisor and/or financial advisor and/or economic advisor and/or investment manager (unless acting as an investment advisor to investment companies, as each is defined in the Investment Company Act of 1940), pursuant to a written contract defining the scope of such advice and/or services and the compensation to be paid therefore;

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

EO 00 M202 00 1107          © 2007, The Hartford          Page 1 of 1

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

issued to:    AMERITAS HOLDING COMPANY

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CONVERSION NOTIFICATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section IX. GENERAL CONDITIONS is amended by adding the following:

J.    Conversion Notification

Upon the Company's intention to convert from a mutual association or organization to a stock association or organization, after the effective date of this Policy, written notice of such intention shall be given to the Insurer c/o **Hartford Financial Products, 2 N. LaSalle Street, Suite 420, Chicago, Illinois 60602**, as soon as practicable but in no event later than thirty (30) days prior to the effective date of the conversion, together with such information as the Insurer may request. The Insurer, at its option, may make premium adjustments or coverage revisions as it deems necessary. In the event that the Company shall fail to deliver any such additional information to the Insurer within such period, any subsequent claim arising from or in any way involving such offering will not be covered under this policy.

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

This endorsement, effective 12:01 am,   10/01/12
of policy number    00 IC 0141426-12

**issued to:**      AMERITAS HOLDING COMPANY

**by:**      TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## COST OF CORRECTIONS

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

This endorsement applies solely to Section II. DEFINITIONS M. "Professional Services":

In consideration of the premium charged, it is agreed that the Insurer shall pay on behalf of the Insured(s) all reasonable and necessary costs or expenses (other than the salaries of the Insureds' Employees) in excess of the applicable retention amount set forth in Item 4. of the Declarations, incurred by the Insured(s) subject to the written consent of the Insurer to correct any situation arising out of any actual or alleged Wrongful Act, but only if such Wrongful Act, if not corrected, would automatically, have resulted in loss or damage to the Insured(s) or any of its shareholders, any client of the Company or any entity covered under this policy, and which would, in the absence of correction, have constituted a Loss payable under the terms of this policy.

It is further agreed that coverage provided by this endorsement shall not extend to any;

(1)    diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value, unless caused by a Wrongful Act of any person or entity insured under this policy in the execution or implementation of investment advice or any investment decision or any other activity covered under this policy; or

(2)    loss of the actual money, securities or other property in the custody or control of the Insured.

It is further agreed that coverage provided by this endorsement shall extend only to:

Professional Services performed solely by any of the Insureds as:

An investment advisor and/or financial advisor and/or economic advisor and/or investment manager (unless acting as an investment advisor to investment companies, as each is defined in the Investment Company Act of 1940), pursuant to a written contract defining the scope of such advice and/or services and the compensation to be paid therefore.

All other terms and conditions remain unchanged.

Neal S. Wolin, President & COO

EO 00 M204 00 1107        © 2007, The Hartford        Page 1 of 1

**This endorsement, effective 12:01 am,**    10/01/12
**of policy number**    00 IC 0141426-12

**issued to:**     AMERITAS HOLDING COMPANY

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FAILURE TO MAINTAIN INSURANCE EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that the Underwriters shall not be liable to make any payment for loss based upon, arising from, or in any way related to any failure to effect or maintain insurance, including, but not limited to, types and amounts of insurance.

All other terms and conditions remain unchanged.

Neal S. Wolin, President & COO

EO 00 M205 00 1107         © 2007, The Hartford         Page 1 of 1

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

**issued to:**    AMERITAS HOLDING COMPANY

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INSURANCE COMPANY WRONGFUL PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY ERRORS AND OMISSIONS POLICY**

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS & OMISSIONS LIABILITY POLICY**

Section III. EXCLUSIONS is amended by the addition of the following:

E.    The Insurer shall not be liable to make any payment for Loss in connection with any Claim where all or part of such Claim is, directly or indirectly, based on, attributable to, arising out of, resulting from or in any manner related to the actual or alleged use of or participation in: (1) Bid Rigging; (2) a Fictitious Quote; (3) Wrongful Contingent Commissions; (4) Conditioning; or (5) Finite Risk Insurance/Reinsurance.

Solely for the purposes of this endorsement, "Bid Rigging" means the knowing participation by the Insured in a scheme in which an agent and/or broker obtains a Fictitious Quote (whether or not from the Insured) in order to create the false appearance of competition among insurance companies for the business being quoted, or otherwise conspires or acts in concert with other parties to achieve such a result.

Solely for the purposes of this endorsement, a "Quote" means an oral or written offer or proposal to provide insurance.

Solely for the purposes of this endorsement, a "Fictitious Quote" means a Quote by an insurance company that is deliberately and artificially inflated and is designed to steer business to a particular insurance company in consideration of the insurance company's participation in either Bid Rigging or the payment of Wrongful Contingent Commissions.

Solely for the purposes of this endorsement, "Wrongful Contingent Commissions" means commissions paid pursuant to an agreement between the Insured and a broker that remunerates the broker on an aggregate basis for placing or maintaining business with the Insured, which, to the knowledge of the Insured, has induced such broker to breach its fiduciary, statutory, regulatory and/or contractual duties owed to its clients or has created an unreasonable restraint on trade or competition.

Solely for the purposes of this endorsement, "Conditioning" means any attempt by an insurance agent and/or broker to link an insurance company's use of the agent and/or broker's reinsurance services with any: (a) incentive, including, but not limited to, compensation, commission discounts or preferential treatment in placement of any insurance; or (b) penalty, including, but not limited to, threats, actual reduction or discontinuance of volume or quality of any insurance placements.

Solely for the purposes of this endorsement, "Finite Risk Insurance/Reinsurance" shall mean any insurance and/or reinsurance contract that is sold or purchased with the intent to provide balance sheet and/or income statement engineering/optimization.

All other terms and conditions remain unchanged.

*Neal S. Wolin, President & COO*

EO 00 M207 00 1107    © 2007, The Hartford    Page 1 of 1

**This endorsement, effective 12:01 am,**     10/01/12
**of policy number**     00 IC 0141426-12

**issued to:**     AMERITAS HOLDING COMPANY

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MEDICAL MALPRACTICE EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. EXCLUSIONS A. is amended by adding the following:

9.     where all or part of such claim is, directly or indirectly, based on, attributable to, arising out of, resulting from or in any manner relating to the rendering or failure to render any medical, nursing, or counseling service by the Company and/or its Directors and/or Officers. Such service includes, but is not limited to, the diagnosis and treatment (whether surgical or otherwise) of any patient for any condition, whether physical or emotional.

All other terms and condition remain unchanged.

Neal S. Wolin, President & COO

EO 00 M208 00 1107                    © 2007, The Hartford                    Page 1 of 1

This endorsement, effective 12:01 am,   10/01/12
of policy number   00 IC 0141426-12

**issued to:**   AMERITAS HOLDING COMPANY

**by:**   TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MUTUAL FUND WRONGFUL PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY ERRORS AND OMISSIONS POLICY**

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS & OMISSIONS LIABILITY POLICY**

Section III. EXCLUSIONS is amended by the addition of the following:

F.   The Insurer shall not be liable to make any payment for Loss in connection with any Claim where all or part of such Claim is, directly or indirectly, based on, attributable to, arising out of, resulting from or in any manner relating to, or in consequence of any Claim made against any Insured alleging that any Insured intentionally or negligently permitted, or aided or abetted others in using, was aware of others using, or was a participant or connected in any way in the use of: 1) Late Trading; 2) Market Timing; 3) Prohibited Sales Practices; or 4) Selective Disclosure. Such Loss is excluded regardless of the form, style or denomination of such Claim, or the theory of liability alleged.

Solely for the purposes of this endorsement, "Late Trading" means:

1)   Any transaction involving mutual fund shares on a given day, undertaken after the market closes on such day, at the price sold to the public during that day prior to the market having closed; or

2)   any transaction defined as late trading by any state or federal statute or regulation, or any prospectus, policy, limitation, agreement or procedure of the mutual fund.

Solely for the purposes of this endorsement, "Market Timing" means any short-term "in/out" trading of mutual funds in such a manner as to exploit market inefficiencies.

Solely for the purposes of this endorsement, "Prohibited Sales Practices" means any misrepresentation or omission made to a purchaser of mutual fund shares regarding advisory fees, expenses, commissions or the existence of any relationship shared or consideration exchanged between the Insured and any broker or other intermediary.

Solely for the purposes of this endorsement, "Selective Disclosure" means the disclosure of the portfolio holdings of any mutual fund to any party other than those to whom it would be disclosed during the course of the mutual fund's normal disclosure of same to the general public.

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

**issued to:**    AMERITAS HOLDING COMPANY

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NUCLEAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. **EXCLUSIONS** A. Exclusions Applicable to all Insuring Agreements is amended to add:

12. for, based upon, arising from, or in any way related to any:

    1. actual, alleged or threatened discharge, dispersal, release or escape of ; or

    2. direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize,

    nuclear material, nuclear waste or radiation, including without limitation any Claim by or on behalf of the Company or its shareholders in their capacity as such

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

EO 00 M211 00 1107            © 2007, The Hartford            Page 1 of 1

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

**issued to:**     AMERITAS HOLDING COMPANY

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## POLLUTION EXCLUSION - DERIVATIVE WAIVER

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section III. **EXCLUSIONS** A. 8. does not apply to any Loss in connection with any Claim made against the Insureds brought on behalf of the Company by a security holder of the Company derivatively, but only if the party bringing the Claim is not a Director or Officer and is acting totally independent of, and totally without the solicitation, assistance or participation of any of the Directors and Officers or the Company.

However, this Endorsement applies only to the extent that the Company is prohibited by law or by reason of Financial Insolvency from indemnifying the Directors and Officers for Loss incurred as a result of such derivative action.

It is further agreed that, if coverage is afforded with respect to such derivative action, no Claims Expenses will be paid by the Insurer until such time as the Company demonstrates to the satisfaction of the Insurer that it is prohibited by law or by reason of Financial Insolvency from indemnifying its Directors and Officers.

All other terms and conditions remain unchanged.

*Neal S. Wolin, President & COO*

EO 00 M212 00 1107        © 2007, The Hartford        Page 1 of 1

**This endorsement, effective 12:01 am,**    10/01/12
**of policy number**    00 IC 0141426-12

**issued to:**      AMERITAS HOLDING COMPANY

**by:**      TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PUNITIVE DAMAGES EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

With respect to the insurability of punitive, exemplary, multiple or liquidated damages, the Insurer will not contend for any reason, unless appropriate to do so as a matter of law, regulation or public policy, that such damages are uninsurable; and the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction which permits coverage of such damages.

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

This endorsement, effective 12:01 am,     10/01/12
of policy number     00 IC 0141426-12

issued to:     AMERITAS HOLDING COMPANY

by:     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SECURITIES OFFERING ENDORSEMENT

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section **IX. GENERAL CONDITIONS** is amended by adding the following:

K.     Securities Offering Provision

If during the **Policy Period** the **Company** announces or agrees to sell, distribute, offer to sell or distribute, or solicit offers to purchase any type of security representing equity interest in or debt obligation of the **Company** on either a public or private placement basis, whether or not a prospectus has been or will be issued, written notice of such announcement or agreement shall be given to the Insurer c/o **Hartford Financial Products, 2 N. LaSalle Street, Suite 420, Chicago, Illinois 60602,** as soon as practicable, but in no event later than thirty (30) days after the effective date of the announcement or agreement, together with such information as the Insurer may request. The Insurer, at its sole option, may make a premium adjustment or coverage revisions as it deems necessary subject the Insurers sole discretion. If the **Parent Company** fails to give such notice, provide such information, pay such additional premium or agree to such coverage revisions, any **Claim** for, based upon, arising from, or in any way related to such sale, distribution, offer to sell or distribute, solicitation of offers to purchase or any other subsequent purchase, sale, distribution or offer to purchase, distribute or sell such securities shall not be covered under this Policy.

All other terms and conditions remain unchanged.

Neal S. Wolin, President & COO

EO 00 M214 00 1107                     © 2007, The Hartford                     Page 1 of 1

This endorsement, effective 12:01 am,    10/01/12
of policy number    00 IC 0141426-12

**issued to:**    AMERITAS HOLDING COMPANY

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIFIC ORGANIZATION EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS & OMISSIONS LIABILITY POLICY**

It is agreed that:

1. "Subsidiary", as defined in Section II. N. of the Policy, shall not include the following entities:
    CALVERT ASSET MANAGEMENT CO., INC.
    CALVERT GROUP, LTD.
    SUMMIT MUTUAL FUNDS, INC.

2. Section III. EXCLUSIONS is amended by adding the following:

    14. brought or maintained by or on behalf of, or in the name of, any of the following organizations, including, but not limited to, any subsidiary, trustee, receiver, assignee, director, officer, security holder, shareholder, or beneficiary thereof:
        CALVERT ASSET MANAGEMENT CO., INC.
        CALVERT GROUP, LTD.
        SUMMIT MUTUAL FUNDS, INC.

All other terms and conditions remain unchanged.

*Neal Wolin*

Neal S. Wolin, President & COO

This endorsement, effective 12:01 am,    10/01/12
of policy number   00 IC 0141426-12

issued to:     AMERITAS HOLDING COMPANY

by:       TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## UNAUTHORIZED ACCESS EXCLUSION

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

It is agreed that Section **III. EXCLUSIONS** C. shall be amended by adding the following:

18.  based upon, arising from, or in any way related to, any actual or alleged non-function, malfunction, or security breach in connection with the mechanisms, devices, procedures, programming, protocols, or encryption of the electronic data, electronic systems, and/or electronic commerce activities of the COMPANY.

All other terms and conditions remain unchanged.

Neal S. Wolin, President & COO

EO 00 M216 00 1107          © 2007, The Hartford          Page 1 of 1

This endorsement, effective 12:01 am,   10/01/12   forms part
of policy number   00 IC 0141426-12

issued to:   AMERITAS HOLDING COMPANY

by:   TWIN CITY FIRE INSURANCE CO.

# NUCLEAR LIABILITY EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

INSURANCE COMPANY ERRORS AND OMISSIONS POLICY

It is agreed that Section III. EXCLUSIONS is amended to add:

( 12)   for, based upon, arising from, or in any way related to any:

1.   actual, alleged or threatened discharge, dispersal, release or escape of ; or

2.   direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize,

nuclear material, nuclear waste or radiation, including but not limited to any position taken by the Insured with respect to any insurance provided for any actual or alleged, nuclear material, nuclear wastes, or radiation.

All other terms and conditions remain unchanged.

David Zwiener, President

EO 00 S051 01 1203                    © 2003, The Hartford                    Page 1 of 1

# ENDORSEMENT    24

This endorsement, effective on          10/01/12          at 12:01 A.M. standard time, forms a part of

Policy No. IC 0141426-12          of the TWIN CITY FIRE INSURANCE CO.

Issued to AMERITAS HOLDING COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADD SUBSIDIARY WITH PENDING OR PRIOR LITIGATION AND PRIOR ACTS EXCLUSIONS

This endorsement modifies insurance provided under the following:

## INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY

It is agreed that the definition of "Subsidiary" in **Section II. DEFINITIONS** N. is amended to include the following:

BNL FINANCIAL CORPORATION

It is further agreed that Section **III. EXCLUSIONS** A. is amended by adding the following:

9.     for, based upon, arising from, or in any way related to any act(s) or omission(s) actually or allegedly committed or attempted by the above referenced **Subsidiary** and/or its **Directors** and **Officers** prior to 01/01/12.

It is further agreed that, solely with respect to the extension of coverage afforded by this Endorsement, the Prior Litigation Date set forth in Item 5. of the Declarations is amended to read in its entirety as follows:

Insuring Agreements A and B:     01/01/12
Insuring Agreement C:     01/01/12

All other terms and conditions remain unchanged.

Neal S. Wolin, President & COO

EO 00 M193 00 1107                                                                                     Page 1 of 1

## ENDORSEMENT    25

This endorsement, effective on          10/01/12              at 12:01 A.M. standard time, forms a part of

Policy No. IC 0141426-12              of the TWIN CITY FIRE INSURANCE CO.

Issued to AMERITAS HOLDING COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### ADD SUBSIDIARY WITH PENDING OR PRIOR LITIGATION AND PRIOR ACTS EXCLUSIONS

This endorsement modifies insurance provided under the following:

### INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY

It is agreed that the definition of "Subsidiary" in **Section II. DEFINITIONS** N. is amended to include the following:

UNION CENTRAL LIFE INSURANCE COMPANY

It is further agreed that Section **III. EXCLUSIONS** A. is amended by adding the following:

9.      for, based upon, arising from, or in any way related to any act(s) or omission(s) actually or allegedly committed or
        attempted by the above referenced **Subsidiary** and/or its **Directors** and **Officers** prior to 01/01/06.

It is further agreed that, solely with respect to the extension of coverage afforded by this Endorsement, the Prior Litigation
Date set forth in Item 5. of the Declarations is amended to read in its entirety as follows:

        Insuring Agreements A and B:      01/01/06
        Insuring Agreement C:             01/01/06


All other terms and conditions remain unchanged.

*Neal S. Wolin*

Neal S. Wolin, President & COO

EO 00 M193 00 1107                                                    Page 1 of 1

This endorsement, effective on          10/01/12                    at 12:01 A.M. standard time, forms a part of

Policy No. IC 0141426-12                 of the TWIN CITY FIRE INSURANCE CO.

Issued to AMERITAS HOLDING COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**FIDUCIARY LIABILITY COVERAGE**

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY DIRECTORS & OFFICERS LIABILITY AND ERRORS AND OMISSIONS POLICY**

Solely regarding the coverage afforded by this Endorsement, it is agreed that:

1.     **DECLARATIONS ITEM 4.** Is amended to add:

       **RETENTION:**  $50,000 each **FIDUCIARY CLAIM**, including **DEFENSE COSTS**.

2.     Section I. **INSURING AGREEMENTS** is amended to add the following coverage:

       D.     The Company shall pay on behalf of an **INSURED** all **LOSS** resulting from a **FIDUCIARY CLAIM** first
              made against an **INSURED** during the **POLICY PERIOD** and reported in writing to the Company as soon
              as practicable, but no later than sixty (60) days after said **CLAIM** is first made, provided always that said
              **CLAIM** arises from a **FIDUCIARY WRONGFUL ACT** committed or alleged to have been committed by an
              **INSURED** during or prior to the **POLICY PERIOD**.

3.     Section II. **DEFINITIONS A. "Claim"** is amended to add:

              (d) "Claim" shall also include a **Fiduciary Claim**.

4.     Section II. **DEFINITIONS H. "Insured"** is amended to add:

              (3)     "**Insured**" also means any **COVERED PLAN**, and **DIRECTORS, OFFICERS**, partners   or
              trustees of the **NAMED INSURED** or any **COVERED PLAN**, but only to the extent a     **CLAIM**   is     made
              against them arising from a **FIDUCIARY WRONGFUL ACT**.

5.     Section II. **DEFINITIONS O. "Wrongful Act"** is amended to add:

              (3)     "**Wrongful Act**" includes a **Fiduciary Wrongful Act**.

6.     Section II. **DEFINITIONS** is amended to add the following definitions:

       P.     "**Covered Plan**" means:

              1.   AMERITAS LIFE INSURANCE CORP SALARIED EMPLOYEES PENSION PLAN
              2.   AMERITAA LIFE INSURANCE CORP GENERAL MANAGERS, UNIT MANAGERS UNIT
                   SUPERVISORS AND AGENTS PLAN
              3.   LIFE INSURANCE PLAN FOR SALARIED EMPLOYEES
              4.   DISABILITY PLAN FOR SALARIED EMPLOYEES

EO 00 M248 00 0112                                                                    Page 1 of 3

5.  TRAVEL ACCIDENT PLAN
6.  DENTAL EXPENSE PLAN FOR GENERAL MANAGERS , UNIT MANAGERS, UNIT SUPERVISORS AND AGENTS
7.  DENTAL EXPENSE PLAN FOR SALARIED EMPLOYEES
8.  MUTUAL OF OMAHA HEALTH PLANS OF LINCOLN, INC. HEALTH PLAN
9.  AMERI-FLEX PLAN
10. VOLUNTARY ACCIDENT INSURANCE PLAN
11. LONG TERM CARE PLAN
12. SUPPLEMENTAL LONG TERM DISABILITY PLAN
13. ACACIA RETIREMENT PLAN
14. ACACIA CAPITAL ACCUMULATION PLAN
15. PENSION PLAN FOR AGENTS, SALES MANAGERS & GENERAL MANAGERS OF ACACIA
16. ACACIA EMPLOYEES GROUP LIFE INSURANCE
17. COMPREHENSIVE MEDIAL BENEFITS PLAN
18. ACACIA EMPLOYEES DISABILITY PLAN
19. ACACIA DEATH AND DISMEMBERMENT PLAN
20. ACACIA LIFE BUSINESS TRAVEL ACCIDENT PLAN
21. TUITION ASSISTANCE PROGRAM
22. KAISER PERMANENTE
23. AETNA HEALTH PLAN, INC. – HMO
24. AMERITAS LIFE INSURANCE CORP TRIFT PLAN FOR SALARIED EMPLOYEES, AGENTS GENERAL MANAGERS AND UNIT SUPERVISORS
25. AGENT AMERI-FLEX PLAN
26. HEALTH EXPENSE PLAN

Notwithstanding the above, **COVERED PLAN** shall not include: (i) any multi-employer plan, as defined in **ERISA**; or (ii) an **EMPLOYEE STOCK OWNERSHIP PLAN** unless such plan is specifically identified as an **EMPLOYEE STOCK OWNERSHIP PLAN** and listed as a **COVERED PLAN** in an endorsement to this Policy.

**"EMPLOYEE STOCK OWNERSHIP PLAN"** means any plan created or acquired to invest primarily in securities of the **NAMED INSURED** or a plan that invests more than 10% of plan assets in securities of the **NAMED INSURED**.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"FIDUCIARY CLAIM"** means a **CLAIM** for a **FIDUCIARY WRONGFUL ACT** in connection with a **COVERED PLAN**.

**"FIDUCIARY WRONGFUL ACT"** means:

(1) any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of any **COVERED PLAN** by **ERISA** or any similar law of any state or other jurisdiction anywhere in the world;

(2) any actual or alleged negligent act, error or omission in handling records, counseling employees, or effecting enrollment, termination or cancellation of participants or beneficiaries under a **COVERED PLAN**; or

(3) any other matter claimed against any **INSUREDS** solely by reason of their serving as fiduciaries of a **COVERED PLAN**.

7.  Section **III. EXCLUSIONS** A. 4. is deleted.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

8.    Section **III. EXCLUSIONS** is amended to add the following exclusions:

    D.    Exclusions Applicable to Insuring Agreement D.

The Insurer shall not be liable to make any payment for loss under Insuring Agreement D. In connection with any Claim made against the Insureds:

    1.    for any liability assumed under any contract or agreement, provided that this exclusion shall not apply to liability: (i) that would have been incurred in the absence of such contract or agreement; or (ii) assumed under any agreement or declaration of trust under which any **COVERED PLAN** was established;

    2.    for any **FIDUCIARY WRONGFUL ACT** involving a **COVERED PLAN** occurring prior to, or after termination of, sponsorship of such **COVERED PLAN** by the **NAMED INSURED**;

    3.    for, based upon, arising from, or in any way related to a failure to fund, or collect contributions owed to, a **COVERED PLAN**;

    4.    for benefits due under the terms of a **COVERED PLAN**, except to the extent such benefits are payable by an **Insured Person** as a personal obligation and liability for such benefits is based upon a covered **FIDUCIARY WRONGFUL ACT**;

    5.    for, based upon, arising from, or in any way related to any prior or pending demand, suit or proceeding against any **INSURED** as of 10/01/97 or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

    6.    for, based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in DECLARATIONS ITEM 2. was the subject of any notice given under any other insurance policy;

    7.    for, based upon, arising from, or in any way related to the gaining, in fact, of any personal profit, remuneration or advantage to which any **INSURED** is not legally entitled; or

9.    Section **V. LIMIT OF LIABILITY AND RETENTION A.** is amended to add:

    Notwithstanding the above, the Insurer's aggregate Limit of Liability for all **LOSS** arising from all **FIDUCIARY CLAIMS** covered under this Policy shall be $15,000,000 in the aggregate each **POLICY**

    **PERIOD**, including **DEFENSE COSTS**. Such Limit of Liability shall be the total aggregate limit of the Company's liability for all amounts payable under this policy as **LOSS** regardless of the number of **FIDUCIARY CLAIMS**, claimants, and/or **FIDUCIARY WRONGFUL ACTS** at issue. Such Limit of Liability shall be part of, and not in addition to, the aggregate Limit of Liability shown under DECLARATIONS ITEM 3.

All other terms and conditions remain unchanged.

*André A. Napoli*

André A. Napoli, President

EO 00 M248 00 0112                                                                                     Page 3 of 3

**issued to:**        AMERITAS HOLDING COMPANY

**by:**               TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under all lines of insurance in this policy subject to the Terrorism Risk Insurance Act.

**A.   Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Department of the Treasury will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of such insured losses that exceed the applicable insurer deductible. However, if aggregate insured losses attributable to "certified acts of terrorism" under the Terrorism Risk Insurance Act, as amended (TRIA), exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of such losses that exceeds $100 billion.

**B.   Cap On Certified Terrorism Losses**

A "certified act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism. The criteria contained in TRIA, for a "certified act of terrorism" include the following:

1.   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.   The act resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to "certified acts of terrorism" under TRIA, exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under TRIA, we shall not be liable for the payment of any portion of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C.   Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion, War Exclusion or the War And Military Action Exclusion.

All other terms and conditions remain unchanged.

David Zwiener, President

G-3435-0                              © 2008, The Hartford                              Page 1 of 1
HG 00 H068 00 0208
              (Includes copyrighted material of the Insurance Services Office, Inc., with its permission.)

This endorsement, effective 12:01 am,  10/01/12  forms part
of policy number  00 IC 0141426-12

**issued to:**  AMERITAS HOLDING COMPANY

**by:**  TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### NEBRASKA CANCELLATION AND NON-RENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

I.   The Cancellation provision of this Policy is deleted and replaced by the following:

NOTICE OF CANCELLATION

A.   The **Insurer** may only cancel this Policy for nonpayment of premium.

B.   The **Insurer** may cancel this Policy by mailing a Notice of Cancellation to the **Insured**, at the last address known to the **Insurer**, at least ten (10) days for nonpayment of premium. Notice of Cancellation will state the reason for cancellation

C.   If this Policy shall be cancelled by the **Insured**, the **Insurer** shall retain the customary short rate proportion of the premium hereon, except as otherwise provided in this Policy. If the **Insurer** cancels this Policy, the **Insurer** shall retain the pro rata proportion of the premium hereon.

II.  The following provisions are added:

NOTICE OF NONRENEWAL

The **Insurer** may nonrenew this Policy by mailing a Notice of Nonrenewal to the **Insured**, at the last address known to the **Insurer**, at least sixty (60) days prior to the expiration date or anniversary date of this Policy. The Notice of Nonrenewal will state the reason for nonrenewal.

METHOD OF NOTIFICATION

Notice of Cancellation or Nonrenewal will be sent by registered, certified, or first-class mail to the **Insured's** last mailing address known to the **Insurer**. If sent by first-class mail, a United States Postal Service certificate of mailing shall be sufficient proof of receipt of Notice of Cancellation or Nonrenewal on the third (3rd) calendar day after the date of the certificate.

All other terms and conditions remain unchanged.

David Zwiener, President

HR 26 H003 00 0805  © 2005, The Hartford  Page 1 of 1

This endorsement, effective 12:01 am,     10/01/12
of policy number     00 IC 0141426-12

**Issued to:**     AMERITAS HOLDING COMPANY

**by:**     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND MAILING ADDRESS FOR NOTICE ENDORSEMENT

**I.   Notice of Claim or Wrongful Act**

    A.   A notice of any **Claim** or **Wrongful Act** shall be given in writing to the following:

        *Via mail:*     The Hartford

                Claims Department

                Hartford Financial Products

                277 Park Avenue, 15th Floor

                New York, New York 10172

                or

        *Via email:*     HFPClaims@thehartford.com

                or

        *Via Facsimile:*     (917) 464-6000

    B.   Where it is stated in the policy or declarations page that a notice of any **Claim** or **Wrongful Act** shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115, it shall be deleted and replaced with the following:

    Notice of any **Claim** or **Wrongful Act** shall be given in writing to the following:

        *Via mail:*     The Hartford

                Claims Department

                Hartford Financial Products

                277 Park Avenue, 15th Floor

                New York, New York 10172

                or

        *Via email:*     HFPClaims@thehartford.com

                or

    *Via Facsimile:* (917) 464-6000

**II.   All Other Notices**

    A.   All notices other than a notice of **Claim** or **Wrongful Act** shall be given in writing to the following:

                The Hartford

                Product Services

                Hartford Financial Products

                277 Park Avenue, 15th Floor

                New York, New York 10172

HG 00 H009 01 0708          © 2008, The Hartford          Page 1 of 2

B.   With the exception of notice of a **Claim** or **Wrongful Act**, where it is stated in the policy or declarations page that a notice shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115 shall be deleted and replaced with the following:

All notices other than a notice of **Claim** or **Wrongful Act** shall be given in writing to the following:

The Hartford

Product Services

Hartford Financial Products

277 Park Avenue, 15th Floor

New York, New York 10172

All other terms and conditions remain unchanged.

Juan Andrade, President & COO

| **Named Insured:** | AMERITAS HOLDING COMPANY |
| --- | --- |
| **Policy Number:** | 00 IC 0141426-12 |
| **Effective Date:** | 10/01/12 |
| **Insurer:** | TWIN CITY FIRE INSURANCE CO. |

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM

We previously notified you that in accordance with the federal Terrorism Risk Insurance Act, as amended (TRIA), we must make "certified acts of terrorism" coverage available in the policies we offer.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism. The criteria contained in TRIA for "certified act of terrorism" include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.  The act resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Any coverage for terrorist acts certified under TRIA made available in our policies is partially reinsured by the United States Department of the Treasury under a formula established by the Act. Under this formula, the federal share equals 85% of that portion of such insured losses that exceeds the applicable insurer deductible. However, if aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) the Treasury will not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion and, in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

At that time we advised you that you will not be required to pay a premium for "certified acts of terrorism" coverage at this time. As a result of our notification, you have accepted "certified acts of terrorism" coverage. If, upon renewal of your policy, a premium is going to be charged for "certified acts of terrorism" coverage, we will provide you with notification of what that premium will be.

By accepting coverage for "certified acts of terrorism", we reserve the right to exclude coverage for losses that are not eligible for federal reinsurance under the Act.

HG 00 H001 03 0208                    © 2008, The Hartford                    Page 1 of 1
**(Includes copyrighted material of the Insurance Services Office, Inc., with its permission)**

IMPORTANT NOTICE

STATE OF <u>NEBRASKA</u>

COMMERCIAL LINES DEREGULATION

Under the commercial insurance deregulation law of <u>NEBRASKA</u> the rates and forms in the enclosed policy have not been approved by your state's insurance regulator.

If you have any questions, please contact your Hartford agent or broker.

David Zwiener, President

HG 00 H053 00 1203                    © 2003, The Hartford                    Page 1 of 1

00 IC 0141426-12  10/01/12

**Producer Compensation Notice** 

You can review and obtain information on The Hartford's
producer compensation practices at www.thehartford.com
or at 1-800-592-5717.

F-5267-0
HR 00 H093 00 0207                © 2007, The Hartford                Page 1 of 1

00 IC 0141426-12    10/01/12

# Exhibit C



# ARCH INSURANCE COMPANY
### A Missouri Corporation

ADMINISTRATIVE OFFICE
One Liberty Plaza
53rd Floor
New York, NY 10006
Tel: 800-817-3252

HOME OFFICE
3100 Broadway, Suite 511
Kansas City, MO 64111

**COMPANY SPONSORED LIFE INSURANCE AGENTS ERRORS AND OMISSIONS POLICY**

**THIS IS A CLAIMS MADE AND REPORTED POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD UNLESS AN EXTENDED REPORTING PERIOD APPLIES.**

**PLEASE READ THE ENTIRE POLICY CAREFULLY.**

## DECLARATIONS

Insurance is provided by: ARCH INSURANCE COMPANY

Policy No.     CAP 0050281 01                    Renewal of:     CAP 0050281 00

Item 1.     Sponsoring Company:     AMERITAS LIFE INSURANCE CORP. & SUBSIDIARIES

             Mailing Address:     P.O. BOX 81889
                                        5900 "O" STREET
                                        LINCOLN, NE 68501

Item 2.     First Named Insured:     AMERITAS LIFE INSURANCE CORP. & SUBSIDIARIES

             Mailing Address:     P.O. BOX 81889
                                        5900 "O" STREET
                                        LINCOLN, NE 68501

Item 3.     Policy Period:     From: JULY 1, 2013   To:  JULY 1, 2014
                                    12:01 a.m. local time at the address shown in Item 1

Item 4.     Limits of Liability:

             Option 1.     $1,000,000     Each Claim
                               $2,000,000     Aggregate Each Agent for the Policy Period

             Option 2.     $2,000,000     Each Claim
                               $3,000,000     Aggregate Each Agent for the Policy Period

             Broker/Dealer:     Ameritas Investment Corp.:

                               $1,000,000     Each Claim
                               $5,000,000     Aggregate

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

| Item 5. | Deductible: | $1,000.00 | each Claim each Agent for Company Sponsored insurance products; |
| | | $2,500.00 | each Claim each Agent for all other covered insurance products; |
| | | $5,000.00 | each Claim each Registered Representative for all securities processed through and approved by Ameritas Investment Corp.; |
| | | $50,000 | each Claim for the Broker/Dealer Entity (Ameritas Investment Corp.) |

Item 6.    Option 1:  Life/Health and Series 6 products

$1,000,000/$2,000,000:  $1,425
$2,000,000/$3,000,000:  $1,760

Option 2: Life/Health, Series 6 & 7 products

$1,000,000/$2,000,000:  $1,750
$2,000,000/$3,000,000:  $2,240

- Retired Agents (Emeritus) will be charged 50% of the active agent rate

Item 7.    Deposit Premium: $800,000.00

Item 8.    Endorsements Effective at Inception: See Attached Schedule of Forms and Endorsements

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

# SCHEDULE OF FORMS AND ENDORSEMENTS

| **NAMED INSURED:** Ameritas Life Insurance Corp. & Subsidiaries | TERM: 07/01/2013 – 07/01/2014 |
|---|---|
| **POLICY NUMBER:** CAP 0050281 01 | |

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| | 05 CAPD001 00 04 03 | COMPANY SPONSORED LIFE INSURANCE AGENTS ERRORS AND OMISSIONS POLICY |
| | 05 ML0002 00 12 06 | SIGNATURE PAGE |
| | 05 ML0014 00 03 08 | CLAIMS HANDLING PROCEDURES |
| | 00 ML0065 00 06 07 | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| 1 | 00 ML0003 00 08 07 | SERVICE OF SUIT |
| 2 | 00 CAP0004 28 06 04 | NEBRASKA STATE AMENDATORY ENDORSEMENT |
| 3 | | |
| 4 | 00 ML0207 00 11 03 | SUPPLEMENTARY PAYMENTS AMENDATORY ENDORSEMENT |
| 5 | 00 ML0207 00 11 03 | AMENDATORY ENDORSEMENT |
| 6 | 00 ML0207 00 11 03 | INDEPENDENT REGISTERED INVESTMENT ADVISER COVERAGE ENDORSEMENT |
| 7 | 00 ML0207 00 11 03 | AMEND LIFE SETTLEMENTS AND OPTIONS EXCLUSION – SUBLIMIT AMENDATORY ENDORSEMENT |
| 8 | 00 ML0207 00 11 03 | AMENDMENT TO RETROACTIVE DATE ENDORSEMENT |
| 9 | 00 ML0207 00 11 03 | AMENDMENT OF PROFESSIONAL SERVICES (DELETION OF SECURITIES COVERAGE) ENDORSEMENT – OPTION 1 |
| 10 | 00 ML0207 00 11 03 | SECURITIES PRODUCTS ENDORSEMENT – OPTION 2 |
| 11 | 00 ML0207 00 11 03 | SPECIFIC PRODUCT EXCLUSION ENDORSEMENT |
| 12 | 00 ML0207 00 11 03 | TERMINATED AGENTS ENDORSEMENT |
| 13 | 00 ML0207 00 11 03 | TRADE ERRORS OR COST OF CORRECTIONS ENDORSMENT |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ



# Arch
## Insurance Group®

Signature Page

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

_____
Michael R. Murphy
President

_____
Patrick K. Nails
Secretary

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

# COMPANY SPONSORED LIFE INSURANCE AGENTS
# ERRORS AND OMISSIONS POLICY

**THIS IS A CLAIMS MADE AND REPORTED POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD UNLESS AN EXTENDED REPORTING PERIOD APPLIES.**

## PLEASE READ THE ENTIRE POLICY CAREFULLY.

In consideration of the payment of premium and in reliance upon the statements in the **Application** which is made a part hereof and incorporated by reference and subject to the Declarations, terms, conditions and exclusions in this Policy, the Insurer indicated in the Declarations and the **Insureds** agree as follows:

I.  INSURING AGREEMENTS

    A.  Professional Liability

        The Insurer shall pay on behalf of the **Insured** all **Loss** which the **Insured** shall become legally obligated to pay because of a **Claim** first made against the **Insured** during the **Policy Period** or an Extended Reporting Period, if applicable, for a **Wrongful Act** committed on or after the **Retroactive Date** by the **Insured** solely in the rendering or failing to render **Professional Services**.

    B.  Wrongful Supervision or Termination

        The Insurer shall pay on behalf of the **Agent Manager** all **Loss** which the **Agent Manager** shall become legally obligated to pay because of a **Claim** first made against the **Agent Manager** during the **Policy Period** or an Extended Reporting Period, if applicable, for a **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** by an **Agent Manager** solely in the rendering or failing to render **Professional Services**.

    C.  Vicarious Liability

        The Insurer shall pay on behalf of the **Sponsoring Company** all **Loss** which the **Sponsoring Company** shall become legally obligated to pay because of a **Claim** first made during the **Policy Period** or an **Extended Reporting Period**, if applicable, solely arising out of a **Wrongful Act** of an **Agent** committed on or after the **Retroactive Date** solely in the rendering or failing to render **Professional Services**.  The **Wrongful Act** must be attributable solely to an **Agent** in the rendering or failing to render **Professional Services** and not due to any actual or alleged independent wrongdoing or bad faith of the **Sponsoring Company**.  If a **Claim** made against the **Sponsoring Company** includes both covered and uncovered allegations, the **Sponsoring Company** and the **Insurer** agree to use their best efforts to agree upon a fair and proper allocation of the payment of **Loss** and **Defense Costs** for such **Claim**.

II.  DEFENSE AND SETTLEMENT

    The Insurer shall have the right and duty to defend any **Claim** against the **Insured** seeking sums payable under this Policy, even if the allegations of the **Claim** are groundless or false.  The Insurer shall make such investigation and settlement of any **Claim** as it deems expedient, but the Insurer shall not be obligated to pay any **Claim** or judgment or continue to defend any **Claim** after the applicable Limit of Liability has been exhausted by payment of **Loss**.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

III.     DEFINITIONS

For purposes of this Policy:

A.     **Agent** means an individual who:

1.     maintains an agent or general agent contract with the **Sponsoring Company**;

2.     has elected to enroll for coverage under this Policy and whose enrollment is on file with the **Sponsoring Company**;

3.     has paid his or her premium;

4.     is licensed by the appropriate authorities to solicit and sell life, accident and health insurance products and services; and

5.     when required in rendering **Professional Services**, is properly registered as a registered representative with the National Association of Securities Dealers.

B.     **Agent Contract** means the contract between an **Agent** and the **Sponsoring Company**.

C.     **Agent Manager** means **Insureds** as defined in Section III. I. 1 and 2.

D.     **Application** means all signed applications and any attachments and materials submitted therewith for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer or any Affiliate of the Insurer of which this Policy is a renewal or replacement. An "Affiliate of the Insurer" is an insurer controlling, controlled by or under common control with the Insurer.

E.     **Broker/Dealer** means an entity acting as a "broker" or "dealer" in **Securities** as those terms are defined in sections 3(a)(4) and 3 (a)(5) of the Securities Exchange Act of 1934, and any amendments thereto.

F.     **Claim** means:

1.     a written demand for monetary damages received by an **Insured**;

2.     a civil proceeding commenced by the service of a complaint or similar pleading in which monetary damages are sought; or

3.     an arbitration commenced by the filing of the statement of claim in which monetary damages are sought;

including any appeal from the proceedings identified in paragraphs 2 and 3 above. **Claim** does not include a demand or proceeding for non-monetary or injunctive relief or any administrative or criminal proceeding.

G.     **Defense Costs** mean reasonable and necessary fees, costs and expenses incurred by or at the direction of the Insurer in the defense of a **Claim** and the premium for appeal, attachment or similar bonds.  The Insurer shall have no obligation to apply for or provide such bonds.  **Defense Costs** shall not include regular or overtime wages, salaries, or fees of directors, officers, and employees of the **Insured** or Insurer or fees and expenses of independent adjusters.

H.  **First Named Insured** means the insurance company listed in Item 2 of the Declarations and listed as the **Sponsoring Company** in Item 1 of the Declarations.

I.  **Insured** means:

    1.  an **Agent**;

    2.  a corporation, partnership or other business entity owned and controlled by an **Agent** but solely with respect to the liability of such organization as it arises out of the **Agent** rendering or failing to render **Professional Services**;

    3.  an employee acting in his or her capacity as such and on behalf of an **Agent** but solely with respect to liability of such employee as it arises out of the **Agent** rendering or failing to render **Professional Services**;

    4.  heirs, executors, administrators or legal representatives of an **Agent** in the event of death, incapacity or bankruptcy;

    5.  the **Sponsoring Company** but only with respect to coverage provided under Section I. C.; and

    6.  any Neophyte Agent of the **Sponsoring Company** provided that they are party to an agent contract with the **Sponsoring Company** on the effective date of this policy and provided that they are licensed by the appropriate authorities to solicit and sell products and/or services made available by the **Sponsoring Company.** Such individuals shall be specifically designated by name and their names shall be on file with the **Sponsoring Company.** Any new Neophyte Agent of the **Sponsoring Company** who shall become party to an agent contract with the **Sponsoring Company** after the effective date of this Policy shall become an **Insured** upon the effective date of such contract.

J.  **Loss** means monetary judgments, awards or settlements that an **Insured** is legally obligated to pay on account of a covered **Claim.** **Loss** shall include fees, charges, taxes, fines or penalties incurred by a claimant and included in such claimant's **Claim** against the **Insured.** **Loss** does not include:

    1.  civil or criminal fines or penalties imposed by law;

    2.  punitive, exemplary or the multiple portion of a multiplied damage award;

    3.  the return or withdrawal of fees, commissions or charges;

    4.  costs incurred as a result of any non-pecuniary or injunctive relief;

    5.  matters which are deemed uninsurable by law;

    6.  any amounts constituting a waiver of fees, charges, costs or any other monetary amounts the **Sponsoring Company** is contractually entitled to impose upon a customer; or

    7.  **Defense Costs**.

K.  **Multiple Employer Welfare Arrangement** shall have the same meaning as the term used by the Employee Retirement Income Security Act of 1974, and any amendments thereto. **Multiple Employer Welfare Arrangement** does not include an arrangement

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

where the direct contract for providing benefits is between the recipient of the benefit and an insurance company: (1) recognized as an admitted insurer by the insurance regulatory agency in the applicable state or jurisdiction; and (2) appropriately licensed to provide the coverage in the state or jurisdiction where the coverage is in force.

L. **Personal Injury** means injury or damage arising out of:

    1.    false arrest, detention or imprisonment;

    2.    malicious prosecution; or

    3.    libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy. However, there shall be no coverage for any such publication or utterance made in the course of or related to any form of advertising activities conducted by or on behalf of an **Insured**.

M. **Policy Period** shall mean the period stated in Item 3 of the Declarations, or any earlier termination or cancellation date of this Policy.

N. **Professional Services** means:

    1.    the solicitation, sale or servicing of:

        a.    life insurance, accident and health insurance, long-term care insurance, workers' compensation insurance as part of a 24-hour accident and health insurance product, disability income insurance or fixed annuities;

        b.    variable annuities, flexible and scheduled premium annuities and variable life insurance;

        c.    mutual funds registered with the Securities and Exchange Commission and sold or serviced through a **Broker/Dealer** that is a member of the National Association of Securities Dealers; and

        d.    **Securities** (other than variable annuities, variable life insurance and mutual funds) that were authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** or that were processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company**;

    2.    the solicitation, sale or administration of employee benefit plans, other than **Multiple Employer Welfare Arrangements**, including group plans, group or ordinary pension or profit sharing plans, retirement annuities, and life, accident and health or disability plans;

    3.    financial planning, advice and consultation solely in connection with any of the products listed in paragraphs 1 and 2 above; and

    4.    providing services as a notary public.

O. **Related Claims** means all **Claims**, whether made against more than one **Insured** or by more than one claimant, arising out of a single **Wrongful Act** or **Wrongful Supervision or Termination Act** or a series of **Wrongful Acts** or **Wrongful Supervision or Termination Acts** that have as a common nexus any fact, circumstance, situation, event,

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

P.  **Retroactive Date** means the inception date of the **Agent's** first claims-made life insurance agents professional liability policy from which date coverage has been maintained in force without interruption. The **Retroactive Date** for the **Sponsoring Company** and **Insureds** defined in Section III. I. 2 through 4 shall be the same as applicable to the **Agent** whose **Wrongful Act** or **Wrongful Supervision or Termination Act** gave rise to the **Claim** or the **Agent** who is responsible for the **Wrongful Act** or **Wrongful Supervision or Termination Act** of such other **Insureds**.

Q.  **Securities** shall have the same meaning as the term used by the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or the Investment Advisors Act of 1940, and any amendments thereto.

R.  **Sponsoring Company** means the **First Named Insured** and the insurance company listed in Item 1 of the Declarations and any **Subsidiaries**.

S.  **Subsidiary** means a corporation in which the **Sponsoring Company** listed in Item 1 of the Declarations:

1.  owns as of the inception date of the **Policy Period** more than fifty percent (50%) of the issued and outstanding voting stock either directly or indirectly through one or more of its **Subsidiaries** and which corporation is engaged in **Professional Services**; or

2.  forms or acquires on or after the inception date of the **Policy Period**, if the **Sponsoring Company** listed in Item 1 of the Declarations owns, directly or indirectly through one or more of its **Subsidiaries**, more than fifty percent (50%) of the issued and outstanding voting stock and which corporation is engaged in **Professional Services**. Such corporation is automatically covered as of the date of formation or acquisition if the number of agents of such corporation total less than twenty percent  (20%) of the total number of **Agents** of the **Sponsoring Company** as of the inception date of the **Policy Period**.  The **Sponsoring Company** shall provide the Insurer with full particulars of the new **Subsidiary** within ninety (90) days of the date of formation or acquisition.

T.  **Wrongful Act** means a negligent act, error or omission or **Personal Injury** committed by an **Insured.**

U.  **Wrongful Supervision or Termination Act** means a negligent, act, error or omission:

1.  arising out of  the supervision and training of an agent contracted with the **Agent Manager**, but only with respect to **Wrongful Acts** of such agent which constitute covered **Professional Services**; or

2.  arising out of the termination of the agency contract between an **Agent Manager** and an agent, provided, however, there shall be no coverage for discrimination as defined by federal, state or local statute, regulation, law or ordinance.

IV.  EXCLUSIONS

This Policy does not apply to any **Claim**:

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

A.     based upon, arising out of or in any way involving any fact, circumstance or situation which has been the subject of any written notice given under any policy of which this Policy is a direct or indirect renewal or replacement or which preceded this Policy;

B.     based upon, arising out of or in any way involving any act, error or omission occurring prior to the date of the **Agent's** initial enrollment as an **Insured** under this Policy or a previously issued policy by the Insurer if on the date of initial enrollment the **Agent** had knowledge of any act, error or omission which could reasonably be expected to result in a **Claim**;

C.     based upon, arising out of or in any way involving any prior or pending litigation against any **Insured** filed on or before the inception date of this Policy or under any other policy of which this Policy is a renewal, whichever is earlier, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

D.     based upon, arising out of or in any way involving any dishonest, fraudulent, criminal, malicious or purposeful act, error or omission committed by or at the direction of an **Insured**; however, notwithstanding the foregoing, the **Insured** shall be afforded a defense, subject to the terms of this Policy, until the allegations are subsequently proven by a final adjudication.  In such event, the **Insured** shall reimburse the Insurer for all **Defense Costs** incurred by the Insurer;

E.     based upon, arising out of or in any way involving an **Insured** gaining, in fact, any profit, remuneration or pecuniary advantage to which the **Insured** was not legally entitled;

F.     based upon, arising out of or in any way involving a willful violation of the rules or regulations of the National Association of Securities Dealers, Securities and Exchange Commission, Securities Act of 1933, Securities Exchange Act of 1934, Investment Company Act of 1940, or the Investment Advisors Act of 1940 and any amendments thereto, or of any state securities statute or state regulatory agency;

G.     based upon, arising out of or in any way involving any commingling of or improper use of client funds;

H.     based upon, arising out of or in any way involving investment products partially or totally owned by the **Insured**;

I.     based upon, arising out of or in any way involving bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

J.     based upon, arising out of or in any way involving discrimination as defined by federal, state or local statute, regulation, law or ordinance;

K.     based upon, arising out of or in any way involving the liability of others assumed by the **Insured** under any contract or agreement unless such liability would have attached to the **Insured** even in the absence of such agreement;

L.     based upon, arising out of or in any way involving any pension, profit sharing, health and welfare, or other employee benefit plan or trust sponsored by the **Insured** as an employer;

M.     based upon, arising out of or in any way involving any professional services performed by the **Insured** as an actuary, accountant, attorney, real estate agent or real estate broker, property/casualty insurance agent or third party claims administrator; however, this

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

Exclusion shall not apply to tax advice incidental to the sale of products listed in Section III. N. 1 and 2;

N.  based upon, arising out of or in any way involving insolvency, receivership, conservatorship, liquidation, bankruptcy, inability or refusal to pay of any organization, entity or vehicle of any kind, nature or structure in which the **Insured** has placed, recommended to be placed or obtained coverage or in which an **Insured** has placed or recommended to be placed the funds of a client or account; however, this Exclusion shall not apply if such organization, entity or vehicle is an insurance company that was rated A- or better by A.M. Best at the time the **Insured** placed, recommended to be placed or obtained such coverage for a client in such insurance company or in which an **Insured** has placed such funds of a client or account;

O.  based upon, arising out of or in any way involving the **Insured's** inability or refusal to pay or collect premium, claim or tax monies;

P.  brought or maintained, directly or indirectly, by or on behalf of :

    1.  an **Insured**; however, this Exclusion shall not apply to a **Claim** covered under Section I. B;

    2.  any insurance company or **Broker/Dealer**;

    3.  any insurance agent or broker;

    4.  any individual or entity that is not a client of an **Insured**; however, this Exclusion shall not apply to a **Claim** brought by an individual or entity who is an alleged beneficiary or heir, executor or administrator of a deceased client of an **Insured;**

    5.  any enterprise that owns, operates, controls or manages an **Insured**;

    6.  an enterprise which an **Insured** owns, operates, controls or manages; or

    7.  any governmental or quasi-governmental official or agency in any capacity, including but not limited to the Securities and Exchange Commission, National Association of Securities Dealers, the Securities Investor Protection Corporation, or any state or federal securities or insurance commission or agency; however, this Exclusion shall not apply to a **Claim** brought by or on behalf of such official or entity in its capacity as a client of an **Insured**;

Q.  based upon, arising out of or in any way involving the use of confidential information by an **Insured**, including but not limited to such use for the purpose of replacement of coverage;

R.  based upon, arising out of or in any way involving the placement of a client's coverage or funds directly or indirectly with any organization, entity or vehicle of any kind, nature or structure which is not licensed to do business in the state or jurisdiction with authority to regulate such business; however, this Exclusion shall not apply to any **Claim** arising from or contributed to by the placement of a client's coverage or funds directly or indirectly with such organization, entity or vehicle which is an eligible surplus lines insurer in the state or jurisdiction with authority to regulate such business;

S.  based upon, arising out of or in any way involving the offering, sale or servicing of structured settlements; however, this Exclusion shall not apply to a **Claim** arising out of the selling or servicing of the underlying covered product;

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

T.  based upon, arising out of or in any way involving the ownership, formation, operation, or administration of a health maintenance organization, preferred provider organization, captive, risk retention group, self-insurance program or purchasing group;

U.  based upon, arising out of or in any way involving the placement of coverage with a **Multiple Employer Welfare Arrangement**;

V.  based solely upon a loss alleged to have been sustained through fluctuation in market value of any security;

W.  based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds) that were not authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** or **Securities** that were not processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company**;

X.  based upon, arising out of or in any way involving:

    1.  any function of an **Insured** as a specialist or market maker for any **Securities**;

    2.  an **Insured** failing to make a market for any **Securities**; or

    3.  the purchase, sale or failure to purchase or sell **Securities** when the **Insured** is a specialist or market maker for such **Securities**;

Y.  based upon, arising out of or any way involving any activities in connection with any equity security priced under five US dollars (US $5.00) at the time of purchase; however, this Exclusion shall not apply if the security is: (1) registered or approved for registration upon notice of issuance on a national exchange; (2) authorized or approved for authorization upon notice of issuance, for quotation in the NASDAQ system; or (3) issued by an investment company registered under the Investment Company Act of 1940 and any amendments thereto. For the purposes of this Exclusion, any equity security which is listed on the NASDAQ bulletin board or pink sheets shall not be considered approved for authorization upon notice of issuance for quotation in the NASDAQ system;

Z.  based upon, arising out of or in any way involving the purchase, sale or the giving of advice regarding promissory notes, viatical or life settlements or any **Security** backed by viatical settlements, commodities, commodity future contracts, or option contracts other than covered call options; or

AA.  based upon, arising out of or in any way involving the purchase, sale, or the giving of advice regarding "junk bonds" or "high yield bonds" unless they are approved by Ameritas Investment Corp., placed through Ameritas Investment Corp. or done on an approved platform of Ameritas Investment Corp. For purposes of this Exclusion, "junk bonds" or "high yield bonds" shall mean bonds which, at the time of purchase or sale were unrated or rated as below investment grade by any rating agency (including but not limited to Moody's rated bonds of Ba or lower or S&P rated bonds of BB or lower).

V.  LIMIT OF LIABILITY, SUPPLEMENTARY PAYMENTS, RELATED CLAIMS AND DEDUCTIBLE AMOUNT

    A.  Limit of Liability

        1.  Limit of Liability Each **Claim**: The Limit of Liability of the Insurer for all **Loss** for each **Claim** first made during the **Policy Period** and Extended Reporting Period,

if applicable, shall not exceed the amount stated in Item 4 of the Declarations for Each **Claim**.

    2.    Limit of Liability Each **Agent**: The Limit of Liability of the Insurer for all **Loss** for all **Claims** first made against each **Agent** during the **Policy Period** and Extended Reporting Period, if applicable, shall not exceed the amount stated in Item 4 of the Declarations as Aggregate Each **Agent**.

    3.    Limit of Liability **Sponsoring Company** and Other **Insureds**: No additional Limits of Liability are provided to the **Sponsoring Company** under Section I.C. or to **Insureds** as defined in Section III. I. 2 through 4. The Limit of Liability of the Insurer for **Loss** for all **Claims** first made against the **Sponsoring Company** and **Insureds** as defined in Section III. I. 2 through 4 during the **Policy Period** or Extended Reporting Period, if applicable, shall be that Limit of Liability applicable to the **Agent** whose **Wrongful Act** or **Wrongful Supervision or Termination Act** gave rise to the **Claim** or the **Agent** who is responsible for the **Wrongful Act** or **Wrongful Supervision or Termination Act** of such other **Insureds**.

    4.    Limit of Liability in the Aggregate for the **Policy Period**: The Limit of Liability of the Insurer for all **Loss** for all **Claims** first made against all **Insureds** and reported during the **Policy Period** and Extended Reporting Period, if applicable, shall not exceed the amount stated in Item 4 of the Declarations as Aggregate all **Loss** for the **Policy Period**.

B.    Supplementary Payments: The Insurer will pay, in addition to the applicable Limit of Liability, **Defense Costs** incurred by or at the direction of the Insurer in the defense of any **Claim** to which this insurance applies.

C.    Related Claims: All **Related Claims** shall be deemed a single **Claim**, subject to a single Each **Claim** Limit of Liability, if covered, and such **Claim** shall be considered first made on the date the earliest such **Related Claim** is first made against an **Insured**, regardless of whether such date is before or during the **Policy Period.**

D.    Deductible Amount: The Deductible Amount stated in Item 6 of the Declarations is applicable to each **Claim** and applies only to the payment of **Loss**. The Limits of Liability set forth in Item 4 of the Declarations are in addition to and in excess of the Deductible Amount.

VI.    EXTENDED REPORTING PERIODS

A.    Group Extended Reporting Periods

    1.    Automatic Extended Reporting Period: The **Insured** shall have a period of sixty (60) days after the expiration of the **Policy Period** to report in writing to the Insurer any **Claim** which is first made during said sixty (60) day period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**.

        This Automatic Extended Reporting Period shall not be available if the **Insured** has any other applicable insurance, including any policy issued subsequent to this Policy. This Automatic Extended Reporting Period shall be included within the Optional Extended Reporting Period described in paragraph A. 2. below, if such is purchased.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

2. Optional Extended Reporting Period: In the event of cancellation or nonrenewal of this Policy by the Insurer, the **Sponsoring Company**, acting on behalf of all **Insureds** shall have the right to purchase an Optional Extended Reporting Period upon payment of an additional premium equal to 200% of the total annual premium which is the sum of the original annualized premium and the fully annualized amount of any additional premiums charged by the Insurer during the **Policy Period**. Pursuant to such Optional Extended Reporting Period, the **Insured** shall have a period of three years from the effective date of such cancellation or nonrenewal to give written notice to the Insurer of a **Claim** which is first made during such three year period and which arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**. The rights contained in this section shall terminate unless written notice of such election together with the additional premium due is received by the Insurer within thirty (30) days after the effective date of cancellation or nonrenewal.

3. If the Insurer cancels this Policy because the **Sponsoring Company** failed to pay a premium when due, the **Insureds** shall not have the right to the Automatic Extended Reporting Period or to purchase the Optional Extended Reporting Period as described in paragraphs A. 1. and 2. above.

4. The quotation of a different premium, deductible amount, limit of liability or policy terms or conditions for renewal shall not constitute a cancellation or nonrenewal for purposes of paragraph A.2 above.

B. Individual Agent Extended Reporting Periods

1. Automatic Extended Reporting Periods Due to Termination of **Agent Contract**: The insurance under this Policy shall cease as of the date of termination of the **Agent Contract**. In such event, the **Agent** shall be entitled to Extended Reporting Periods as follows:

    a. 90 Day Extended Reporting Period

       The **Insured** shall have a period of ninety (90) days after the date of termination of the **Agent Contract** or until the end of the **Policy Period**, whichever comes later, to give written notice to the Insurer of any **Claim**, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the **Agent Contact**.

    b. 1 Year Extended Reporting Period

       The **Insured** shall have a period of one (1) year after the date of termination of the **Agent Contract** to give written notice to the Insurer of any **Claim** which is first made during the one (1) year period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the **Agent Contact**. Such reporting period, however, shall be limited to **Claims** solely involving products issued by the **Sponsoring Company** or sold through its **Broker/Dealer** subsidiary. The **Insured** shall not be entitled to this one (1) year Extended Reporting Period if the **Sponsoring Company** terminated the **Agent Contract** with the **Insured** for disciplinary reasons.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

2. Automatic Extended Reporting Period Due to Disablement, Retirement, or Death

If the **Agent** becomes disabled, retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or dies, the **Insured** or the legal representative of a deceased **Agent**, shall be entitled to a period of two (2) years after the date of termination of the **Agent Contract** by reason of disablement, retirement or death to give written notice to the Insurer of any **Claim** which is first made during said two (2) year period and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the **Agent Contract** due to disablement, retirement or death.

The **Insured** shall not be entitled to any of the Automatic Extended Reporting Periods described in paragraphs A. 1 and B. 1 and 2 if the **Insured** has any valid and collectible insurance which applies to any **Loss** or **Defense Costs**.

3. Optional Extended Reporting Periods

a. An **Agent** who becomes disabled or retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or the legal representative of a deceased **Agent** may elect to purchase an Extended Reporting Period for **Claims** which are first made against an **Insured** and reported in writing to the Insurer within:

   (i) three (3) years of the date of termination of the **Agent Contract**, if the **Agent** or the legal representative of the deceased **Agent** pays an additional premium equal to 200% of the **Agent's** last annual premium within sixty (60) days of the date of termination of the **Agent Contract**; or

   (ii) five (5) years of the date of termination of the **Agent Contract**, if the **Agent** or the legal representative of the deceased **Agent** pays an additional premium equal to 300% of the **Agent's** last annual premium within sixty (60) days of the date of termination of the **Agent Contract**; or

   (iii) an unlimited amount of time after the date of termination of the **Agent Contact**, if the **Agent** or the legal representative of the deceased **Agent** pays an additional premium equal to 400% of the **Agent's** last annual premium within sixty (60) days of the date of termination of the **Agent Contract**.

b. These Optional Extended Reporting Periods shall be in addition to any Automatic Extended Reporting Periods described in VI. A. and B above.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

C.   The Extended Reporting Periods do not reinstate or increase the Limit of Liability beyond the limits shown on the Declarations, nor extend the **Policy Period**.

D.   **Claims** which are properly reported during an Extended Reporting Period will be deemed to have been made on the last day of the **Policy Period**.

VII.   CONDITIONS

A.   Notice and Cooperation

1.   The **Insured** shall, as a condition precedent to the availability of rights provided under this Policy, give written notice to the Insurer as soon as practicable during the **Policy Period** but in no event more than sixty (60) days after the end of the **Policy Period**, of any **Claim** made against the **Insured** during the **Policy Period**, unless an Extended Reporting Period is applicable in which case its terms shall be controlling.

Notwithstanding the requirements of the preceding paragraph, if continuous coverage is in effect pursuant to consecutive policies issued by the Insurer, a **Claim** may be reported to the Insurer in writing, as soon as practicable, during the policy period consecutive to and immediately following this **Policy Period** without constituting a violation of this provision. In such condition, the **Claim** will be deemed reported on the last day of the **Policy Period**.

2.   The **Insured** shall not agree to arbitration or mediation, admit liability, make any payment, consent to any judgment, settle any **Claim** or incur any **Defense Costs** without the written consent of the Insurer.

3.   The **Insured** shall furnish the Insurer with copies of demands, reports, investigations, pleadings and related papers, and provide other such information, assistance and cooperation as the Insurer may reasonably request in the investigation, settlement and defense of a **Claim**.

4.   The **Insured** shall further cooperate with the Insurer and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that the **Insured** may have.

5.   All written notices provided for in this Policy shall be in writing and addressed to the Insurer at:

Arch Insurance Group
One Liberty Plaza
53rd Floor
New York, NY 10006

For Claims and potential Claims: Attn: Professional Liability Claims

All Other Notices: Attn: Vice President – Life Insurance Agents

B.   Notice of Circumstances Giving Rise to a **Claim**

If during the **Policy Period**, an **Insured** becomes aware of a **Wrongful Act** or **Wrongful Supervision or Termination Act** that could give rise to a **Claim** against an **Insured** and gives written notice to the Insurer prior to the end of the **Policy Period** of the following:

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

1. the names of all potential claimants;

2. the names of each **Insured** that committed the **Wrongful Act** or **Wrongful Supervision or Termination Act**;

3. a detailed description of the **Wrongful Act** or **Wrongful Supervision or Termination Act**;

4. the damage which has or may result from the **Wrongful Act** or **Wrongful Supervision or Termination Act;** and

5. the circumstances by which the **Insured** first became aware of such **Wrongful Act** or **Wrongful Supervision or Termination Act**;

then any **Claim** which subsequently arises out of such **Wrongful Act** or **Wrongful Supervision or Termination Act** shall be treated as a **Claim** first made during the **Policy Period**.

C.   Territory

This Policy applies to **Wrongful Acts** or **Wrongful Supervision or Termination Acts** committed anywhere in the world provided that the **Claim** is made against the **Insured** in the United States of America, its territories or possessions.

D.   Other Insurance

If the **Insured** has other insurance which applies to any **Loss** or **Defense Costs** insured under this Policy, this Policy shall be excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written as specific excess insurance over this Policy.

This provision will not apply if the **Insured** has other insurance with the Insurer, or an Affiliate of the Insurer. In such event, the **Insured** must elect the Policy under which the **Claim** will be made. If an **Insured**, other than the **Agent,** is entitled to coverage for the **Claim**, the **Agent** whose **Wrongful Act** or **Wrongful Supervision or Termination Act** is the basis of the **Claim** or who is legally responsible for such **Wrongful Act** or **Wrongful Supervision or Termination Act** shall be entitled to   make the election and such election shall be binding on all other **Insureds**.

E.   Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to all the **Insured's** rights of recovery thereof and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing after loss to waive or prejudice such rights. Any amounts recovered in excess of the Insurer's total payment shall be paid to the **Insureds**, less the cost to the Insurer of recovery.  The Insurer agrees to waive any such rights of recovery against the **Sponsoring Company**.

F.   Changes

Notices to any agent or knowledge possessed by any agent shall not effect a waiver or a change in any part of this Policy or prevent the Insurer from asserting any rights under

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

the terms of this Policy, nor shall the terms of this Policy be waived or changed, unless endorsed hereon.

G.  Action Against the Insurer

No action shall be taken against the Insurer unless, as a condition precedent thereto, the **Insured** shall have fully complied with all the terms of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Insurer. Any person or organization or the legal representative thereof who has secured a judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. No person or organization shall have any right under this Policy to join the Insurer in any action against the **Insured** to determine the **Insured's** liability, nor shall the Insurer be impleaded by the **Insured** or their legal representative.

H.  Assignment of Interest

No assignment of interest under this Policy shall be binding on the Insurer unless its consent is endorsed hereon.

I.  Cancellation and Termination

1.  Termination: This Policy shall terminate at the earliest of the following times:

    a.  upon expiration of the **Policy Period** as set forth in Item 3 of the Declarations, or the effective date of cancellation, if earlier;

    b.  ten (10) days after receipt by the **First Named Insured** of a written notice of termination from the Insurer for failure to pay a premium when due; or

    c.  as to the **Agent**, upon termination of the **Agent Contract.**

2.  Cancellation:

    a.  This Policy may be cancelled by the **First Named Insured** by surrender thereof to the Insurer or by providing written notice to the Insurer stating when thereafter cancellation shall be effective. If this Policy is cancelled by the **First Named Insured**, the Insurer shall retain the customary short rate proportion of the premium.

    b.  This Policy may be cancelled by the Insurer by providing written notice of cancellation to the **First Named Insured** at the address shown in Item 1 of the Declarations, with the effective date of the cancellation not less than sixty (60) days thereafter. Proof of mailing the notice of cancellation shall be sufficient proof of notice and this Policy shall terminate on the date and time specified in such notice. If the Insurer cancels this Policy, the earned premium shall be computed prorata. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation.

J.     Transactions Changing Coverage

    1.     Change of Control of **Sponsoring Company**

If during the **Policy Period**, the **Sponsoring Company** consolidates with or merges into, or sells all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than fifty percent (50%) of the voting power for election of directors of the **Sponsoring Company,** or acquires the voting rights of such an amount of securities, then this Policy shall continue in full force and effect as to **Wrongful Acts** or **Wrongful Supervision or Termination Acts** committed prior to the effective date of such event.

The **Sponsoring Company** shall give the Insurer written notice of any such event as soon as practicable but not later than thirty (30) days after the date of such event.

    2.     Cessation of **Subsidiaries**

If an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** shall continue until termination of this Policy.  Such coverage continuation shall apply only with respect to **Claims** for covered **Wrongful Acts** or **Wrongful Supervision or Termination Act** committed prior to the date such organization ceased to be a **Subsidiary**.

K.     Authorization Clause

By acceptance of this Policy, the **First Named Insured** shall act of behalf of the **Insureds** for all purposes, including but not limited to the payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this Policy, giving and receiving notice of cancellation, termination or nonrenewal, or reimbursement to the Insurer of any Deductible Amount advanced.

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

# Claims Handling Procedures

An important value of your insurance coverage is the ability of the insurance company to respond when you have a claim. Arch Specialty Insurance Company is committed to providing its insureds with effective claim services.

Notices of each incident, claim or suit must be sent immediately to:

Arch Specialty Insurance Company
ATTN: BROWN & BROWN PROGRAM SERVICES, INC., DBA LANCER CLAIMS SERVICES
P.O. BOX 7048
ORANGE, CA 92863-7048
Phone: 800-821-0540
Fax: 714-978-8023

You will be contacted by a representative of Lancer's Claim Department. This representative will confirm receipt of the loss notice directly to you, provide a company claim number for all future correspondence, refer to legal counsel if necessary, and discuss further handling of the claim.

06 ML0014 00 03 03

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SERVICE OF SUIT**

It is agreed that:

1.  In the event of the failure of the **Insurer** to pay any amount claimed to be due hereunder, the **Insurer**, at the request of the **Insured**, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. All matters arising under this Policy shall be determined in accordance with the law and practice of such Court, provided that nothing shall prohibit the **Insurer** from removing any action, suit or proceeding to a United States District Court. The **Insurer** shall abide by the final decision of such court or any appellate court in the event of an appeal.

2.  Service of process in the above described action, suit or proceeding may be made upon: General Counsel, Arch Insurance Group Inc., One Liberty Plaza, 53rd floor, New York, NY 10006. Upon the request of the **Insured**, such General Counsel shall give a written undertaking to enter an appearance on behalf of the **Insurer** in the event that such an action, suit or proceeding shall be instituted.

3.  Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the **Insurer** hereby designates the Superintendent, Commissioner, or Director of Insurance or other officer specified in such statute as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted against the **Insurer** upon this Policy. The Superintendent, Commissioner or Director of Insurance or other officer is hereby authorized and directed to accept service of process on behalf of the **Insurer** in any such action, suit or proceeding and to mail a copy of such process to the above mentioned General Counsel.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 1

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

00 ML0003 00 08 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NEBRASKA STATE AMENDATORY ENDORSEMENT**

Endorsement forming part of and attaching to this Policy as stated above.

Paragraph 2., Cancellation of Subsection I., Cancellation and Termination is hereby deleted in its entirety and replaced with the following:

2.    Cancellation and Nonrenewal

**Cancellation by the Sponsoring Company**

This Policy may be cancelled by the **Sponsoring Company** shown in the Declarations by mailing or delivering to the Insurer or its authorized agent advance notice of cancellation.

**Cancellation by the Insurer**

a.  If this Policy has been in effect for 60 days or less, the Insurer may cancel this Policy for any reason.

b.  If this Policy has been in effect for more than 60 days or if this is a renewal of a policy the Insurer issued, the Insurer may cancel this Policy only for one or more of the following reasons:

(1)  Nonpayment of premium;

(2)  The Policy was obtained through material misrepresentation;

(3)  Any **Insured** has submitted a fraudulent claim;

(4)  Any **Insured** has violated the terms and conditions of this Policy;

(5)  The risk originally accepted has substantially increased;

(6)  Certification to the Director of Insurance of the Insurer's loss of reinsurance which provided coverage to the Insurer for all or a substantial part of the underlying risk insured; or

(7)  The determination by the Director of Insurance that the continuation of the Policy could place the Insurer in violation of the Nebraska Insurance Laws.

c.  If the Insurer cancels this Policy subject to **a.** or **b.** above, the Insurer will mail to the **Sponsoring Company** a written notice of cancellation, stating the reasons for cancellation, at least:

(1)  10 days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

(2)  60 days before the effective date of cancellation if the Insurer cancels for any other reason.

(3) The Insurer will mail its notice by first class mail to the **Sponsoring Company's** last mailing  address known to the Insurer. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

**Nonrenewal**

If the Insurer decides not to renew this Policy, the Insurer will mail written notice of non renewal, stating the reasons for nonrenewal, to the **Sponsoring Company**, at least 60 days prior to the expiration date of this Policy.

Any notice of nonrenewal will be mailed by first class mail to the **Sponsoring Company's** last mailing address known to the Insurer. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 2

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

# Broker/Dealer Entity Endorsement

In consideration of the premium charged, it is agreed as follows:

I.  Policy Section I. INSURING AGREEMENTS is amended by adding:

    E. Broker/Dealer Liability

    The Insurer shall pay on behalf of the **Broker/Dealer Insured** all **Loss** which the **Broker/Dealer Insured** shall become legally obligated to pay because of a **Claim** first made against the **Broker/Dealer Insured** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** or **Wrongful Supervision Act** committed on or after the **Retroactive Date** by an **Insured** (other than the **Sponsoring Company**) solely in the rendering or failing to render **Professional Services**.

II. Policy Section III. DEFINITIONS is amended as follows:

A.  Paragraph I. is amended to add:

    7.  **Broker/Dealer Insured**. **Broker/Dealer Insured** shall mean  Ameritas Investment Corp.

B.  Paragraph R. is amended to add:

    **Sponsoring Company** does not include Ameritas Investment Corp.

C.  For purposes of the coverage provided by I. INSURING AGREEMENTS, E., Policy Section III. DEFINITIONS, N. 1 is amended to add the following:

    d.  **Securities** (other than variable annuities, variable life insurance and mutual funds) that were authorized or approved by the **Broker/Dealer Insured** or that were processed through the **Broker/Dealer Insured**;

D.  Paragraph P. is amended to add:

    The **Retroactive Date** for the **Broker/Dealer Insured** is 7/1/2012. Coverage provided under this Endorsement is subject to a prior knowledge and pending and prior litigation exclusion as of 7/1/2013.

 III. For purposes of the coverage provided by I. INSURING AGREEMENTS, E, Policy Section IV. EXCLUSIONS, W is deleted in its entirety and replaced with:

    W.  based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds) that were not authorized or approved by the **Broker/Dealer Insured** or **Securities** that were not processed through the **Broker/Dealer Insured;**

IV. RETENTION

For purposes of this Endorsement, Policy Section V. D. is amended to add the following:

00 ML0207 00 11 03

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

The Retention applicable to INSURING AGREEMENT E. shall be $50,000 for the **Broker/Dealer Insured** and applies to the payment of **Loss** and **Defense Costs**.

V. LIMITS OF LIABILITY

Coverage under this Endorsement shall be subject to Limits of Liability in the amount of $1,000,000 each **Claim** and $5,000,000 in the aggregate hereunder for the Policy Period.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 3

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

00 ML0207 00 11 03

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SUPPLEMENTARY PAYMENTS AMENDATORY ENDORSEMENT**

It is understood and agreed that Section V.B. SUPPLEMENTARY PAYMENTS is deleted and replaced by with the following:

B.    Supplementary Payments:  The Insurer will pay, in addition to the applicable Limits of Liability, **Defense Costs** incurred by or at the direction of the Insurer in the defense of any **Claim** to which this insurance applies.  However, the payment of **Defense Costs** shall be subject to a maximum limit of liability of $1,000,000 each **Claim** and in the aggregate each **Insured Agent** or Union Central Life Insurance Company, Ameritas Investment Corp. and/or Carillon Investments.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 4

Policy Number:  CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

In consideration of the premium charged, it is agreed that Section IV. EXCLUSIONS, is amended to add the following:

BB.    based upon, arising out of or any way involving the **Insured** exercising discretionary authority with regard to the management, acquisition or disposition of assets or liabilities for a client's account; however, this Exclusion shall not apply to Representatives or Advisors who are approved by Ameritas Investment Corporation and then only to the extent such discretionary authority is within the policies, procedures and guidelines of Ameritas Investment Corporation;

All other terms and conditions of this Policy remain unchanged.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 5

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INDEPENDENT REGISTERED INVESTMENT ADVISER COVERAGE**

**ENDORSEMENT**

In consideration of the premium charged, it is agreed as follows:

1. Coverage is provided under this Endorsement for the **Registered Investment Advisers** whose names are on file with the Insurer.

For purposes of this Endorsement, Section III. DEFINITIONS is amended by adding the following:

> V. **Investment Advisory Services** means advisory services rendered for a client by a **Registered Investment Adviser** pursuant to the Investment Advisers Act of 1940, and any amendments thereto, provided that prior to providing any such services, the **Registered Investment Adviser** received written approval from Ameritas Investment Corporation to conduct such services;

> W. **Registered Investment Adviser** means an **Agent** who is registered as a registered representative with the National Association of Securities Dealers and is also registered as an "Investment Adviser" as that term is defined in the Investment Advisers Act of 1940, and any amendments thereto, with the Securities and Exchange Commission and/or registered or licensed with any other appropriate authorities, including any state securities commission;

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 6

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

E-FILED 06/10/2019 11:26 AM   /   CONFIRMATION 852707   /   A 1902831   /   COMMON PLEAS DIVISION   /   IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMEND LIFE SETTLEMENTS AND OPTIONS EXCLUSION – SUBLIMIT**

**AMENDATORY ENDORSEMENT**

It is agreed as follows:

1.      Section IV. EXCLUSIONS, Z is deleted and replaced bywith the following:

      Z.   based upon, arising out of or in any way involving the purchase, sale or the giving of advice regarding promissory notes, viatical or life settlements of any **Security** backed by viatical settlements, commodities, commodity future contracts, or option contracts other than option contracts approved by Ameritas Investment Corporation; however, this Exclusion shall not apply to the purchase or sale of or the giving of advice regarding life settlements arranged through a provider or broker approved by Union Central Life Insurance Company, Ameritas Investment Corp. and/or Carillon Investments, Inc.;

2.      For the purposes of this Endorsement, it is agreed that the coverage for life settlements is subject to a Sub-Limit of Liability in the amount of $500,000 each **Claim** and in the aggregate for each **Agent** enrolled hereunder for the Policy Period. Such Sub-Limit of Liability are included in, and are not in addition to, the Limits of Liability otherwise provided to each such **Agent** under the Policy. Such Limits of Liability are subject to a per **Claim** deductible of $2,500, which is applicable to both **Loss** and **Defense Costs**.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 7

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

00 ML0207 00 11 03 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDMENT TO RETROACTIVE DATE ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that Section III. DEFINITIONS, P. is deleted in its entirety and replaced with the following:

P. **Retroactive Date** means:

    a. for **Professional Services** as defined in Section III. N.1. a., b. and c., the earlier of: (1) the **Agent's** date of contract with the **Sponsoring Company**; or (2) the inception date of the **Agent's** first claims-made life insurance agents or registered representative professional liability policy from which date coverage has been maintained in force without interruption;

    b. for all other covered **Professional Services**, the **Agent's** date of contract with Carillon Investments, Ameritas Investment Corp., The Advisors Group and/or the **Sponsoring Company**.

    The **Retroactive Date** for the **Sponsoring Company** and **Insureds** defined in Section III. I. 2 through 4 shall be the same as applicable to the **Agent** whose **Wrongful Act** or **Wrongful Supervision** or **Termination Act** gave rise to the **Claim** or the **Agent** who is responsible for the **Wrongful Act** or **Wrongful Supervision** or **Termination Act** of such other **Insureds**.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 8

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDMENT OF PROFESSIONAL SERVICES (DELETION OF SECURITIES COVERAGE) ENDORSEMENT – OPTION 1**

In consideration of the premium charged, it is agreed as follows:

I.      Section III. DEFINITIONS, N. Professional Services, paragraph 1.d. is deleted.

II.     Section IV. EXCLUSIONS, W is deleted i and replaced by the following:

W.  based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds);

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 9

Policy Number:  CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SECURITIES PRODUCTS ENDORSEMENT – OPTION 2**

It is agreed as follows:

I. For purposes of this Endorsement, **Insured** means any **Agent**: (A) who has paid a premium; and (B) whose name is on file with the Insurer.

II. For those **Insureds** as defined in paragraph I above, Policy Section III. DEFINITIONS, N. **Professional Services**, paragraph 1.d is deleted and replaced by the following:

d. **Securities** (other than variable annuities, variable life insurance and mutual funds) that were authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments or that were processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments;

III. For purposes of coverage provided by this Endorsement, Policy Section IV. EXCLUSIONS, W is deleted and replaced by the following:

W. based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds) that were not authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments or **Securities** that were not processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 10

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

00 ML0207 00 11 03

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SPECIFIC PRODUCT EXCLUSION ENDORSEMENT**

It is agreed that Section IV. EXCLUSIONS is amended to add the following:

Based upon, arising out of or in any way involving the purchase, sale or giving of advice regarding:

1. callable certificates of deposit; however this exclusion shall not apply to Callable CDs approved by Carillon Investments, Inc. and/or Ameritas Investment Corp.;

2. any investment involving ATM machines, payphones or ETS payphones;

3. Debentures; however this exclusion shall not apply to Debentures approved by Carillon Investments, Inc. and/or Ameritas Investment Corp.;

4. DBSI Management Products;

5. Provident Royalties;

6. Medical Capital Nate Program;

7. Black Diamond Program;

8. Desert Capital REIT;

9. IMH Secured Loan Fund, LLC; or

10. Geneva Exchange LLC/The Geneva Organization;

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 11

Policy Number:  CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2013

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TERMINATED AGENTS ENDORSEMENT**

In consideration of the premium charged, it is agreed that III. DEFINITIONS, I. Insured, is amended to include the following:

7. Brokers who, prior to the effective date of their broker's contract with the **Sponsoring Company**, were party to an **Agent's Contract** with that insurance company and were an **Insured** under this policy; provided that they are licensed by the appropriate authority to solicit and sell the products and/or services made available by the **Sponsoring Company**. Such individuals shall be specifically designated by name, and their names shall be on file with the Company.

For the purposes of this Endorsement, it is further agreed and understood that Section B. of INSURING AGREEMENTS, VI. EXTENDED REPORTING PERIODS shall be deleted in its entirety and replaced by the following:

B. Individual Agent Extended Reporting Periods

1. Automatic Extended Reporting Periods Due to Termination of broker contract: The insurance under this Policy shall cease as of the date of termination of the broker contract. In such event, the broker shall be entitled to Extended Reporting Periods as follows:

a. 90 Day Extended Reporting Period

The **Insured** shall have a period of ninety (90) days after the date of termination of the broker contract to give written notice to the Insurer of any **Claim** which is first made during said ninety (90) day period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the broker contact.

b. 1 Year Extended Reporting Period

The **Insured** shall have a period of one (1) year after the date of termination of the broker contract to give written notice to the Insurer of any **Claim** which is first made during the one (1) year period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the broker contact. Such reporting period, however, shall be limited to **Claims** solely involving products issued by the **Sponsoring Company** or sold through its **Broker/Dealer** subsidiary. The **Insured** shall not be entitled to this one (1) year Extended Reporting Period if the **Sponsoring Company** terminated the broker contract with the **Insured** for disciplinary reasons.

2. Automatic Extended Reporting Period Due to Disablement, Retirement, or Death

If the broker becomes disabled, retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or dies, the **Insured** or the legal representative of a deceased broker, shall be entitled to a period of two (2) years after the date of termination of the broker contract by reason of disablement,

00 ML0207 00 11 03

E-FILED 06/10/2019 11:26 AM / CONFIRMATION 852707 / A 1902831 / COMMON PLEAS DIVISION / IFIJ

retirement or death to give written notice to the Insurer of any **Claim** which is first made during said two (2) year period and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the broker contract due to disablement, retirement or death.

The **Insured** shall not be entitled to any of the Automatic Extended Reporting Periods described in paragraphs A. 1 and B. 1 and 2 if the **Insured** has any valid and collectible insurance which applies to any **Loss** or **Defense Costs**.

3.  Optional Extended Reporting Periods

    a.  A broker who becomes disabled or retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or the legal representative of a deceased broker may elect to purchase an Extended Reporting Period for **Claims** which are first made against an **Insured** and reported in writing to the Insurer within:

        (i)   three (3) years of the date of termination of the broker contract, if the broker or the legal representative of the deceased broker pays an additional premium equal to 200% of the broker's last annual premium within sixty (60) days of the date of termination of the broker contract; or

        (ii)  five (5) years of the date of termination of the broker contract, if the broker or the legal representative of the deceased broker pays an additional premium equal to 300% of the broker's last annual premium within sixty (60) days of the date of termination of the broker contract; or

        (iii) an unlimited amount of time after the date of termination of the broker contact, if the broker or the legal representative of the deceased broker pays an additional premium equal to 400% of the broker's last annual premium within sixty (60) days of the date of termination of the broker contract.

    b.  These Optional Extended Reporting Periods shall be in addition to any Automatic Extended Reporting Periods described in VI. A. and B above.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number:12

Policy Number: CAP 0050281 01

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 7/1/2013

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TRADE ERRORS OR COST OF CORRECTIONS ENDORSEMENT**

In consideration of the premium charged, it is agreed as follows:

I.      INSURING AGREEMENT

For purposes of this Endorsement, Policy Section I. INSURING AGREEMENTS is amended by adding the following

> D.  Trading Error Reimbursement
>
> The Insurer shall reimburse the **Named Insured** all **Trading Loss** which the **Insured** first becomes aware of during the **Policy Period**, or an Extended Reporting Period, if applicable, for a **Trading Error** committed on or after the **Retroactive Date** by an **Insured** solely in the rendering or failing to render **Professional Services.**

II.     DEFINITIONS

For purposes of this Endorsement, Policy Section III. DEFINITIONS is amended as follows:

A.  Policy Section III. F is amended to add the following:

   With respect to the coverage provided under Section I. D, only, **Claim** shall include **Trading Error.**

B.  The following definitions are added:

**Trading Error** means the **Insured's** negligent act, error or omission resulting in the failure to follow the directions of a client when purchasing or selling products defined in Section M. 1. b. and 3. and which if not corrected, will likely result in a **Claim** as defined in Section F. 1, 2 or 3.

**Trading Loss** means the actual cost of correcting the transaction so that it conforms with the instructions of the **Insured's** client. **Trading Loss** shall not include any *ex gracia* payments or amounts for which the **Insured** is not legally liable.

III.  RETENTION

For purposes of this Endorsement, Policy Section V. D. is amended to add the following:

The Retention applicable to INSURING AGREEMENT D. shall be $50,000 for the **Broker/Dealer Insured** and $5,000 for the individual **Registered Representative**.

IV.  LIMITS OF LIABILITY

Coverage under this Endorsement shall be subject to Limits of Liability in the amount of $1,000,000 each **Claim** and in the aggregate for each **Insured** enrolled hereunder for the Policy Period. Such Limits of Liability are included in, and are not in addition to, the Limits of Liability otherwise provided to each such **Insured** under the Policy.

E-FILED 06/10/2019 11:26 AM  /  CONFIRMATION 852707  /  A 1902831  /  COMMON PLEAS DIVISION  /  IFIJ